*AC*

# United States Bankruptcy Court

NORTHERN DISTRICT OF ILLINOIS
219 S. Dearborn Street
Chicago, IL 60604

**FILED**
J.N
AUG. 14, 2008
8-14-2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**Kenneth S. Gardner**, Bankruptcy Clerk

Date _____ 8/14/2008 _____

Michael Dobbins, Clerk
United States District Court
Northern District of Illinois
219 S Dearborn Street
Chicago, IL 60604

DiSTRicT CouRT Case # 08 C 04229

Case Number _____ 99 B 35434 _____

Case Name _____ Resource Technology Corp _____

Notice of Appeal Filed _____ 6/26/2008 _____

Appellant _____ Ungaretti & Harris _____

Dear Sir:

Pursuant to **Bankruptcy Rule 8007** transmitted herewith is the Record on Appeal. The Record on Appeal consist of:

☐ Transmittal Letter and Civil Cover Sheet

☐ Designation and Statement of Issues

☐ Transcript of Proceeding

☐ In Forma Pauperis

☐ Notice of Appeal

☐ Copy of Documents Designated

☐ Exhibits

☐ Expedited Notice of Appeal

Additional Items Included

☐ _____

_____

☐ Total Volumes Transmitted

The following items will be transmitted as a supplemental to the Record on Appeal

☑ Designation of Additional Items for the Record on Appeal (4319)

_____

Previous D C Judge   Judge Kennelly Magistrate Judge Brown   Case Number _____ 08 C 04229 _____

By Deputy Clerk _____ Dorothy Carroll _____

Dorothy Carroll  Team B

Revised 03/26/08rj

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | |
| RESOURCE TECHNOLOGY | ) | Case No. 99 B 35434 |
| CORPORATION, | ) | |
| | ) | Hon. Eugene R. Wedoff |
| Debtor. | ) | U.S. Bankruptcy Court Judge |

### THE ESTATE'S DESIGNATION OF ITEMS FOR RECORD ON APPEAL
### RE: THE APPEAL FILED BY UNGARETTI & HARRIS, LLP [4319]

The Estate of Resource Technology Corporation (the "Estate"), by and through Jay A. Steinberg, not individually but solely in his capacity as Chapter 7 Trustee (the "Trustee") for the Estate, pursuant to Federal Rule of Bankruptcy Procedure 8006, designates the following additional items for the record on appeal with respect to the Notice of Appeal filed by Ungaretti & Harris, LLP [4319] from the Order Directing Disgorgement of Fees entered by the Bankruptcy Court on June 17, 2008 [4313]:

### DESIGNATION OF ADDITIONAL ITEMS FOR THE RECORD ON APPEAL

| Filing Date | Description | Docket No. |
|---|---|---|
| 09/11/2003 | Notice of Motion and Motion for Entry of an Administrative Order establishing procedures for Interim Compensation and Reimbursement of expenses of Trustee's Professionals | 1821 |
| 09/18/2003 | Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Trustee's Professionals | 1830 |
| 06/24/2005 | Motion to Approve Settlement of 506(c) Claim | 2463 |
| 09/21/2005 | Order Granting Motion to Convert Case to Chapter 7 | 2567 |
| 02/24/2006 | Notice of Filing Draft Settlement Agreement | 3101 |
| 10/23/2006 | Report Summary of Administrative Claims | 3637 |

| 7/17/2007 | Reply in Support of Motion for Order Directing Disgorgement of Fees | 4036 |

In addition to the above items, the Estate designates the transcript of proceedings before the Honorable Eugene Wedoff on June 17, 2008 and July 15, 2008, copies of which have been ordered and will be filed upon receipt.

Dated: July 31, 2008

**THE CHAPTER 7 ESTATE OF RESOURCE TECHNOLOGY CORPORATION, BY AND THROUGH JAY A. STEINBERG, NOT INDIVIDUALLY BUT SOLELY IN HIS CAPACITY AS CHAPTER 7 TRUSTEE**

By:　　　/s George P. Apostolides

Barry A. Chatz
George P. Apostolides
Arnstein & Lehr LLP
120 S. Riverside Plaza, Suite 1200
Chicago, IL 60606
Phone: (312) 876-7100
Fax: (312) 876-0288

James Richmond
Gregory E. Ostfeld
Greenberg Traurig LLP
77 W. Wacker Dr.
Suite 2500
Chicago, IL 60601
Phone: (312) 456-8400
Fax: (312) 456-8435

**FILED**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS

SEP 11 2003

KENNETH S. GARDNER, CLERK
PO DEP. - KO

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE:                                          )    CHAPTER 11
                                                )
RESOURCE TECHNOLOGY CORPORATION,                )    Case No. 99-35434
                                                )
                                                )    Honorable Eugene R. Wedoff
                                                )
Debtor.                                         )
                                                )    Hearing Date: September 16, 2003
                                                )    Hearing Time: 10:00 a.m.

## NOTICE OF MOTION

To:    Attached Service List

    PLEASE TAKE NOTICE that on **September 16, 2003, at 10:00 a.m.**, or as soon thereafter as counsel may be heard, we shall appear before the Honorable Eugene R. Wedoff, or any other judge sitting in his stead, in Courtroom 744 of the United States Courthouse, Dirksen Federal Building, 219 South Dearborn Street, Chicago, Illinois, and shall then and there present the attached **TRUSTEE'S MOTION FOR ENTRY OF AN ADMINISTRATIVE ORDER ESTABLISHING PROCEDURES FOR INTERIM COMPENSATION AND REIMBURSEMENT OF EXPENSES OF TRUSTEE'S PROFESSIONALS**, a copy of which is hereby served upon you.

Dated:  September 11, 2003

                        Gregg E. Szilagyi, Trustee for Resource Technology
                        Corporation

                        By: _____
                                One of his Attorneys

OF COUNSEL

R. Scott Alsterda, ARDC No. 3126771
Christopher L. Rexroat, ARDC No. 6274402
Alex Pirogovsky, ARDC No. 6256978
UNGARETTI & HARRIS
3500 Three First National Plaza
Chicago, Illinois 60602
Telephone: 312.977.4400
Facsimile: 312.977.4405

UHDOC: 595968-1

## PROOF OF SERVICE

STATE OF ILLINOIS      )
                       )     ss.
COUNTY OF COOK         )


I, Theresa Horecny non-attorney, hereby state that true and correct copies of the foregoing NOTICE OF MOTION and TRUSTEE'S MOTION FOR ENTRY OF AN ADMINISTRATIVE ORDER ESTABLISHING PROCEDURES FOR INTERIM COMPENSATION AND REIMBURSEMENT OF EXPENSES OF TRUSTEE'S PROFESSIONALS, were served upon the individuals on the attached SERVICE LIST via facsimile before the hour of 5:00 p.m. on September 11, 2003.

```
***********************
*    "OFFICIAL SEAL"   *
* CYNTHIA M. LEWANDOWSKI *
*  Notary Public, State of Illinois *
* My Commission Expires 12/6/04 *
***********************
```

_____
Theresa Horecny

SUBSCRIBED and SWORN to before
me this 11th day of September, 2003.

_____
Notary Public

595968-1

# MASTER SERVICE LIST

## IN RE: RESOURCE TECHNOLOGY CORPORATION - Case No 99-35434

Robert M. Fishman
Brian L. Shaw
Shaw, Gussis, et al.
1144 West Fulton, Suite 200
Chicago, IL 60607
Fax Number: (312) 541-0155

Kathryn Gleason, Esq.
United States Trustee's Office
227 West Monroe Street, Suite 3350
Chicago, IL 60606
Fax Number: (312) 886-5794

Elizabeth D. Sharp
330 South Wells, Suite 711
Chicago, IL 60606
Fax Number: (312) 341-9596

Leon Greenblatt
Chiplease, Inc.
Banco Panamericano, Inc.
330 South Wells, Room 711
Chicago, IL 60605
Fax Number: (312) 341-9596

Gerald F. Munitz, Esq.
Kathryn A. Parmenter, Esq.
Goldberg Kohn Bell Black Rosenbloom &
    Moritz, Ltd.
55 East Monroe Street, Suite 3700
Chicago, IL 60603
Fax Number: (312) 332-2196

William J. Barrett
Barack Ferrazzano Kirschbaum Perlman & Nagelberg
333 W. Wacker Drive, Suite 2700
Chicago, IL 60606
Fax Number: (312) 984-3150
Telephone: (312) 984-3100/(312) 629-5170

L. Park Davis
Thomas R. Osterberger
Davis Kaplan Dystrup & Hoster, P.C.
181 North Hammes Avenue
Joliet, IL 60435
Fax Number: (815) 744-4518

Stuart M. Rozen
Craig E. Reimer
Mayer Brown & Platt
190 S. LaSalle Street
Chicago, IL 60603
Fax Number: (312) 701-7711

Michael S. Baird, Esq.
Stotis & Baird, Chartered
200 West Jackson Boulevard, Suite 1050
Chicago, IL 60606
Fax Number: (312) 461-1486

Richard Mason, Esq.
Ross & Hardies
150 North Michigan Avenue, Suite 2500
Chicago, IL 60601
Fax Number: (312) 920-6136

Charles P. Schulman
David E Lieberman
Mark A. Brand
Sachnoff & Weaver Ltd.
30 South Wacker Drive, 29th Floor
Chicago, IL 60606-7484
Fax Number: (312) 207-6400

William J. Factor
Phillip L. Comella
Seyfarth, Shaw, Fairweather & Geraldson
55 East Monroe Street, Suite 4200
Chicago, IL 60603
Fax Number: (312) 269-8869

John S. Delnero
Bell, Boyd & Lloyd, LLC
70 West Madison Street, Suite 3300
Chicago, IL 60602
Fax Number: (312) 372-2098

Edward J. Lesniak
Burke, Warren, MacKay & Serritella, P.C.
Attorneys for The Catholic Bishop of Chicago
330 N. Wabash Avenue, 22nd Floor
Chicago, IL 60611-3607
Fax Number: (312) 840-7900

David A. Rolf
Sorling, Northrup, Hanna, Cullen and Cochran, Ltd.
Suite 800, Illinois Building
607 East Adams Street
P.O. Box 5131
Springfield, IL 62705
Fax Number: (217) 522-3173

Alex D. Moglia
Alex D. Moglia & Associates, Inc.
1325 Remington Road, Suite H
Schaumburg, IL 60173
Fax Number: (847) 884-1188

Kevin T. Keating
Mark F. Shure
Keating & Shure, Ltd.
150 N. Wacker Dr., Suite 1550
Chicago, IL 60606
Fax Number: (312) 201-9368

William J. Connelly, Esq.
Karen R. Goodman, Esq.
Hinshaw & Culbertson
222 N. LaSalle St., Suite 330
Chicago, IL 60601
Fax Number: (312) 704-3001

Frank W. Ierulli
Assistant State's Attorney
Chief, Civil Division
County of Peoria
Peoria County Courthouse
324 Main Street
Peoria, IL 61602
Fax Number: (309) 672-6029

James J. Manning
Heyl Royster Voelker & Allen
Bank One Building
124 S.W. Adams St., Suite 600
Peoria, IL 61602
Fax Number: (309) 676-3374

George Roe, Esq.
1701 E. Lake Avenue, Suite 170
Glenview, IL 60025
Fax Number: (847) 657-8168

Thomas W. Goedert, Esq.
Neal, Murdock & Leroy, LLC
203 N. LaSalle Street, Suite 2300
Chicago, IL 60601-1213
Fax Number: (312) 641-5137
Phone: (312) 641-7144

Michael L. Molinaro
Neal, Gerber & Eisenberg
Two North LaSalle St.
Chicago, IL 60602
Fax Number: (312) 269-1747

John Kelliher
Office of General Counsel
Illinois Commerce Commission
160 North LaSalle Street, 9th Floor
Chicago, IL 60601
Fax Number: (312) 793-1556

James Newbold
Assistant Attorney General
100 West Randolph Street, Suite 13-222
Chicago, IL 60601
Fax Number: (312) 814-3589

Philip C. Curley
Robinson Curley & Clayton PC
300 S. Wacker Dr., Suite 1700
Chicago, IL 60606
Fax Number: (312) 663-0303

Stephen B. Garcia
Kaye Scholer LLP
70 W. Madison St., #4100
Chicago, IL 60602
Fax Number: (312) 583-2360
Phone: (312) 583-2300

Thomas F. Blakemore
David A. Agay
Winston & Strawn
35 W. Wacker Drive
Chicago, IL 60601
Fax Number: (312) 558-5700
Phone: (312) 558-5600

John F. Higgins
Susan C. Mathews
Gail Jamrok
Porter & Hedges, LLP
700 Louisiana, 35th Floor
Houston, TX 77002
Fax Number: (713) 228-1331 or 228-4935
Phone: (713) 226-0600

David E. Finck
Schwartz, Junell, Campbell & Oathout, LLP
909 Fannin, Suite 2000
Houston, TX 77010
Fax Number: (713) 752-0327
Phone Number: (713) 752-0017

Eugene J. Geekie, Jr.
Michelle J. Murphy
Schiff Hardin & Waite
233 S. Wacker Drive, Suite 6600
6000 Sears Tower
Chicago, IL 60606
Fax Number: (312) 258-5600
Phone Number: (312) 258-5500

James T. Markus
Block, Markus, Williams, LLC
1700 Lincoln Street, Suite 3550
Denver, CO 80203
Fax Number: (303) 830-0809

FILED
UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS

SEP 1 1 2003

KENNETH S. GARDNER, CLERK
PR RFF. - ▪▪

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
|  | ) |  |
| RESOURCE TECHNOLOGY CORPORATION, | ) | Case No. 99-35434 |
|  | ) |  |
|  | ) | Honorable Eugene R. Wedoff |
| Debtor. | ) |  |
|  | ) | Hearing Date: September 16, 2003 |
|  | ) | Hearing Time: 10:00 a.m. |

## TRUSTEE'S MOTION FOR ENTRY OF AN ADMINISTRATIVE ORDER ESTABLISHING PROCEDURES FOR INTERIM COMPENSATION AND REIMBURSEMENT OF EXPENSES OF TRUSTEE'S PROFESSIONALS

Gregg E. Szilagyi, not individually but as the chapter 11 trustee for Resource Technology Corporation (the "Trustee"), hereby moves the Court pursuant to 11 U.S.C. §§ 331 and 105 and Fed. R. Bankr. P. 2016 for entry of an Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Trustee's Professionals (the "Motion") and, in support thereof, the Trustee states as follows:

### JURISDICTION

1.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### BACKGROUND

2.     An involuntary petition under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") was filed against the Debtor on November 15, 1999.

3.     On January 18, 2000, the Court entered an Order for Relief and an Order converting this case to one under chapter 11 of the Bankruptcy Code, effective February 11, 2000.

4.     On August 19, 2003 the Court entered an order approving the appointment of a chapter 11 trustee. On August 25, 2003, the United States Trustee filed an Application to approve

the appointment of Gregg E. Szilagyi as the chapter 11 trustee, and on August 26, 2003, an order was entered approving the appointment of Gregg E. Szilagyi.

5.    On August 28, 2002, the Court entered an Order authorizing the Trustee to retain Ungaretti & Harris as his legal counsel, and on September 2, 2003, the Court authorized the Trustee to retain Alex D. Moglia and Associates as his financial advisor.  The Trustee expects to seek authority to retain one or more additional professionals in this case.

## RELIEF REQUESTED

6.    By this Motion, the Trustee requests the entry of an order establishing procedures for the compensation and reimbursement of his court-approved professionals (the "Professionals") on a monthly basis on terms set forth below.  Establishing such procedures will streamline the professional compensation process and enable the Court and other parties to monitor the professional fees incurred in this Chapter 11 case more efficiently.

7.    The Trustee proposes an arrangement whereby, within twenty (20) days of the conclusion of each month, each Professional will present to counsel for the Trustee, counsel for the Debtor, the United States Trustee, counsel for the Official Committee of Unsecured Creditors, counsel for National Electric Company and such other parties as the Court might order, a detailed statement of services rendered and expenses incurred ("Invoice") by the Professional for such month.  Said parties will have ten (10) days from the service of the Invoice in which to serve a written objection on the Professional, delineating with specificity those fees or expenses as to which there is an objection.  If there is no timely objection to the Invoice or if such objection is only as to a portion of the fees or expenses, the Trustee will cause the Debtor to pay eighty percent (80%) of the unobjected-to amount of fees incurred for the month, with a twenty percent (20%) holdback, and one hundred percent (100%) of the unobjected-to expenses for the month.  These payments will be subject to the court's subsequent approval as part of the normal interim fee application

594727-1                                          2

process approximately every 120 days. The failure of a party to object to an Invoice shall not prejudice said party's right to raise any objection to a fee application. Neither the payment of, nor the failure to pay, in whole or in part, monthly interim compensation and reimbursement as provided herein shall bind any party in interest or this court with respect to the final allowance of applications for compensation and reimbursement of Professionals.

8.    The above procedure shall <u>not</u> apply to requests for the Trustee's compensation pursuant to 11 U.S.C. §326.

9.    Similar procedures for compensating and reimbursing court-approved professionals have been established in other Chapter 11 cases in this and other districts. *See, e.g. In re Emerald Casino, Inc.*, 02 B 22977 (Bankr. N.D. Ill. October 2, 2002); *In re Telco Services, Inc.*, 01 B 34078 (Bankr. N.D. Ill. November 8, 2001); *In re Scottsboro Aluminum*, Case No. 01 B 36856 (Bankr. N.D. Ill. September 20, 2001); *In re Allied Products Corporation*, Case No. 00 B 28798 (Bankr. N.D. Ill. October 2, 2000); *In re Eagle Food Centers, Inc.*, Case No. 00-01311 (D. Del. March 2, 2000); *In re: Harnischfeger Indus., Inc.*, Case No. 99-02171 (Bankr. D. Del. June 7, 1999). Such procedures are necessary to avoid having professionals fund the reorganization case. *See In re Int'l Horizons, Inc.*, 10 B.R. 895, 897 (Bankr. N.D. Ga. 1981).

10.    For the foregoing reasons, the Trustee believes that granting the relief requested herein is appropriate and in the best interest of all parties-in-interest.

11.    No previous request for the relief sought herein has been made to this Court or any other court.

## NOTICE

12.    Notice of this Motion has been given via facsimile to: (a) the United States Trustee's Office; (b) counsel for the Debtor; (c) counsel for National Electric Company; (d) counsel for the

Official Committee of Unsecured Creditors; and (c) all other parties who have requested notice in this case.

**WHEREFORE,** the Trustee respectfully requests entry of an Administrative Order in substantially the form as is submitted herewith:

1. Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Trustee's Professionals; and

2. Such other and further relief as the Court may allow.

Dated: September 10, 2003

Gregg E. Szilagyi, Trustee for Resource Technology Corporation

By: _____
One of his Attorneys

OF COUNSEL

R. Scott Alsterda, ARDC No.3126771
Christopher L. Rexroat, ARDC No. 6274402
Alex Pirogovsky, ARDC No. 6256978
UNGARETTI & HARRIS
3500 Three First National Plaza
Chicago, Illinois 60602
Telephone: 312.977.4400
Facsimile: 312.977.4405

594727-1

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

IN RE:                                  ) CHAPTER 11
                                        )
RESOURCE TECHNOLOGY CORPORATION,        ) Case No. 99-35434
                                        )
                                        ) Honorable Eugene R. Wedoff
                                        )
Debtor.                                 )

## ADMINISTRATIVE ORDER ESTABLISHING
## PROCEDURES FOR INTERIM COMPENSATION AND
## REIMBURSEMENT OF EXPENSES OF TRUSTEE'S PROFESSIONALS

Upon consideration of the motion (the "Motion") of Gregg E. Szilagyi, chapter 11 trustee in the above-captioned Chapter 11 case (the "Trustee"), for an order under 11 U.S.C. §§ 105 and 331 establishing procedures for interim compensation and reimbursement of expenses of Trustee's Professionals specifically retained by order of this court; this court having determined that granting the relief requested in this Motion is in the best interest of the estate and its creditors; it appearing that proper and adequate notice has been given and that no other or further notice is necessary; and after finding that good and sufficient cause appears therefore upon the record herein,

**IT IS HEREBY ORDERED:**

1.    The Motion is granted.

2.    Except as may otherwise be provided in court orders authorizing the retention of specific professionals, the Trustee's Professionals in these cases may seek interim compensation in accordance with the following procedures:

Within twenty (20) days of the conclusion of each month, each Professional will present to counsel for the Trustee, counsel for the Debtor, the United States Trustee, counsel for the Official Committee of Unsecured Creditors, counsel for National Electric Company and such other parties as the Court might order, a detailed statement of services rendered and expenses incurred ("Invoice") by the Professional for such month. Said parties will have ten (10) days from the service of the Invoice in which to serve a written objection

594726-1                            1 of 2

on the Professional, delineating with specificity those fees or expenses as to which there is an objection. If there is no timely objection to the Invoice or if such objection is only as to a portion of the fees or expenses, the Debtor will pay eighty percent (80%) of the unobjected-to amount of fees incurred for the month, with a twenty percent (20%) holdback, and one hundred percent (100%) of the unobjected-to expenses for the month. These payments will be subject to the court's subsequent approval as part of the normal interim fee application process approximately every 120 days. The failure of a party to object to an Invoice shall not prejudice said party's right to raise any objection to a fee application. Neither the payment of, nor the failure to pay, in whole or in part, monthly interim compensation and reimbursement as provided herein shall bind any party in interest or this court with respect to the final allowance of applications for compensation and reimbursement of Professionals.

3.      The monthly payments made pursuant to this Order shall be provisional in nature and consequently shall be subject to further order of the court as part of the interim fee application process pursuant to 11 U.S.C. §331. All fees and expenses paid to Professionals pursuant to this Order shall be subject to disgorgement until final allowance by the Court.

DATED:_____

                              ENTER:


                              _____
                              United States Bankruptcy Judge


*Order Prepared By:*

R. Scott Alsterda (ARDC No. 3126771)
Christopher L. Rexroat (ARDC No. 6274402)
Alex Pirogovsky (ARDC No. 6256978)
UNGARETTI & HARRIS
3500 Three First National Plaza
Chicago, Illinois 60602
Telephone:  312.977.4400
Facsimile:  312.977.4405

1830

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

IN RE:                                      )        CHAPTER 11
                                            )
RESOURCE TECHNOLOGY CORPORATION,   )        Case No. 99-35434
                                            )
                                            )        Honorable Eugene R. Wedoff
Debtor.                                     )

## ADMINISTRATIVE ORDER ESTABLISHING
## PROCEDURES FOR INTERIM COMPENSATION AND
## REIMBURSEMENT OF EXPENSES OF TRUSTEE'S PROFESSIONALS

Upon consideration of the motion (the "Motion") of Gregg E. Szilagyi, chapter 11 trustee in

the above-captioned Chapter 11 case (the "Trustee"), for an order under 11 U.S.C. §§ 105 and 331

establishing procedures for interim compensation and reimbursement of expenses of Trustee's

Professionals specifically retained by order of this court; this court having determined that granting

the relief requested in this Motion is in the best interest of the estate and its creditors; it appearing

that proper and adequate notice has been given and that no other or further notice is necessary; and

after finding that good and sufficient cause appears therefore upon the record herein,

**IT IS HEREBY ORDERED:**

1.      The Motion is granted.

2.      Except as may otherwise be provided in court orders authorizing the retention of

specific professionals, the Trustee's Professionals in these cases may seek interim compensation in

accordance with the following procedures:

Within twenty (20) days of the conclusion of each month, each Professional will

present to counsel for the Trustee, counsel for the Debtor, the United States Trustee,

counsel for the Official Committee of Unsecured Creditors, counsel for National Electric

Company, counsel for Banco Panamericano, Inc., counsel for Aquila Energy Capital

Corporation and such other parties as the Court might order, a detailed statement of services

rendered and expenses incurred ("Invoice") by the Professional for such month. Said parties

594726-2

will have ten (10) days from the service of the Invoice in which to serve a written objection on the Professional, delineating with specificity those fees or expenses as to which there is an objection. If there is no timely objection to the Invoice or if such objection is only as to a portion of the fees or expenses, the Debtor will pay eighty percent (80%) of the unobjected-to amount of fees incurred for the month, with a twenty percent (20%) holdback, and one hundred percent (100%) of the unobjected-to expenses for the month. These payments will be subject to the court's subsequent approval as part of the normal interim fee application process approximately every 120 days. The failure of a party to object to an Invoice shall not prejudice said party's right to raise any objection to a fee application. Neither the payment of, nor the failure to pay, in whole or in part, monthly interim compensation and reimbursement as provided herein shall bind any party in interest or this court with respect to the final allowance of applications for compensation and reimbursement of Professionals.

3.       The monthly payments made pursuant to this Order shall be provisional in nature and consequently shall be subject to further order of the court as part of the interim fee application process pursuant to 11 U.S.C. §331. All fees and expenses paid to Professionals pursuant to this Order shall be subject to disgorgement until final allowance by the Court.

DATED:___**18 SEP 2003**

ENTER:

United States Bankruptcy Judge

_Order Prepared By:_

R. Scott Alsterda (ARDC No. 3126771)
Christopher L. Rexroat (ARDC No. 6274402)
Alex Pirogovsky (ARDC No. 6256978)
UNGARETTI & HARRIS
3500 Three First National Plaza
Chicago, Illinois 60602
Telephone:  312.977.4400
Facsimile:  312.977.4405

594726-2

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| RESOURCE TECHNOLOGY CORPORATION, | ) | Case No. 99-35434 |
| | ) | |
| | ) | Honorable Eugene R. Wedoff |
| Debtor. | ) | |
| | ) | Hearing Date: July 14, 2005 |
| | ) | Hearing Time: 9:30 a.m. |

## NOTICE OF MOTION

To:    SEE ATTACHED SERVICE LIST

PLEASE TAKE NOTICE that on **July 14, 2005** at **9:30 a.m.** or as soon thereafter as counsel may be heard, I shall appear before the Honorable Eugene R. Wedoff in Courtroom 744 of the United States Courthouse, 219 South Dearborn Street, Chicago, Illinois, or in his absence, before any other Judge who may be sitting in his place, and shall then and there present **Trustee's Motion for Entry of an Order (1) Dismissing Chapter 11 Case and (2) Approving Settlement on Trustee's § 506(c) Claim** at which time and place you may appear. A copy of said Motion is attached hereto and is herewith served upon you.

\* \* \*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, affirms and certifies that a copy of the above-referenced Motion was served upon the attached SERVICE LIST <u>via first class United States Mail</u>, from the law offices of Ungaretti & Harris, 3500 Three First National Plaza, Chicago, Illinois, before the hour of **5:00 p.m.** on **June 24, 2005.**

**GREGG E. SZILAGYI**, as Trustee
for Resource Technology Corporation

By: _____
One of his Attorneys

OF COUNSEL:
Susan G. Feibus (ARDC No. 6181749)
Christopher L. Rexroat (ARDC No. 6274402)
UNGARETTI & HARRIS LLP
3500 Three First National Plaza
Chicago, Illinois 60602
Telephone:    (312) 977-4400
Facsimile:    (312) 977-4405

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
FILED
JUN 2 4 2005
KENNETH S. GARDNER, CLERK
PS REP. - CK

## Resource Technology Service List - All Creditors

Robert M. Fishman
Brian L. Shaw
Shaw Gussis Fishman Glantz Wolfson & Towbin, LLC
321 North Clark St., Suite 800
Chicago, IL 60610

Kathryn Gleason
United States Trustee's Office
Suite 3350
Chicago, IL 60606

Elizabeth D. Sharp
330 South Wells St., Suite 711
Chicago, IL 60606

Gerald F. Munitz
Kathryn A. Parmenter
Goldberg Kohn Bell Black
Rosenbloom & Moritz, Ltd.
55 East Monroe Street, Suite 3700
Chicago, IL 60603

William J. Barrett
Barack Ferrazzano Kirschbaum
Perlman & Nagelberg
333 West Wacker Dr., Suite 2700
Chicago, IL 60606

Thomas R. Osterberger
333 North Hammes Avenue
Suite 101
Joliet, IL 60435

Stuart M. Rozen
Craig E. Reimer
Mayer Brown Rowe & Maw
190 South LaSalle Street
Chicago, IL 60603

Michael S. Baird
Stotis & Baird, Chartered
200 West Jackson Blvd., Suite 1050
Chicago, IL 60606

Richard Mason
Ross & Hardies
150 North Michigan Ave., Suite 2500
Chicago, IL 60601

William J. Factor
Phillip L. Comella
Seyfarth, Shaw, Fairweather & Geraldson
55 East Monroe St., Suite 4200
Chicago, IL 60603

John S. Delnero
Bell, Boyd & Lloyd, LLC
70 West Madison St., Suite 3300
Chicago, IL 60602

Kevin T. Keating
Mark E. Shure
Keating & Shure, Ltd.
150 North Wacker Dr., Suite 1550
Chicago, IL 60606

William J. Connelly
Karen R. Goodman
Hinshaw & Culbertson
222 North LaSalle St., Suite 330
Chicago, IL 60601

Karen V. Newbury
JENNER & BLOCK, LLC
One IBM Plaza
Chicago, Illinois 60611

Pia N. Thompson
Sonnenschein Nath & Rosenthal LLP
Sears Tower, Suite 8000
233 South Wacker Drive
Chicago, Illinois 60606

Frank W. Ierulli
Assistant State's Attorney
Chief, Civil Division, County of Peoria
Peoria County Courthouse
324 Main Street
Peoria, IL 61602

James J. Manning
Heyl Royster Voelker & Allen
Bank One Building
124 S.W. Adams St., Suite 600
Peoria, IL 61602

George Roe
University of Illinois
Business Administration
601 South Morgan St.
Chicago, IL 60067

700905-1

## Resource Technology Service List - All Creditors

Charles P. Schulman, David E Lieberman
Mark A. Brand
Sachnoff & Weaver Ltd.
30 South Wacker Dr., 29th Floor
Chicago, IL 60606-7484

Mitchell Marinello
Allan V. Abinoja
Novack & Macey
303 West Madison St., Suite 1500
Chicago, Illinois 60606

James Newbold
Assistant Attorney General
100 West Randolph St., Suite 13-222
Chicago, IL 60601

Philip C. Curley
Robinson Curley & Clayton PC
300 South Wacker Dr., Suite 1700
Chicago, IL 60606

John F. Higgins
Susan C. Mathews
Gail Jamrok
Porter & Hedges, LLP
700 Louisiana, 35th Floor
Houston, TX 77002

David E. Finck
Schwartz, Juncll, Campbell & Oathout, LLP
909 Fannin, Suite 2000
Houston, TX 77010

Eugene J. Geekie, Jr.
Michelle J. Murphy
Schiff Hardin & Waite
233 South Wacker Dr., Suite 6600
Chicago, IL 60606

Steven R. Jakubowski
Elizabeth F. Richert
Robert F. Coleman & Associates
77 West Wacker Drive - Suite 4800
Chicago, IL 60601

Kristin T. Mihelic
FagelHaber LLC
55 East Monroe Street, 40th Floor
Chicago, IL 60603

Thomas W. Goedert
Neal & Leroy, LLC
203 North LaSalle St., Suite 2300
Chicago, IL 60601-1213

Mitchell Marinello
Allan V. Abinoja
Novack & Macey
303 West Madison St., Suite 1500
Chicago, Illinois 60606

William I. Kohn
Schiff Hardin LLP
6600 Sears Tower
Chicago, Illinois 60606-6473

John F. Young
Block, Markus, Williams, LLC
1700 Lincoln St., Suite 3550
Denver, CO 80203

William W.P. Atkins
Assistant State's Attorney
Chief, Civil Division
Peoria County Courthouse
Room 111, 324 Main Street
Peoria, IL 61602

William J. McKenna, Jr.
FOLEY & LARDNER LLP
321 North Clark, Suite 2800
Chicago, Illinois 60610

James T. Markus
Block, Markus, Williams, LLC
1700 Lincoln St., Suite 3550
Denver, CO 80203

Greta G. Weathersby
McGuireWoods LLP
77 West Wacker Dr. - Suite 4400
Chicago, IL 60601

700905-1

## Resource Technology Service List - All Creditors

A-1 Lock
101 4th @ Washington
Springfield, IL 62701

A-C Compressor Corp.
401 E. South Island St.
Appleton, WI 54915

Aaron Equipment
735 E. Green St.
Bensenville, IL 60106

Abeltech Inc.
2510 Elmwood Ave.
Ann Arbor, MI 48104

Aboy, Roberto Bso
268 Munoz Rivera Ave.
Suite 1905
Hato Rey, PR 00918

Advance Liquid Recycling
14-16 W. Main St.
Meriden, CT 06451

Advance Systems Technology Inc.
2255-2 Lois Dr.
Rolling Meadows, IL 60008

Air and Waste Management Assoc.
11 Pleasant Hill Blvd.
Palatine, IL 60067

Alfred Mossner Company
Atten: Maxine Mitchell
P.O. Box 46467
Plymouth, MN 55446

All Electric Co.
1266 Townsend Ave.
New Haven, CT 06513

Alltel
P.O. Box 8000
Little Rock, AR 72203

Altorfer Inc. - Caterpillar Dealer
P.O. Box 2008
Springfield, IL 62705

Alternative Risk Management
171 W. Wing St., Suite 210
Arlington Heights, IL 60005

Altschuler, Melvoin & Glasser
30 S. Wacker Dr., Suite 2600
Chicago, IL 60606

Am Fluid Equipment Inc.
29 Coachmans Lane
Bethany, CT 06524

American Arbitration Assoc
140 W. 51st St., 9th Fl.
New York, NY 10020

American Arbitration Association
335 Madison Ave., 10th Fl.
New York, NY 10017

American Cilco
P.O. Box 66826
St. Louis, MO 63166

## Resource Technology Service List - All Creditors

American Disposal Services/Allied
Waste North American Inc.
P.O. Box 4653
Oakbrook, IL 60522

American Landfill Supply
7550 Lucerne Dr., Suite 110
Cleveland, OH 44130

American Rigging Inc.
30 Clark St.
East Hartford, CT 06108

Ameritech
225 W. Randolph St.
Law Department, Suite 27A
Chicago, IL 60606

Ameritech - Beats Billing
P.O. Box 92471
Chicago, IL 60675

Anchor Engineering Services, Inc.
75 Nutmeg Lane c/o Lawrence Murphy
Glastonbury, CT 06033

Anchor Engineering Svcs.
75 Nutmeg Lane
Glastonbury, CT 06033

Anderson Elec. Inc.
P.O. Box 758
Springfield, IL 62705

Anderson Electric Inc.
c/o David A Rolf Sorling, Northrup
607 E. Adams St., Suite 800 IL Bldg.
Springfield, IL 62705

Anderson, Robert
112 Sunset Cove Lane
Palm Beach, FL 33148

API Construction Co.
2366 Rose Place
Saint Paul, MN 55113

Aqua-Shed Manufacturing
220 E. Industrial Park Blvd.
Florence, SC 29502

Arch Communications
1301 W. Pioneer Pkwy.
Peoria, IL 61615

Architect
c/o Pence Schwartz & Assoc Inc.
386 N. York Rd.
Elmhurst, IL 60126

ARI Environmental, Inc.
951 Old Rand Road
Wauconda, IL 60084

ArntzenCorp.
1025 School St.
Rockford, IL 61105

Associated Mechanical
5601 N. Main St.

AT&T
Billing Department
1842 Centre Point Dr., #1106
Naperville, IL 60563-1445

## Resource Technology Service List - All Creditors

Atlas Communications
P.O. Box 528365
Chicago, IL 60652

Atlas Van Lines Inc.
21284 Corwin Rd.
Apple Valley, CA 92307

ATS Specialized Inc.
NW7130
Minneapolis, MN 55485

AT&T
P.O. Box 9001309
Louisville, KY 40290-1309

Bagby & Russell Electric St.
513 W. I-65 Service Center Rd. N.
Mobile, AL 3660-7098

Bagby & Russell Electric Co.Inc.
c/o Jeffrey C Dan
135 S. LaSalle St.
Suite 3705
Chicago, IL 60603

Michael S. Baird
Stotis & Baird, Chartered
200 West Jackson Blvd., Suite 1050
Chicago, IL 60606

Baker Tanks
Dept 8863
Los Angeles, CA 90084

Bank Of America Auto Finance Corp.
P.O. Box 2269
Brea, CA 92822

Bank of America N.A.
P.O. Box 26012
Nc-105-03-14
Greensboro, NC 27420

Bert C Young & SonsCorp.
4009 Warren Ave.
Bellwood, IL 60104

Bill's Lawn & Garden
117 W. 13th St.
Kewanee, IL 61143

Bombardier Capital/American Capital
1050 Franklin Ave., Suite 104
Garden City, NY 11530

Borg Mechanical Contractors
225 Fencl Lane
Hillside, IL 60162

Brian Lee Munsterman
205 Anita Drive
Bourbonnias, IL 60914

Brown, James E.
311 S. Towanda Ave.#2
Normal, IL 61761

Browning-Ferris Industries
325 E. Fullerton Ave.
Carol Stream, IL 60188

Bryan Cave LLP
3500 One Kansas City Place
Kansas City, MO 64105-2100

## Resource Technology Service List - All Creditors

Builtwell Inc.
17 Guild St.
Enfield, CT 06082

Calvert, George
330 S. Wells #711
Chicago, IL 60606

Capital Waste
2931 N. Dirksen Pkwy
Springfield, IL 62702

Case Environmental Services
3717 Peach Tree Rd., Suite 4
Atlanta, GA 30319

Catholic Bishop Of Chicago, The
c/o E. J Lesniak, Burke, Warren
330 N. Wabash Ave.22nd Floor
Chicago, IL 60611

CCH, Inc.
P.O. Box 4307
Carol Stream, IL 60197-4307

Central Illinois Light Company
300 Liberty
Peoria, IL 61602

Century Petroleum
147 Gazza Blvd
Farmingdale, NY 11735

Chapple Design Build
31W007 North Ave.
West Chicago, IL 60185

Bushnell Inc.
2110 Oxford Rd.
Des Plaines, IL 60018

Capital Machinery/Power Co.
P.O. Box 2008
Springfield, IL 62705

Carlson Environmental
65 E. Wacker Place
Chicago, IL 60601

Timothy R. Casey
GARDNER CARTON & DOUGLAS
Quaker Tower
191 West Wacker Drive, Suite 3700
Chicago, IL 60606

Cavallo Trucking, Inc.
7950 W. Joliet Road
McCook, IL 60525

Central Contractors Service Inc.
4655 W. 137th St.
Crestwood, IL 60445

Central Landscaping
12507 Mendell Rd.
Princeville, IL 61559

CES Landtec
3717 Peachtree Rd., Suite 4
Atlanta, GA 30319

Chase Automotive Finance
P.O. Box 15700
Wilmington, DE 19886-5700

700905-1

## Resource Technology Service List - All Creditors

Chicago Computer Co.
620 Enterprise Dr.
Oakrbook, IL 60521

Chicago Tribune
P.O. Box 6315
Chicago, IL 60680

Cilco
300 Liberty St.
Peoria, IL 61602

City Of Gary Indiana
c/o George Roe Esq
1701 E. Lake Ave.
Glenview, IL 60025

Clayton Environmental
1250 E. Moore Lake Dr., Suite B
Minneapolis, MN 55432

Clayton Group Services
41650 Gardenbrook Rd., Suite 155
Novi, MI 48375

Coffee Unlimited
1408 S. Clinton
Chicago, IL 60607-5102

Comfort Suites
4021 War Memorial
Peoria, IL 61614

Commonwealth Edison & Company
System Credit/Bankruptcy Dept
2100 Swift Drive
Oak Brook, IL 60523

Compressor Development Corp.
509 S. Westgate St.
Addison, IL 60101

Connecticut Dept Of Environmental
c/o Krista E. Trousdale Asst. Atty.
P.O. Box 120
Hartford, CT 06141

Connecticut Dept. Of Revenue Svcs.
C&E Div. Bankruptcy Section
25 Sigourney Street
Hartford, CT 06106

Consolidated Freightways
P.O. Box 488
Portland, OR 97208

Contractors Power & Light Co.
901 N. Williams St.
Thornton, IL 60476

Control Center Inc.
Box 917390
Orlando, FL 32891

Cook County Department of Environment
69 W. Washington, Suite 1900
Chicago, IL 60602-3004

Cooper Energy Services
10810 Northwest Fry
Houston, TX 77092

Cooper Energy Services
105 Sandusky
Mount Vernon, OH 43050

700905-1

## Resource Technology Service List - All Creditors

Core Laboratories Inc.
5295 Hollister Rd.
Houston, TX 77040

CT Corporation System
208 S. LaSalle Street
Chicago, IL 60604

Culligan Water Conditioning
413 W. Jefferson St.
Ottowa, IL 61350

Daniels Excavating, Inc.
108 E. Chaplin St.
Morris, IL 60450

Davenport Electric Contract Co.
c/o David J Franks, Atty
4300 E. 53rd Street, Suite 103
Davenport, IA 52807

Davis, L Park, Esq.
c/o Thomas R Osterberger, Esq., et al.
181 N. Hammes Ave.
Joliet, IL 60435

Dean, David A
Box 191
Steger, IL 60475

Delnero, Johns S.
Bell Boyd & Lloyd LLC
70 W. Madison St., Suite 3300
Chicago, IL 60602

Dew Concrete Construction
P.O. Box 191
Steger, IL 60475

D. Farretti Construction Inc.
604 Crystal Dr.
Shorewood, IL 60431

Dick Gaunt Trucking & Excavating
2354 Washington Rd.
Washington, IL 61571

Distinctive Office Products
P.O. Box 5940
Carol Stream, IL 60197-5940

Diversified Electrical Products
1430 Church St.
Bohemia, NY 11797

Donley Inc.
P.O. Box 1374
Williamsville, IL 62693

Drake, Nancy
10857 Avenue D
Chicago, IL 60617

Durable Controls Inc.
515 Industrial Dr.
Hartland, WI 53029

Dynamic Electric Inc.
4825 W. 128th Place
Alsip, IL 60658

Earth Solutions, Inc.
P.O. Box 61066
Indianapolis, IN 46268

700905-1

## Resource Technology Service List - All Creditors

Eastern Gas & Electric
Power Equipment Division
152 Kensington Rd.
Garden City, NY 11530

Eco-Clean Incorporated
P.O. Box 674
Oak Lawn, IL 60453

Eco Clean
P.O. Box 20336
Springfield, IL 62708

Electrical Energy Experts
N115 W. 18900 Edison Dr.
Germantown, WI 53032

Equipment Sales & Service
W 2808 Crestwood
Appleton, WI 54915

Enviance Inc.
2386 Faraday Avenue, Suite 220
Carlsbad, CA 92008

Environmental Monitoring
c/o Carl Kubaszewski, Esq.
77 W. Washington St., Suite 1201
Chicago, IL 60602

Environmental Specialists Inc.
3001 E. 83rd St.
Kansas City, MO 64132

EPS
c/o Bill Henderson
9070 N. Park Plaza Ct.
Milwaukee, WI 53223

Ernie Christenen
5487 N. Milwaukee Ave.
Attn: Diane O'Neill
Chicago, IL 60630-1249

Esg Watts Inc.
c/o William J. Connelly Hinshaw et al.
222 N. LaSalle St., Suite 300
Chicago, IL 60601

Espiritue & Associates
79 West Monroe St, Suite 1205
Chicago, IL 60603

Esquire Deposition Service
155 N. Wacker 10th Fl.
Chicago, IL 60606

Euclid Electric
S713 Coon Bluff Rd.
Wisconsin Dells, WI 53965

Evans & Son Blacktop Inc.
3N775 Powis Road
West Chicago, IL 62702

Extended Stay America 677
1201 E. Touhy Ave.
Des Plaines, IL 60018

Federal Valve & Fitting
5140 W. 73rd St.
Bedford Park, IL 60499

Ferguson Thrall Distribution Inc.
4250 Mcfarland Rd.
Loves Park, IL 61111

700905-1

## Resource Technology Service List - All Creditors

First Electric Motor Shop, Inc.
1130 W. Reynolds St.
Springfield, IL 62702

First Insurance Funding
135 S. LaSalle
Dept 8075
Chicago, IL 60674

First Midwest Bank
P.O. Box 125- Loan Processing Center
Bedford Park, IL 60499-0125

David J. Fischer
T. Kellan Grant
WILDMAN, HARROLD, ALLEN & DIXON
225 West Wacker Drive, Suite 3000
Chicago, IL 60606-2000

Flat Rock Sand & Gravel
5901-B Warm Springs Rd.
Columbus, GA 31909

Floyd Steel Erectors, Inc.
N/A

Forrer Supply Company
c/o Patrick J Schoen Quarles Etal
411 E. Wisconsin Ave., Suite 2040
Milwaukee, WI 53202

Fortelka, Robert
556 Ingalton Ave.
West Chicago, IL 60195

Freeborn & Peters
Attn: Steven M Hartmann
311 S. Wacker Dr., Suite 3000
Chicago, IL 60606

Freesen Inc.
P.O. Box 350
Bluffs, IL 62621

F S Welsford & Co.
P.O. Box 605
Lionville, PA 19353

F S Welsford Company
c/o Leslie Weisse, Esq
1650 Market St., Suite 3100/1 Liberty
Philadelphia, PA 19103

Ft. Dodge Asphalt
P.O. Box 1374
Fort Dodge, IA 50501

Gajeske Inc.
2929 Antoine
Houston, TX 77092

GE Capital
P.O. Box 740441
Atlanta, GA 30374

Genserve
5 Dakota Dr.
Lake Success, NY 11042

Steven D. Gertler
STEVEN D. GERTLER & ASSOCIATES, LTD.
88 W. Randolph Street
Suite 1518
Chicago, IL 60601

Global Finance Corporation
Attn: Donald B Reid
124 Phantum Lane
Bellaire, TX 77401

## Resource Technology Service List - All Creditors

Global Finance/Logan Capital
80 Hazel Ave.
Glencoe, IL 60022

Golder Associates Inc.
1809 N. Mill St., Suite C
Naperville, IL 60563

Goodall Rubber Company
790 Birney Highway, Suite 100
Aston, PA 19014

Grainger Inc.
100 Research Dr.
Milford, CT 06460

Green Cas Dbt
501 Silverside Rd., Suite B7AR
Wilmington, DE 19809

Grove/Hill Systems Group
1611 Barclay Blvd.
Buffalo Grove, IL 60089

Guardian Dental
P.O. Box 95101
Chicago, IL 60694-5101

Hal Weinberger Consulting
2105 N. Southport
Chicago, IL 60614

Hawkey & Kline Coring & Drilling
c/o James Richard Myers
303 South 7th Street
P.O. Box 399
Vandalia, IL 62471

Golder Associates Inc.
c/o Jeffrey L Hamera Baker Etal
One Prudential Plaza 130 Randolph
Chicago, IL 60601

Goodall Rubber Co.
P.O. Box 73577
Chicago, IL 60673

Gooding Rubber Company
10321 Werch Drive
Suite 200
Woodridge, IL 60517

Grainger Industrial Equipment
Dept 136-838477966
Palatine, IL 60038

Greene's Water Wells Inc.
Route 4 Box 952
Gray, GA 31032

GTE North
AFNI/GTE
404 Brock Drive
Bloomington, IL 61701

Hacquet Borthers Drilling Inc.
P.O. Box 536
Newport, IN 47956

Hanson Engineers Inc.
c/o William F Trapp
Brown Hay & Stephens
P.O. Box 2459
Springfield, IL 62705

Hecksel Machine Inc.
609 Carter St.
Watertown, MN 55388

## Resource Technology Service List - All Creditors

Hester-Greer Associates
152 Kensington Rd.
Garden City, NY 11530

Hinckley & Schmidt
P.O. Box 20336
Bedford Park, IL 60499

Hinsdale Bank & Trust Co.
c/o Donald L Newman & Associates
2 N. LaSalle St, Suite 2010
Chicago, IL 60602

Hj Eppel & Co.Inc.
1400 Tuesburg Court
Pontiac, IL 61764

Hoffrichter's West Side Lumber Co.
423 N. Court St.
Pontiac, IL 61764

Homewood Disposal Service Inc.
17415 S. Ashland Ave.
Hazel Crest, IL 60429

Huff, John
24 Big Oak Dr.
Saint Peters, MO 63376

Hunt The Mover
1155 Ellis Ave.
Bensenville, IL 60106

Hydraulic Crane Specialists
P.O. Box 11453
Chickasaw

Hy-Tech Specialized Svc
4201 Sand Hill Rd.
Springfield, IL 61702

Ides-IL
527 South Wells
Metro Office
Chicago, IL 60607

Ikon Office Solutions
21588 Network Place
Chicago, IL 60673

Illinois Dept of Employment Security
Bankruptcy
Unit/3rd Floor
401 S. State St.
Chicago, IL 60605

Illinois Gas Producers LLC
c/o Dennis E. Quaid, Esq.
Fagel, et al.
140 S. Dearborn St., Suite 1400
Chicago, IL 60603

Illinois Epa
P.O. Box 19506
Springfield, IL 62794

Illinois Oil Marketing Inc.
6000 S. Washington St.
Peoria, IL 61607

Illinois Portable Service Co.
P.O. Box 1383
Peoria, IL 61654

Inland Environmental Inc.
3921 Howard St.
Skokie, IL 60076

700905-1

## Resource Technology Service List - All Creditors

Insulco Construction Svc.
2840 W. Vermont St.
Blue Island, Il. 60406

Integrity Transportation St.
2444 Ball Drive
Richfield, WI 53076

Interior Installation & Design
400 W. 76th St., Suite 3N
Chicago, IL 60620

Internal Revenue Service
District Director
P.O. Box 745
Chicago, IL 60690

Intrastate Piping
P.O. Box 8
Orland Park, IL 60462

Intrastate Piping & Controls
c/o Theodore S. Leonas, Jr. & Assoc.
12600 South Harlem, Suite 202
Palos Heights, IL 60463

IOS Capital
P.O. Box 9115
Macon, GA 31208

J.B. Lee Transportation St.
P.O. Box 48
Pontiac, IL 61767-0048

J & P Trucking
160 N. Elizabeth St.
Chicago, IL 60607

J&D Storage
3515 78th Ave.
Milan, IL 61264

J&R International Power
230 Se 28th St.
Oklahoma City, OK 73129

Joel Moske Hy-Tech
Joel Moske
4201 Sand Hill Rd.
Springfield, IL 62702

John Sexton Sand & GravelCorp.
1815 S. Wolf Rd.
Hillside, IL 60162

John Spot Portable
P.O. Box 2545
Joliet, IL 60434

John Zink Co.
11920 E. Apache
P.O. Box 21220
Tulsa, OK 74121

Gregory J. Jordan
Evangelos J. Gegas
DYKEMA GOSSETT ROOKS PITTS, LLC
10 South Wacker Drive, Suite 2300
Chicago, IL 60606

Journal Star [Peoria]
1 News Plaza
Peoria, IL 61643

Kahn, Dees, Donovan & Kahn
501 Main St.
Evansville, IN 47735

700905-1

## Resource Technology Service List - All Creditors

Kar Products
P.O. Box 2414
Des Plaines, IL 60017

Kar Products
Dept. CH14079
Palatine, IL 60055-4079

Kara Plumbing Inc.
645 Center Rd.
Frankfort, IL 60423

Karl L. Fortelka
556 Ingalton Avenue
West Chicago, IL 60185

Kay's Trucking Inc.
30 Clark St.
East Hartford, CT 06108

Keift Brothers, Inc.
837 S. Riverside Dr.
Elmhurst IL 60126

Kelso-Burnet Co.
5200 Newport Dr.
Rolling Meadows, IL 60008

Kenny Construction Co.
250 Northgate Parkway
Wheeling, IL 60090

Ken's Water Systems, Inc.
30455 S. Dixie Hwy.
Beecher, IL 60401

Kolodziej Development
1325 W. 171st St.
East Hazel Crest, IL 60429

Kraft, W.A.
P.O. Box 605
241 W. Parkway
Pompton Plains, NJ 07444

Kroowsyk Trucking & Excavating
9731 Indianapolis Blvd
Highland, IN 46322

L&S Electric Co. Inc.
750 131st Place
Hammond, IN 46327

L R Elam Specialized Hauling
4420 Lindenwood Dr.
Matteson, IL 60443

L4 Inc.
P.O. Box 1958
Kenner, LA 70063

La Fasteners Inc.
7936 W. 47th St.
Lyons, IL 60534

Labor Ready Midwest Inc.
1002 Solutions Ctr.
Chicago, IL 60677

Laframbuise Well Drilling Inc.
P.O. Box 303
Thompson, CT 06277

700905-1

## Resource Technology Service List - All Creditors

LaGrange Crane Inc.
6156 E. Avenue
Hodgkins, IL 60525

Lakeside Pipe & Fabrication Inc.
N117 W. 18493 Fulton Dr.
Germantown, WI 53022

Landcomp Corp.
P.O. Box 520
Ottawa, IL 61350

Landgas Technology Llc Dba Landgas
c/o David S. O'Neill Esq
5487 N. Milwaukee Ave.
Chicago, IL 60630

Landtec Landfill Control
937 S. Vislata, Suite 650
Colton, CA 92324

Lano Equipment Inc.
6228 Hwy. 10 NW
Anoka, MN 55303

Larson-Becker Co.
Catheron Elliott-Dunne Atty At Law
P.O. Box 10371
Chicago, IL 60610

Lazer, Aptheker, Feldman
Melville Law Center
225 Old Country Rd.
Melville, NY 11747

Leake Excavating - Trucking
Dba Hughie Leake
P.O. Box 1
Verona, IL 60479

Lee Supply Co.
1st & Lincoln Ave.
Box 35
Charleroi, PA 15022

Levoy, Sonya
19353 Foxford Lane
Mokena, IL 60448

LFG and E
9855 Prospect Ave.
Santee, CA 92071

Lfg. Specialties
7550 Lucerne Dr., Suite 110
Cleveland, OH 44130

LH Lacy Co.
10888 Shady Trail
Dallas, TX 75354

Lincoln Land Fs Inc.
P.O. Box 19440
Springfield, IL 62794

Lipinsky, John A
Rooks Pitts And Poust
4200 Commerce Ct., Suite 300
Lisle, IL 60532

Lockport Steel Fabricators Inc.
P.O. Box 248
Lockport, IL 60441

L & M Waste Systems, Inc.
P.O. Box 725
Muscatine, IA 52761

## Resource Technology Service List - All Creditors

Logan Capital Co.
605 Willowglen Rd, Suite 200
Santa Barbara, CA 93105

Loop Telecom LP
330 S. Wells St., Suite 518
Chicago, IL 60606

Lozier Oil
P.O. Box 266
Farmington, IL 61531

Machinery Inc.
5081 Manchester Ave.
Saint Louis, MO 63110

Machinery Inc.
c/o Robert A. Breidenbach, Esq.
121 Hunter Ave., Suite 101
Saint Louis, MO 63124

Masi Ltd.
1419 Lake Cook Rd.
Deerfield, IL 60015

MaSutter Printers
330 E. Roosevelt Rd.
Lombard, IL 60148

Matco Tools - Glenn Englemann
783 Water Tower Rd.
Jacksonville, IL 62650

Material Service Corp.
1451-600 75th Ave.
Lincoln, IL 62656

MCB Water Authority Inc.
P.O. Box 75
Bucks, AL 36512

McDougal Hartmann Co.
c/o Eugene Crane Esq
135 S. LaSalle St.#1540
Chicago, IL 60603

McDougal Hartmann Co.
P.O. Box 1228
Peoria, IL 61654

McElroy, Terry
211 - 1st St.
Pawnee, IL 62558

Metalworking Lubricants Corp.
25 Silverdome Industrial Park
Pontiac, MI 48342

MG & Co.
3405 West Wellington
Hernando Beach, IL 34607

Mid America Energy
P.O. Box 8020
Davenport, IA 52808

Mitch Wilkinson
414 Howard Street
Elmhurst, IL 60126

Modern Welding Co. of Ohio, Inc.
Attn: Jerry Waller
72 Waldo Street
Newark, OH 43055

700905-1

## Resource Technology Service List - All Creditors

Moline Consumers Co.
1701 - 5th Avenue
Moline, IL 61265

Mostardi-Platt Associates,Inc.
945 Oak Lawn Ave.
Elmhurst, IL 60126

Motion Industries
P.O. Box 91319
Chicago, IL 60693

Muir, Vincent G
4330 W. Shawnda Ct.
Peoria, IL 61615

Vincent Muir
6809 N. Frostwood Pkwy., Unit #7
Peoria, IL 61615

National Coal Museum
4523 RFD
Long Grove, IL 60047

National Environmental Testing
P.O. Box 530101
Atlanta, GA 30353

National Filter Media Corp.
P.O. Box 840
New Haven, CT 05504

National Piping & Construction
7987 Pecue Lane, Suite A
Aurora, IL 60504

Newingham Excavating
3355 Stayton Dairy Rd.
Waverly, IL 62692

New Paradigm Resources
12 South Michigan Avenue – 5th Floor
Chicago, IL 60603

Nextel Communications
P.O. Box 6220
Carol Stream, IL 60197

Nichols, Richard
330 S. Wells 711
Chicago, IL 60606

Nicor Energy
1001 Warrenville Rd., Suite 550
Lisle, IL 60532

Noble EarthCorp.
5035 Linell Blvd
Saint Louis, Mo 63108

Northern Illinois Steel Supply
P.O. Box 2146
Joliet, IL 60434

Norocomm Public Safety Com.
P.O. Box 1368 (395 W. Lake Street)
Elmhurst, IL 60126-1368

Northern Illinois Gas
Attn: Bankruptcy And Collections
P.O. Box 549
Aurora, IL 60507-0549

700905-1

## Resource Technology Service List - All Creditors

Northern Illinois Steel Supply
P.O. Box 2146
Joliet, IL 60434

Northfield Inn & Suites
3280 Northfield Dr.
Springfield, IL 62702

Novaspect
P.O. Box 92202
Chicago, IL 60675

O'Connell Electric Company
405 W. 104th St.
Chicago, IL 60628

Oeuhauser, David
330 S. Wells #711
Chicago, IL 60606

Oil Waste
P.O. Box 4130
Peoria, IL 61607

Old Kent Bank
105 S. York
Elmhurst, IL 60126

Opperman Construction St.
16535 N. 1650 East Road
Pontiac, IL 61764

Owt Construction/Emcon
7550 Lucerne Dr.#110
Middleburg Hts, OH 44130

Ozinga Transportation Systems
21900 S. Central Ave.
Matteson, IL 60443

Park Trucking
326 Derby Ave.
Derby, IL 60418

Parker Fabrication
501 E. Courtland St.
Morton, IL 61550

Patten Industries Inc.
A Caterpillar Dealer
635 W. Lake St.
Elmhurst, IL 60126

Payroll Processors
5647 W. Diversey Ave.
Chicago, IL 60639

PCMS Inc.
8702 Patterson St.
Saint John, IN 46373

PDI, Inc.
17 W. 755 Butterfield Rd., Suite 312
Oakbrook Terr, IL 60181

PDI, Inc.
414 Howard Street
Elmhurst, IL 60126

Pence-Schwartz & Associates
386 N. York St.
Elmhurst, IL 60126

700905-1

## Resource Technology Service List - All Creditors

Pennsylvania Electric Coil Ltd
5325 W. 130th St.
Cleveland, OH 44130

Peoria, City/County
c/o F Ierulli
Peoria County State's Atty's Office
324 Main Street
Peoria, IL 61602

Phil Pollack & Co.Inc.
9945 Capital Dr.
Wheeling, IL 60090

Piezometer Research & Development
P.O. Box 2638
Bridgeport, CT 06608

Pollak & Hoffman Ltd
1200 Shermer Rd., Suite 301
Northbrook, IL 60062

Powell, Kenneth
9193 S. Burnside
Chicago, IL 60619

Praxair/Gas Tech
P.O. Box 6003
Hillside, IL 60162

Professional Service Industries
P.O. Box 71168
Chicago, IL 60694

Puritan Springs Water
1709 N. Kickapoo
Lincoln, IL 62656

Peoria Disposal Co.
City/County Landfill
P.O. Box 9071
Peoria, IL 61612

Petersburg Plumbing & Heating
117 N. 7th St.
Petersburg, IL 62675

Phillips Getschow Co.
229 Van Buren
Oconto Falls, WI 54154

Pitts & Sons, Incorporated
c/o Gregory B Mcatee, P.C.
3766 Professional Parkway
Mobile, AL 36609

Poly Systems Inc.
P.O. Box 795042
Saint Louis, MO 63179

Power Drill Inc.
1 South 65 Spring Rd.
Villa Park, IL 60181

Praxair/Gas Tech
Dept. Ch. 10660
Palatine, IL 60055-0660

Proshine Hand Wash & Detail
4313 E. New York
Aurora, IL 60504

QED Environmental Systems Inc.
P.O. Box 3726
Ann Arbor, MI 48106

700905-1

## Resource Technology Service List - All Creditors

Quicksilver Messenger Svc
330 S. Wells, Suite 1410
Chicago, IL 60606

Quill Corp.
P.O. Box 94081
Palatine, IL 60094

Quint City Barricade Rentals
P.O. Box 10
Coal Valley, IL 61240

R. Russell & Associates
215 W. Washington
Pontiac, IL 61764

Raeco Environmental
9324 Gulfstream Road
Frankfort, IL 60423-2529

Ray Architects Engineers
Galaria San Patricio
Tabonuco St.
San Juan, PR 00920

Rd Lawrence Construction Co.
603 N. Amos
Springfield, IL 62702

Rental Service Corp.
T&M Rentals
300 W. Chicago Ave.
East Chicago, IN 46312

Rental ServiceCorp.
c/o Lambuert C Genetos
8585 Broadway, Suite 480
Gary, IN 46410

Rhodes Welding
20 Hideaway Estates
Petersburg, IL 62675

Rhodes, Rebecca
5038 W. 158th St.
Oak Forest, IL 60452

RN Realty LP
225 W. Illinois, Suite 305
Chicago, IL 60610

Rolf, David A.
Sorling, Northrup, Hanna Etal
607 E. Adams St/P.O. Box 5131
Springfield, IL 62705

Roman, Osvaldo
c/o 2200 Hamilton Lane
Darien, IL 60561

Ronchetti Excavating St.
520 Pasadena Avenue
Crest Hill, IL 60435

Rosemont Inc.
P.O. Box 39129
Minneapolis, MN 55439

Roy Zenere Trucking
c/o Nigro & Westfall Pc
1793 Bloomingdale Rd.
Glendale Height, IL 60139

RS Used Oil Services, Inc.
25903 S. Ridgeland
Monee, IL 60449

700905-1

## Resource Technology Service List - All Creditors

RTO Services
919 Rock St.
Peru, IL 61354

R.W. Beck
550 Cochituate Road
Framingham, MA 01701-9344

SBC Ameritech
Bill Payment Center
Chicago, IL 60663-001

Scattered Corp.
330 S. Wells Room 718
Chicago, IL 60606

Schaefer Electric
1020 S.W. Jefferson Ave.
Peoria, IL 61605

Schain, Firsel & Burney
222 N. LaSalle St., Suite 1910
Chicago, IL 60601

Schulte Supply Co.
P.O. Box 388
Edwardsville, IL 62025

Seaman Mechanical Services
P.O. Box 355
Southbury, CT 06488

Secretary of State – IL – Vehicles
501 S. 2nd Street – Rm 591 Vehicle Services
Springfield, IL 62756-7200

Selco Industries Inc.
Berglund & Niew PC
900 Jorie Blvd., Suite 122
Oak Brook, IL 60523

Selco Industries, Inc.
6655 Kitty Avenue
Chicago Ridge, IL 60415

Sexton Disposal Services
276 E. Sauk Trail
Frankfort, IL 60423

Shiner Moseley & Associates
2820 S. Padre Island Dr., Suite 210
Corpus Christi, TX 78415

Shiner Moseley & Assoc Inc.
555 N. Carancahua, Suite 1650
Corpus Christi, TX 78478

Siemens Westinghouse Technical
Dept Ch10169
Palatine, IL 60055

Sievert Electric Service
1230 S. Hannah St.
Forest Park, IL 60130

Snet
P.O. Box 1861
New Haven, CT 06508

Solar Turbines Incorporated
P.O. Box 200580
Houston, TX 77216-0580

## Resource Technology Service List - All Creditors

Sparkling Spring Water Co.
565 Lakeview Pkwy., Suite 120
Vernon Hills, IL 60061

Springfield Battery
2645 E. Cook St.
Springfield, IL 62703

State Of Connecticut
Dept Of Revenue Svc
P.O. Box 5089
Hartford, CT 06102

State Of Illinois
300 W. Jefferson St.
Springfield, IL 62702

Lawrence N. Stein
C & M PIPE & SUPPLY CO., INC
20 N. Clark, Suite 1725
Chicago, Illinois 60602

Stevens Drilling & Environmental
6240 Highway 12 West
Maple Plain, MN 55359

Superior Petroleum Products
405 Thomas St.
Crown Point, IN 46307

Superior Products Inc.
1200 10th St.West
Birmingham, AL 35204

SWANA
P.O. Box 7219
Silver Spring, MD 20907-7219

T A M E Tool Sales
James Moot-Matco Tools
P.O. Box 2647
Bridgeview, IL 60445

Taft Contracting Co.
900 W. 67th St.
Hodgkins, IL 60525

Talamo Court Reporters Inc.
100 W. Monroe St., Suite 2222
Chicago, IL 60603

Tanzillo Contractors
886 S. Milwaukee Ave.
Wheeling, IL 60090

T C Construction Inc.
1122 Evanston Road
Lucedale, MS 39452

Terracon Consultants Inc.
135 Ambassador Dr.
Naperville, IL 60540

Testamerica Incorporated
850 W. Bartlett Rd.
Bartlett, IL 60103

The Medlen Group
P.O. Box 96370
Houston, TX 77213

Thilman & Fillippini
P.O. Box 71851
Chicago, IL 60694

700905-1

## Resource Technology Service List - All Creditors

Thompson MechanicalCorp.
4040 Washington Blvd
Hillside, IL 60162

Thrall Distribution Inc.
135 S. LaSalle St.
Dept 1217
Chicago, IL 60674

TJ Lambrecht Construction
Route 30 & Gouger RFD 2
Joliet, IL 60432

TLC Contracting Inc.
P.O. Box 2543
Darien, IL 60561

Trailer Masters Inc.
1560 Recreation Dr.
Springfield, IL 62707

Transamerican Waste Industries Inc.
314 N. Post Oak Lane
Houston, TX 77024

Treasurer of the State of Illinois
300 W. Jefferson
Springfield, IL 62702

Trinity Consultants
12801 North Central Expressway, Suite 1200
Dallas, TX 75243

Turner, Jimmy
Matco Tools
732 Lewis Rd.
Geneva, IL 60134

Unishippers
P.O. Box 5506
Woodridge, IL 60517

United Illuminating
157 Church St.
New Haven, CT 06506

United Industrial
14-16 W. Main St.
Meriden, CT 06451

United Parcel Service
c/o D&B Bankruptcy Services
P O Box 5126
Timonium, MD 21094

United Parcel Service
P.O. Box 505820
The Lakes, NV 88905-5820

Universal Pipe & Supply Inc.
P.O. Box 2404
Joliet, IL 60434

Utilities ServiceCorp.
7810 Kickapoo/Edwards Rd.
Peoria, IL 61601

Uwm-Geotechnical Engineering
2228 Engineering Hall
1415 Engineering Dr.
Madison, WI 53706

Village Of Hillside
30 Northwolf Rd.
Hillside, IL 60162

700905-1

## Resource Technology Service List - All Creditors

Village Of Lansing
18200 Chicago Ave.
Lansing, IL 60438

Village Of McCook
5000 Glencoe Ave.
McCook, IL 60525

W.A. Kraft Corporation
199 Wildwood Avenue
P O Box 2189
Woburn, MA 01888

Walker, Richard
16 W. 253 93rd Place
Burr Ridge, IL 60521

Waste Mgmt. of Peoria
206 W. Camp
East Peoria, IL 61611

Weaver Boos Consultants Inc.
415 Taft Ave.
Glen Ellyn, IL 60137

Peter Weeks
506 S. Trenton Ave
Pittsburgh, PA 15221

Weeks, Philip
14504 Linder Court
Oak Forest, IL 60452

Wentworth Tire Service Inc.
11130 S. Corliss Ave.
Chicago, IL 60628

Werner, Kevin
21 W. 531 Eagle Terrace
Medinah, IL 60157

Will County Land Use Dept
501 Ella Ave.
Joliet, IL 60433

William Scotsman Inc.
The Scotsman Group
8211 Town Center Dr.
Baltimore, MD 21236

Woodland Recycling & Disposal
P.O. Box 364
South Elgin, IL 60177

Worsek & Vihon PC
180 N. LaSalle St., Suite 3010
Chicago, IL 60601

W.W. Grainger
7300 N. Melvina
Niles, IL 60714

W.W. Grainger Inc.
Dept 136-838477866
Palatine, IL 60038

Wyant Surveying Co.
225 N. Main St.
Benton, IL 62812

Charles E. York
1624 Fernbrook Drive
Mobile, AI. 36605

700905-1

## Resource Technology Service List - All Creditors

John Kelliher
Office of General Counsel
Illinois Commerce Commission
160 North LaSalle St., 9th Floor
Chicago, IL 60601

State of Georgia
Department of Revenue
P.O. Box 740390
Atlanta, Georgia 30373

Alabama Department of Revenue
50 North Ripley Street
Montgomery, Alabama 36132

Connecticut Department of
  Revenue Services
25 Sigourney Street
Hartford, CT 06106

State of Texas
Department of Revenue
Austin Central
1711 San Jacinto Blvd., Ste. 180
Austin, TX 78701-1416

Texas Comptroller of Public Accounts
P.O. Box 13528, Capitol Station
Austin, Texas 78711

Ohio Department of Taxation
30 E. Broad Street
22nd Floor
Columbus, Ohio 43215

Louisiana Department of Revenue
P.O. Box 201
Baton Rouge, LA 70821

Iowa Department of Revenue
P.O. Box 10471
Des Moines, IA 50306

Ms. Mary Bacon
EWING BEMISS & CO.
901 E. Byrd St., Suite 1650
Richmond, VA 23219

Mr. Louis D. Bernstein
GOULD & RATNER
222 North LaSalle Street
8th Floor
Chicago, Illinois 60601

Ms. Lois West, CPA
POPOWCER KATTEN, LTD.
35 East Wacker Drive
Suite 1550
Chicago, Illinois 60601-2207

Illinois Department of Revenue
101 West Jefferson Street
Springfield, IL 62702

Illinois Department of Revenue
James R. Thompson Center
100 West Randolph Street
Chicago, Illinois 60601

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

IN RE:                           )    Chapter 11
                                 )
RESOURCE TECHNOLOGY              )    Case No. 99-35434
CORPORATION,                     )
                                 )    The Honorable Eugene Wedoff
        Debtor,                  )
                                 )    Hearing Date: July 14, 2005
                                 )    Hearing Time: 9:30 a.m.

## TRUSTEE'S MOTION FOR ENTRY OF AN ORDER (1) DISMISSING CHAPTER 11 CASE AND (2) APPROVING SETTLEMENT ON TRUSTEE'S § 506(c) CLAIM

Gregg E. Szilagyi, the Chapter 11 Trustee ("Trustee") for the Debtor, Resource Technology Corporation ("RTC") pursuant to 11 U.S.C. §§ 1112(b), 506(c), 105(a) and Fed. R. Bankr. P. 2002(4) and 9019(a), moves this Court for the entry of an order dismissing this Chapter 11 bankruptcy case for cause (the "Motion").

In support thereof, the Trustee states:

### INTRODUCTION

Cause exists to dismiss this case based upon RTC's deteriorating financial condition and its manifest inability to effectuate a plan of reorganization. This Motion is made in the context of a negotiated agreement (the "Agreement") between the Trustee and RTC's primary prepetition and postpetition secured creditor under which substantially all of RTC's trade and professional administrative claims in the case will be paid or otherwise satisfied in full. Recent developments have impacted negatively upon RTC's net operating income. Further, the value of the estate property is declining. Absent the Agreement, described in greater detail below, a significant possibility exists that the estate would be administratively insolvent and would provide little or no payment to existing administrative creditors. Furthermore, all significant disputed issues presently before this Court are appropriate for resolution in non-bankruptcy forums. Finally,

conversion of this case to Chapter 7 would not be in the best interests of creditors because conversion would destroy any remaining "going-concern" value of the Debtor's business and would create a Chapter 7 estate with no purpose nor cause for administration.

The Trustee's proposal for voluntary dismissal provides for full payment or satisfaction of substantially all known, undisputed "trade payable" and professional administrative claims. Under any reasonable view of the relevant facts and circumstances, this is the best result for RTC's creditors. Accordingly, the Trustee requests the entry of an order: (a) dismissing this Chapter 11 case, and (b) approving the Agreement. The Trustee also asks that this Court retain jurisdiction for the purpose of ruling on professional fee applications and enforcing or interpreting the terms of the Agreement as may be necessary.

## FACTS

### A.    The Debtor's Business

1.    On March 15, 1993, RTC was incorporated under the laws of the State of Delaware. On January 1, 1995, Rumplestiltskin (USA) Corp. became the 100% shareholder of RTC. As of approximately June 28, 2004, Rumplestiltskin (USA) Corp. was owned directly or indirectly as follows: 50% by Leon Greenblatt and Leslie Jabine, 30% by Andrew Jahelka and 20% by Richard O. Nichols.

2.    John Connolly is the President of RTC and, as of June 28, 2004, Mssrs. Connolly, Jahelka, Nichols and Kevin Werner comprised RTC's board of directors.

3.    Leon Greenblatt, for himself and as agent for Banco Panamericano, Inc. and Chiplease, Inc. (collectively, "Banco"), was the primary prepetition and postpetition Debtor-In-Possession lender to RTC. Banco Panamericano, Inc. is a South Dakota Corporation that is solely owned by Leon Greenblatt. Chiplease, Inc. is a South Dakota corporation that is solely

owned by a trust for the benefit of Leon Greenblatt's family. Mr. Greenblatt is also the Secretary and President of both Chiplease and Banco Panamericano.

4.     RTC is in the business of controlling and disposing of methane gas produced as a result of landfill operations. RTC typically enters into contracts with landfill owners for rights to extract and sell the landfill's recoverable methane gas. In some instances, RTC also enters into a multi-year contract with a local utility company for the purchase of the electrical power generated from the gas produced from that landfill.

## B.    The Chapter 11 Case and Appointment of a Trustee

5.     This case began on or about November 15, 1999, when three creditors filed an involuntary petition under Section 303 of the Bankruptcy Code against RTC. On or about January 18, 2000, RTC consented to the entry of an Order for Relief and converted the case to one under Chapter 11 of the Bankruptcy Code, both effective as of February 1, 2000. The case proceeded under Chapter 11, with RTC in possession of its assets and operating its business as Debtor in Possession under Sections 1107 and 1108 of the Bankruptcy Code.

6.     In the summer of 2000, RTC negotiated a financing arrangement with Network Electric Company ("NEC"), which allowed the financing and construction of a facility located in Pontiac, Illinois (the "Pontiac Site").

7.     RTC subsequently negotiated additional financing agreements with NEC regarding the financing, design and construction of additional equipment at the Pontiac Site as well as other facilities located in Hillside, Illinois and Beecher, Illinois.

8.     In the Spring of 2002, RTC and Aquila Capital Energy Corporation ("Aquila") negotiated the terms of a refinancing arrangement of the NEC/Pontiac Financing, which provided a better interest rate, a longer payout and an improved cash flow opportunity for RTC.

9.    In late March 2003, NEC filed two motions, one to lift automatic stay to proceed to foreclose on its collateral and one seeking the appointment of a Chapter 11 Trustee.

10.    On August 26, 2003, the Court appointed Mr. Szilagyi as the Chapter 11 trustee for RTC's bankruptcy estate and NEC subsequently withdrew its motion for relief from the automatic stay.

### C.    Operations, Proceedings and Other Developments Since the Trustee was Appointed

11.    Upon being appointed, pursuant to his obligations under 11 U.S.C. § 1106(a)(3), the Trustee reviewed the Debtor's assets and operations and determined that it would be in the best interests of the estate to continue operations and maintain the "going concern value" of RTC's business while investigating and pursuing reorganization options.

12.    Since very early in the case, the Trustee has taken the position that the interests of creditors would be maximized through reorganization or, if reorganization were not feasible, an orderly liquidation of the RTC facilities as operating businesses to maximize its "going concern value."

13.    Due to the complex, industry-specific and wide-ranging nature of RTC's business, as well as the lack of cash available for the Trustee's discretionary use, the Trustee determined that it was necessary to maintain most of RTC's existing employees and management to efficiently continue RTC's operations, pending resolution of the Chapter 11 bankruptcy case.

14.    When the Trustee was appointed, numerous adversary proceedings, contested matters and other disputed matters were pending in this Court, the federal district court, the Seventh Circuit Court of Appeals, various state courts and before administrative agencies, many of which required immediate attention.

15.    Since his appointment, the Trustee has litigated through trial or settlement at least twenty such disputes, several of which currently are in various stages of the appellate process.

16.    Among such disputes were several matters relating to the Trustee's disposition of assets of the estate. Banco objected without exception to each such proposed disposition and fought the Trustee in his efforts to dispose of assets in most cases through trial and appeal. While each of these matters was decided by the Court in the Trustee's favor, many required extensive discovery and an evidentiary hearing involving the Trustee, Banco and other interested parties.

17.    Banco's opposition to the Trustee's efforts to dispose of estate assets presented significant difficulties for the Trustee in his efforts to operate RTC's business, carry out his statutory obligations and pursue an effective reorganization or orderly liquidation of RTC as a going concern. Examples of such difficulties are:

(a)    Immediately upon the Trustee's appointment, Banco terminated its debtor in possession financing facility leaving RTC with no access to credit and forcing the Trustee to fund all operations with cash generated from operations as was available pursuant to cash collateral agreements with various secured creditors.

(b)    Through its existing relationship with RTC, Banco continued to exert significant control over RTC's management and operations and benefited from insider relationships not typically available to a debtor in possession lender.

(c)    Banco's historically strong insider relationships with existing RTC employees and management, including its President, John Connolly, who has been employed by RTC for approximately seven years, created severe difficulties for the Trustee and his counsel in the numerous disputes with Banco. RTC's employees and management were typically the best source of information regarding the company and its operations and were often key witnesses in such proceedings, yet they

generally testified on behalf of Banco and in opposition to the Trustee in those proceedings.[1]

(d)    Banco's court-approved post-petition loan documents provided Banco with extraordinary rights and remedies including, among others, the rights to relief from the automatic stay and to terminate cash collateral, as essentially self-executing relief upon notice, and without regard to the standards normally required to obtain such relief under the Bankruptcy Code.

(e)    Through its insider relationship with RTC and ownership and control of certain business trusts used by RTC to "monetize" a significant portion of RTC's income (derived from the lease of its gas rights to the business trusts which leases give rise to "section 29 tax credits"), Banco effectively controls most of RTC's income and cash flow.  Since the Trustee's appointment, Banco has caused these business trusts to withhold payment to the estate the income it is due from the leases.  The Trustee has devoted considerable efforts to obtain RTC's income from the business trusts, including initiating a Rule 2004 investigation, to no avail.

18.    Nonetheless, until recently the Trustee has managed to continue RTC's operations on more or less a "break-even" basis on an operational level (*i.e.*, not including all professional fees).

19.    The Trustee also has diligently pursued administration of estate assets and resolution of disputes.  However, the interests of the estate and its creditors are no longer best served by continued litigation and delay, but by dismissal subject to the terms set forth below and in the Agreement attached hereto.

---

[1]    Indeed, the Trustee was forced to obtain a Court order to prevent his employees from consulting with opposing counsel in preparation for trial.

692953-4                                    6

**D.**    **Banco State Court Proceedings and Trustee's Injunction Adversary**

20.    On September 8, 2004, Banco filed a Motion for Relief From the Automatic Stay. On October 15, 2004, the Court granted Banco's Motion over the Trustee's objection and entered an Order Granting [Banco] Relief From the Automatic Stay.

21.    On October 27, 2004, Banco filed an action in the Circuit Court of Cook County for breach of contract. Banco also sought the appointment of a receiver to administer most of the Debtor's operations.

22.    The Trustee removed Banco's state court action to this Court and, on November 16, 2004, following certain proceedings, filed an Adversary Complaint for Injunctive and Declaratory Relief (the "Injunction Adversary"). The Trustee asked this Court to enjoin Banco from pursuing remedies against its collateral in a non-bankruptcy forum and for other relief.

23.    On December 27, 2004, the Court conducted a preliminary hearing on the Trustee's request for injunctive relief, and, on December 30, 2004, entered an order granting the Trustee's request for preliminary injunctive relief.

24.    The permanent injunction hearing on the Trustee's Injunction Adversary is presently scheduled to begin on August 15, 2005. A hearing on the Trustee's objection to Banco's secured claim also is also scheduled for that date.

25.    In the event the Trustee were to prevail and obtain entry of a permanent injunction, his intention would have been to continue to pursue orderly liquidation of the RTC facilities that have value and abandonment of those that do not. Based upon its consistent prior pattern of opposition to the Trustee's actions, Banco is expected to oppose each such sale or proposed disposition of property of the estate.

## DEVELOPMENTS SINCE THE DECEMBER 27 PROCEEDING

26.    Since the December 27, 2004 preliminary hearing, certain developments have caused the Trustee to reconsider his pursuit of injunctive relief and orderly liquidation and pursue the present motion for voluntary dismissal of the RTC bankruptcy case. These include:

(a)    Based on mounting pressures from a continuing lack of funds for maintenance and capital improvements, RTC's business has experienced a steady decline. This decline has resulted in a string of months with declining revenue from operations and increasing accrual of operating expenses.

(b)    RTC recently received notices of violation from the Illinois Environmental Protection Agency for its Peoria, McCook and Taylor Ridge facilities. In addition, certain ongoing maintenance issues at the Pontiac and Springfield landfills have raised significant safety concerns and created the possibility, if not likelihood, that RTC will receive additional violation notices from the Illinois Environmental Protection Agency. Based upon the current status of RTC's business, the Trustee will have insufficient funds to address and remedy environmental problems at the landfills.

(c)    Earlier this year, a fire occurred at RTC's Springfield facility causing approximately $250,000 to $350,000 in damages and shutting down the facility. Currently, the Springfield facility is not operating. Previously, Springfield was one of the few RTC facilities that was providing positive cash flow to RTC.

(d)    Scattered Corporation, a Banco affiliate, purchased the claim and secured position of Caterpillar Financial relating to RTC's Springfield and Peoria facilities. Scattered terminated the cash collateral arrangement that had been in place regarding the funds generated at those facilities. Therefore, to gain access to this

source of funds upon which the Trustee has relied since his appointment, he will have to repair the damage caused by the fire and engage in a contested cash collateral proceeding with Banco.

(e)  Over the past several months, the Trustee has been engaged in substantial efforts to market and sell the Pontiac Site, including hiring an investment banker to assist with the sale.  In connection with those efforts, the Trustee has encountered significant unanticipated difficulties.  Although the Pontiac Site is not directly relevant to the Injunction Adversary, the Trustee's difficulties selling the Pontiac site likely foreshadow similar difficulties he may face in his efforts to sell other RTC facilities.  This expectation is particularly appropriate so long as Banco remains opposed to such sales.  The difficulties that may affect the Trustee's ability to market RTC's facilities at locations other than Pontiac include:

  (i)  Legislation was introduced in the Illinois legislature this past term, which, if enacted, would have had a significant negative impact upon the profitability of RTC's Illinois-based operations.[2]  In sum, this proposed legislation sought to eliminate the "Illinois Retail Rate" law (220 ILCS 5/8-402.1) under which a "qualified solid waste energy facility" ("QSWEF"), as determined by the Illinois Commerce Commission ("ICC"), receives a premium for the electricity that it sells to public utilities.  If this legislation were to have passed, RTC's revenue from its Illinois operating facilities would likely be approximately half of the revenue that RTC currently receives.  Although it failed to pass this term, the Trustee believes that the regulatory atmosphere engendered by this

---

[2]  SB 1450 and HB 1050, 94th General Assembly

proposed legislation has made the Pontiac site less attractive to potential purchasers. Presumably, the same will be true regarding RTC's other Illinois operating facilities.

(ii)     An administrative proceeding is pending before the ICC attacking RTC's QWSEF status at Pontiac. Should the ICC prevail, presumably it will challenge the QWSEF status of RTC's other operating facilities. Without QWSEF status, RTC's other Illinois operating facilities will not receive the Retail Rate, which will reduce RTC's revenues and make these assets less valuable.

(f)     Notwithstanding the Trustee's pursuit of an orderly liquidation, he is aware of and has encouraged settlement discussions between Banco and NEC. Despite the Trustee's efforts and what appeared to be ongoing good faith negotiations between Banco and NEC, the Trustee has concluded that these parties will not resolve their differences in the context of a Chapter 11 proceeding.

(g)     Banco approached the Trustee and, following certain discussions and negotiations, made a proposal, the substance of which is set out in greater detail below and in the document attached hereto as Exhibit A, which the Trustee believes is in the best interests of the RTC estate and its creditors.

## PROPOSAL FOR VOLUNTARY DISMISSAL

27.     The terms of Banco's proposal are set out in a letter from its counsel dated June 22, 2005, a copy of which is attached hereto as Exhibit A (the "Agreement"). The Trustee has already begun carrying out certain major portions of this proposal, which do not require Court approval, such as the payment of allowed administrative claims referenced therein.

28.    The Agreement includes the following major features:

(a)    Banco shall fund the estate's payment of the administrative claims set forth on Schedule A to the Agreement, which represent substantially all known trade and professional administrative claims in this case. The administrative claims listed on schedule A will be paid by the Trustee in full prior to the hearing on this Motion.

(b)    A select few additional administrative claims are listed on Schedule B to the Agreement. Banco assumes responsibility for the administrative claims listed on Schedule B (as of this filing, Banco has already purchased several of these claims from the respective claimants as indicated on Schedule B.) RTC will not be discharged or otherwise relieved of its liability or responsibility for such claims (or any other claims), but Banco obligates itself in the Agreement to be responsible and liable for those specific claims listed on Schedule B. Banco and RTC retain their right to dispute any such claims and only to be liable to the extent these claims are adjudicated by this Court or another court of competent jurisdiction.

(c)    Banco agrees that the Trustee's fees and expenses, and the fees and expenses of his counsel, to the extent such fees and expenses are allowed by this Court, and subject to a cap and certain other restrictions as set out in the Agreement, are recoverable from Banco's collateral pursuant to 11 U.S.C. § 506(c) and shall be paid by Banco in cash to the Trustee subject to the terms of the Agreement.

(d)    The hearing on the pending Injunction Adversary shall be continued until the present motion is resolved. The preliminary injunction order shall remain in effect until the permanent injunction hearing is held, the case is dismissed or upon further order of the Court.

(e)   Banco will advance funds necessary to pay any outstanding United States Trustee fees and shall assist the Trustee to the extent necessary in bringing the estate current on all outstanding operating reports and similar administrative obligations.

## STANDARD FOR DISMISSAL UNDER 11 U.S.C. § 1112(b)

29.   11 U.S.C. § 1112(b) provides that, upon request of a "party in interest," the Court may dismiss a Chapter 11 bankruptcy case for "cause" or may convert the case to a case under Chapter 7, depending on the "best interest of creditors and the estate." The statute contains a non-exhaustive list of ten examples of what may constitute "cause" for dismissal or conversion of a Chapter 11 case. *See* H. Rep. 595, 95th Cong., 1st Sess. 406 (1977). *See In re SLG Carbon Corp.*, 200 F.3d 154, 160 (3rd Cir. 1999) ("The list is not exhaustive. The Court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases").

30.   Among the specifically enumerated examples of "cause" are the "continuing loss or diminution of the estate and absence of a reasonable likelihood of rehabilitation" and an "inability to effectuate a plan." *See* 11 U.S.C. §§ 1112(b)(1) and (b)(2).

31.   The decision whether to dismiss or convert a Chapter 11 case upon request of a party in interest is within the discretion of the court.

32.   The Seventh Circuit has recognized that the purpose of section 1112(b) is to allow a court to dismiss Chapter 11 cases at any time during the bankruptcy process where it is evident that continuing the "plan and confirmation" process is "pointless." *In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994).

33.   In *Woodbrook*, 19 F.3d at 316, the court granted a secured creditor's motion to dismiss the case for cause, having found that the debtor could not propose a confirmable plan.

34.     In ruling on a debtor's own motion to dismiss its Chapter 11 case, a court must address whether the debtor has made a showing that creditors' interests will be best served by dismissal, as opposed to conversion of the case. *See In re Continental Holdings, Inc.*, 170 B.R. 919, 927-928 (Bkrtcy. N.D. Ohio, 1994) (citations omitted).  In performing this analysis, the court ultimately must compare "the creditors' interests in bankruptcy with those they would have under state law."  170 B.R. at 927, citing *Rolex Corp. v. Associated Materials, Inc. (In re Superior Siding & Window, Inc.)*, 14 F.3d 240, 243 (4th Cir. 1994).

35.     The United States Supreme Court has identified two primary policies underlying Chapter 11: "preserving going concerns and maximizing property available to satisfy creditors." *Bank of America Nat'l Trust and Savings Assoc. v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 453, (1999), citing *Toibb v. Radloff*, 501 U.S. 157, 163(1991).

## ARGUMENT

36.     Dismissal of these cases is in the best interests of creditors and serves the primary policies of Chapter 11, as identified by the United States Supreme Court in *203 N. LaSalle*.

37.     If there is one thing that all parties to this bankruptcy case can agree upon, it is that no party is able or willing to propose and confirm a plan of reorganization.  As a result, there is no reasonable likelihood in the context of these proceedings that RTC will be able to "effectuate a plan," much less "rehabilitate" its business.

38.     Furthermore, the RTC estate is suffering continuing losses and, in view of negative developments over the past several months, may well be diminishing in value.  In fact, the Trustee is concerned that, with decreasing revenue and increasing accrual of unpaid operating expenses, he will not be able to sustain RTC's operations absent a considerable cash infusion.[3]  If

---

[3]   Banco has expressed a willingness to assist the Debtor in addressing its revenue shortfalls, but will not advance additional sums as a debtor-in-possession lender in this case other than as specifically set out in the Agreement.

RTC were to cease operations, the estate would be imperiled by the prospect of additional environmental liability.

39.     Continuing the Chapter 11 process under these circumstances is "pointless," as that term is used by the Seventh Circuit in *Woodbrook*.

40.     The Trustee's efforts to obtain a permanent injunction, if successful, will not necessarily solve RTC's fundamental problems relating to funding of operations, maintenance and environmental concerns and difficulties in the sale process. Rather, success only will give the Trustee the opportunity to pursue the orderly liquidation that appeared to be in the best interest of the estate in the Fall of 2004, when injunction proceedings were initiated.

41.     In pursuing the orderly liquidation, the Trustee certainly would continue to face opposition from Banco and all the difficulties, expense and delay posed by that opposition. Given the cost of such actions, the difficulties posed by the present state of RTC's operations and the uncertain recovery from the disposition of RTC's assets, it is unclear, to say the least, that pursuing an orderly liquidation would provide as much or more benefit to the estate than that provided by immediate dismissal of the case under the terms outlined herein.

42.     The present proposal best serves the twin policies referenced in the *203 N. LaSalle* case insofar as it:  (a) allows RTC to continue in business in its present form outside the bankruptcy forum; (b) provides that a solvent entity, Banco, will assume liability for certain disputed administrative claims not paid prior to dismissal; (c) provides creditors with more than they reasonably could have expected to receive under any foreseeable scenario in the bankruptcy context; and (d) allows creditors to pursue remaining claims in the venue of their choosing under applicable non-bankruptcy law.

43.     Furthermore, conversion of the case to Chapter 7 would not be in the best interests of creditors as it would eliminate the going concern value of RTC's business, add

administrative expense and delay and create an estate that no Chapter 7 trustee likely would administer.[4]

44.    While in the context of the Injunction Adversary, the Trustee has maintained that there is an "equity cushion" in Banco's collateral created by the value of the estate's property (excluding the Pontiac site) over and above the amount of Banco's lien, no party, including the Trustee, has ever suggested that there is any reasonable possibility for payment of a dividend to general unsecured creditors. Indeed, even under the most aggressive assumptions, the Trustee was at most hopeful that an orderly liquidation might pay some, but not all, of the existing administrative claims in this case.[5]

45.    The present proposal provides for payment in full or other satisfaction of administrative claims in an amount of approximately $6,327,000. In addition, the proposal provides security for certain administrative claimants by obligating Banco, in addition to RTC, on certain claims after dismissal.

46.    Finally, RTC's creditors, whether secured, unsecured, priority, administrative or otherwise, are not prejudiced and are most likely better off pursuing their claims in the appropriate jurisdiction of their choice free from the constraints of the automatic stay and other restrictions imposed on such creditors by the Bankruptcy Code. Secured creditors will not suffer any prejudice by dismissal as they will be free to pursue foreclosure or other remedies that may be available to them in a venue of their choosing. Similarly, general unsecured claimants have

---

[4]    Environmental concerns would be particularly acute should the case convert to Chapter 7. RTC operates pollution control devices (the landfill gas to energy plants) at certain of its Illinois facilities. In a Chapter 7 case, the trustee would require court authority to continue to operate RTC's business. RTC's operational permits with the Illinois Environmental Protection Agency require the operator to name an individual "responsible official" for the permittee, a position which imposes a degree of personal liability. The Trustee presumes that, if the case converted to Chapter 7, John Connolly, RTC's president and current "responsible person" on the permits, would resign. Considering RTC's current state of affairs, it is unlikely that someone else would be willing to be named a substitute "responsible official."

[5]    The total secured debt is in excess of $100 million and the Trustee believes that the estate's assets have a value between $50 million and $60 million.

little, if any, chance if any to receive any payment of their claims in a Chapter 11 or Chapter 7 bankruptcy proceeding. These claims, however, have "new life" under a voluntary dismissal, as the unsecured creditors will be free to pursue these claims, as permitted under applicable state law. Finally, administrative claimants, as addressed above, will receive a larger payment, and receive it sooner, than under any other conceivable result attainable through the bankruptcy process.

## NOTICE

47.     Notice of this Motion was provided to the following parties by U.S. Mail on June 24, 2005:

    (a)     The United States Trustees office;

    (b)     Counsel for the Unsecured Creditors Committee;

    (c)     All parties that the requested service of notices in this case;

    (d)     All known creditors;

    (e)     All parties that filed administrative claims in this case;

    (f)     All parties that filed proofs of claims in this case;

    (g)     All known interested state and federal governmental agencies;

    (h)     All landowners and operators at RTC facilities;

    (i)     All professionals known to the Trustee to have provided services to the RTC estate at any time;

    (j)     All other parties who, in the Trustee's opinion and according to the best information and data available to him after diligent investigation may be interested in the RTC bankruptcy case and the present motion.

**WHEREFORE,** the Trustee requests entry of any order in the form submitted herewith:

1.    Granting this Motion;

2.    Approving the Notice of the Motion as set out above;

3.    Dismissing the RTC bankruptcy case;

4.    Approving the Agreement as to the Trustee's section 506(c) claim, subject to final

      approval of fees and expenses and other restrictions outlined in the Agreement;

5.    Approving the terms of the Agreement;

6.    Discharging the Trustee from his duties as Chapter 11 Trustee for RTC;

7.    Retaining jurisdiction for the purposes of ruling on professional fee applications

      and interpretation and enforcement of the Agreement as may be necessary; and,

8.    For such other and further relief as the Court may allow.


Dated: June 24, 2005

                                        **GREGG E. SZILAGYI,** as Trustee
                                        for Resource Technology Corporation

                                        By: _____
                                              One of his Attorneys


OF COUNSEL:
Susan G. Feibus (ARDC No. 6181749)
Christopher L. Rexroat (ARDC No. 6274402)
UNGARETTI & HARRIS LLP
3500 Three First National Plaza
Chicago, Illinois 60602
Telephone:    (312) 977-4400
Facsimile:    (312) 977-4405

692953-4                          17



James T. Markus
(303) 866-0102
jmarkus@bmwllc.com

**BLOCK**
**MARKUS &**
**WILLIAMS LLC**
Attorneys at Law

Offices in
Colorado
Wyoming

June 22, 2005

**VIA E-MAIL**

Gregg E. Szilagyi
Ungaretti & Harris
3500 Three First National Plaza
Chicago, IL 60602

      Re:   In re Resource Technology, Corp., Case No. 99-b-35434
              BMW No. 10677.002

Dear Gregg:

      This letter will set forth the terms of an understanding which has recently been reached between you as the chapter 11 trustee for the bankruptcy estate of the Resource Technology Corporation ("RTC") and Banco Panamericano, Chiplease, Inc. and Leon Greenblatt (the "Lenders").

      In exchange for your agreement, to file and pursue through conclusion a motion to dismiss the RTC bankruptcy case, the Lenders have agreed to do the following:

      1.  The Lenders will advance to the trustee sums to pay the administrative expense claims owing by RTC to the claimants identified on **Exhibit A** hereto and in the amounts set forth on such Exhibit A. Trustee agrees that such sums will be treated first as an advance on account of the post-petition financing agreement to the extent there is availability thereunder and next such sums shall be treated as an allowed post-petition claim pursuant to 11 U.S.C. §364(a).

      2.  The Lenders will assume by agreement and be responsible for all of RTC's liabilities owing to the parties on **Exhibit B** except for disputed claims, which will be paid upon a final disposition of such claims.

      3.  In full satisfaction of and release from any and all claims for Trustee's attorneys' fees and Trustee's fees arising under 11 U.S.C. § 506(c) against the Lenders (individually and collectively), upon execution of this agreement, the Lenders shall pay to the Trustee the sum of $2,000,000 (the "506(c) Settlement"). Of the 506(c) Settlement, the Trustee shall be permitted to disburse immediately up to $1,000,000 to Ungaretti & Harris LLP ("U&H") for professional fees, as permitted under certain administrative fee payment orders entered in the RTC bankruptcy case. The remaining $1,000,000 will be payable in the form of a cashier's check in the amount of $500,000 and in the form of a letter of credit in the amount of $500,000 (the "Letter of

1700 Lincoln, Suite 4000, Denver, Colorado 80203 · (303) 830-0800 · Fax (303) 830-0809
211 West 19th Street, Suite 310, Cheyenne, Wyoming 82001 · (307) 778-8178 · Fax (307) 778-8953
www.bmwllc.com

**EXHIBIT**

**A**

June 22, 2005
Page 2

Credit") identifying U&H as the beneficiary, which Letter of Credit may be drawn upon joint direction or upon the effective date of a dismissal of the RTC case. The $500,000 and the Letter of Credit shall be held in a segregated account by the Trustee, to be disbursed to U&H upon the effective date of an order of dismissal, and all required orders approving U&H's fees and expenses and Trustee's fees. In the event the case is not dismissed, pursuant to the Trustee's motion or any amended or subsequently filed motion or otherwise, then the funds and the Letter of Credit held in the segregated account shall be returned by the Trustee to the Lenders, except that if the RTC bankruptcy case is not dismissed as a result of an objection raised by any party listed on Exhibit B, no funds shall be returned to Lenders. If the RTC bankruptcy case is not dismissed or any dismissal order entered by the bankruptcy court is reversed on appeal, then the Trustee agrees that he shall not be entitled to any further payments for professional fees or Trustee's fees from the RTC estate until and unless the sums advanced by the Lenders pursuant to this agreement are repaid to the Lenders by RTC in full. The Lenders agree that they will not, nor will they cause any other party or person to object to the allowance or payment of Trustee's fees or U&H's fees in the RTC bankruptcy case. As security for the Lenders' obligations to pay the 506(c) Settlement, the Lenders agree to a carve-out and subordination of their security interests in their RTC collateral, including cash collateral, in favor of U&H, in the amount of $1 million, which carve-out and subordination shall be deemed terminated upon payment in full of the 506(c) Settlement by Lenders.

   4. As part of the Trustee's motion to dismiss the RTC bankruptcy case, Trustee agrees to seek dismissal of the proceeding initiated against the Lenders, Adversary Proceeding No. 04-4068; provided, however, that Lenders agree that the preliminary injunction entered in that case shall remain in effect pending the resolution of the motion to dismiss. Furthermore, pending the decision on the Trustee's motion to dismiss the RTC bankruptcy case, Trustee agrees to cease any efforts to settle, compromise, sell or take any other action involving or affecting any of the Lenders' collateral and which collateral is comprised of all RTC's property and all property of RTC's bankruptcy estate.

   5. Lenders agree to provide all manpower, resources and assistance necessary to assist the Trustee in completing all remaining monthly operating reports and to advance or consent to use cash collateral sums necessary for the Trustee to pay any unpaid United States Trustee fees required for dismissal.

   6. Trustee agrees to timely file a notice of appeal with respect to appeal order entered in Adversary No. 00A00150 entitled RTC v. Connecticut Resources Recovery Authority dated June 16, 2005.

June 22, 2005
Page 3

Thank you for your attention to these matters and your efforts in getting the RTC matter brought to conclusion. If you have any questions or comments, please contact me.

Sincerely,

BLOCK MARKUS & WILLIAMS LLC

James T. Markus

JTM:cdw

cc: Leon Greenblatt

AGREED TO AND ACKNOWLEDGED BY:

Gregg E. Szilagyi

## Schedule A

KTC Admin. Payables Past Position

SUPPLIER TOTALS
(last row per supplier represents TOTAL supplier payable)

| Supplier | Total |
|---|---|
| Advance Systems Technology Inc | $432.00 |
| Air and Waste Management Assoc | $275.00 |
| Alex Mogile & Assoc. | $18,480.00 |
| Altus Mossner Company | $1,859.79 |
| AMEREN CILCO | $2,000.00 |
| American Grading Co | $350.00 |
| Anderson Electric | |
| Anderson Electric Co. | |
| Anderson Electric Company | |
| Anderson Electric, Inc. | $2,186.08 |
| ABI Environmental, Inc. | $16,937.90 |
| AT&T | |
| AT&T | |
| AT&T | |
| AT&T | $207.04 |
| AT&T | $32,179.71 |
| Bagby & Russell Electric Co. | $3,000.00 |
| Brian Lee Munsterman | |
| BRYAN CAVE LLP | $3,821.08 |
| C & M Pipe & Supply Co. Inc. | |
| C & M Pipe & Supply Co., inc. | |
| C & M Pipe & Supply Co., Inc. | |
| C&M Pipe & Supply Co | $22,489.33 |
| C&M PIPE SUPPLY CO | $383.03 |
| Capital Waste Systems | $29,193.66 |
| Carlson Environmental | |
| Cavallo Trucking | |
| Cavallo Trucking, Inc. | $11,084.00 |
| Cavallo Trucking, Inc. | $81.93 |
| CDI, Inc. | $3,345.00 |
| Charles E. York | $702.85 |
| Chase Automotive Finance | $24,274.80 |
| CITY OF PEORIA | $167.08 |
| Coffas Unlimited | $108,759.48 |
| Congress Development Corporation | $84.00 |
| Cook County Dept of Environmen | $891.00 |
| CT Corporation System | $28.82 |
| Culligan Water Conditioning | $28,699.50 |
| D. Ferrard Construction Inc. | $8,093.33 |
| Daniels Excavating, Inc. | $3,582.82 |
| Distinctive Office Products | $16,818.15 |
| Earth Solutions, Inc. | $391.00 |
| Eco-Clean Incorporated | $878.41 |
| Elizabeth G. Sharp | $1,200.00 |
| Emhart, Inc. | $10,166.67 |
| Espiritu & Associates | $881.15 |
| Evink & Son Blacktop Inc. | $10,000.00 |
| First Electric Motor Shop, Inc | $735.32 |
| First Insurance Funding Corp. | $1,200.00 |
| First Midwest Bank | $3,229.66 |
| Floyd Steel Erectors, Inc. | |
| Floyd Steel Erectors, Inc. | $880.00 |
| Gooding Rubber Company | $2,762.88 |
| Guardian Dental | $186.52 |
| Hydraulic Crane Specialists | $450.00 |
| IEPA | |
| IL Environmental Protection Ag | |
| IL-EPA Permits | |
| Illinois EPA | $8,147.00 |
| Illinois Department of Revenue | $55,000.00 |
| Integrity Transportation Co. | $1,090.00 |
| J. B. Lee Transportation Co. | $8,469.00 |
| J.B. Lee Transportation Co. | $31,370.75 |
| John Connolly | $817.81 |
| Kar Products | $1,146.00 |
| KF Crushe | |
| Ken's Water Systems, Inc. | $65.07 |

| | |
|---|---|
| Kevin Werner | $4,511.98 |
| KIEFT BROTHERS, INC | |
| Kieft Brothers, Inc. | $10,707.60 |
| L&M Waste Systems, Inc. | $339.85 |
| Lamp Telecom L.P. | $7,445.25 |
| MCB Water Authority Inc. | $485.00 |
| Metalworking Lubricants Co. | $13.75 |
| Mid/American Energy | $88.87 |
| Mitch Wilkinson | $3,250.00 |
| Nancy Drake | $2,018.05 |
| Natson Oil Co., INI. | $4,314.38 |
| New Paradigm Resources | $5,914.52 |
| Nextel Communications | $1,066.48 |
| Norcomm Public Safety Communi | $491.00 |
| Oppelman Construction Co. | $850.00 |
| PDI, Inc. | $10,494.07 |
| Peter Weeks | $6,250.00 |
| Philip Weeks | $6,819.72 |
| Praxair/Gas Tech | $98.49 |
| Puritan Springs Water | $67.40 |
| QED Environmental Systems | $350.00 |
| Quicksilver Messenger Service | $145.50 |
| R.W. Beck | $9,173.83 |
| Raedo Environmental | $591.80 |
| Rebecca Rhodes | $2,443.85 |
| Richard Walker | $4,413.81 |
| Ronchetti Excavating Co. | |
| Ronchetti Excavating Co. | $10,548.95 |
| RS USED OIL SERVICES | |
| RS Used Oil Services Inc | |
| RS Used Oil Services, Inc. | |
| RS Used Oil Services, Inc. | |
| RS Used Oil Services, Inc. | |
| RS Used Oil Services, Inc. | $15,725.60 |
| SBC Ameritech | |
| SBC Ameritech | $264.71 |
| Secretary of State, Illinois | $156.00 |
| Seico Industries, Inc. | $18,941.71 |
| Service Sanitation, Inc | $1,000.28 |
| Solar Turbines Inc. | $189,660.00 |
| SONYA A. LEVOY | $2,397.00 |
| Springfield Battery Co | $459.00 |
| Superior Petroleum Products | |
| Superior Petroleum Products | $864.78 |
| SWANA | $1,000.00 |
| T C Construction Inc. | $42,900.00 |
| Terry McEvoy | $477.79 |
| The Madish Group | |
| The Madish Group | |
| The Madish Group | $1,182.78 |
| Tillman & PRRAN LLC | $347.00 |
| TLC Contracting Inc. | $8,333.64 |
| Trinity Consultants | $14,456.88 |
| Unishopers | $10.88 |
| United Parcel Service | $5,510.66 |
| Vincent Muir | $130.63 |
| Village of Lansing | $7,879.40 |
| | |
| Total | $981,294.23 |

Schedule B

| | | | |
|---|---|---|---|
| Shaw Gussis Domanskis | $337,645.81 | $337,645.81 | By agreement |
| Solar Turbines Incorporated | $184,700.00 | $184,700.00 | Assume Baecher payment plan |
| Richard Nichols | $117,000.00 | $117,000.00 | By agreement |
| RN Realty | $100,143.37 | $100,143.37 | By agreement |
| Robinson, Curley & Clayton | $804,519.11 | $804,519.11 | By agreement |
| Peoples Energy Services Corp. | $546,220.58 | | |
| Peoples Energy Services Corp. | $677,376.90 | $1,223,597.48 | purch by Banco |
| Nicor Energy, LLC | $184,917.82 | $184,917.82 | purch by Banco |
| Jenbacher Energie Systems | $492,000.00 | $492,000.00 | Disputed |
| | $3,446,523.59 | $3,446,523.59 | |

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| RESOURCE TECHNOLOGY | ) | Case No. 99-35434 |
| CORPORATION, | ) | |
| | ) | The Honorable Eugene Wedoff |
| Debtor, | ) | |

## ORDER

This Matter having come before the Court on the Trustee's Motion for Entry of an Order (1) Dismissing Chapter 11 Case and (2) Approving Settlement on Trustee's § 506(c) Claim (the "Motion") with the Court being fully advised in the premises:

IT IS HEREBY ORDERED that:

(1)   The Motion is granted[1];

(2)   Notice of the Motion is approved;

(3)   The "506(c) Settlement" referenced in the Agreement attached as Exhibit A to the Motion is hereby approved as being in the best interests of the estate and such fees and expenses having been reasonable, necessary costs of preserving or disposing of Banco's collateral.

(4)   All other terms and conditions set out in the Agreement attached as Exhibit A to the Motion are hereby approved.

(5)   The Chapter 11 case is hereby dismissed;

(6)   All pending adversary proceedings related to this chapter 11 case are hereby dismissed without prejudice;

(7)   This Order of Dismissal shall not discharge the Debtor of any prepetition or postpetition debt or liability.

(8)   The Chapter 11 Trustee is hereby discharged of his trust and his bond is hereby exonerated;

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to such terms in the Motion.
695573-1                                                        1

(9)   The Court retains jurisdiction to hear and rule on motions for final approval of professional fees in this case and to construe or enforce the terms of the Agreement attached as Exhibit A to the Motion;


DATED:_____


ENTER:   _____
              Eugene R. Wedoff
              United States Bankruptcy Judge

ORDER PREPARED BY:

Susan G. Feibus (ARDC No. 6181749)
Christopher L. Rexroat (ARDC No. 6274402)
UNGARETTI & HARRIS LLP
3500 Three First National Plaza
Chicago, Illinois 60602

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In re:                                              )
                                                    )
RESOURCE TECHNOLOGY                                 )
CORPORATION                                         )
                                                    )   Case No. 99 B 35434
Debtor.                                             )   (Chapter 11)

### ORDER GRANTING AQUILA ENERGY CAPITAL CORPORATION'S, CONCERT CAPITAL RESOURCES, LP'S AND NETWORK ELECTRIC COMPANY'S MOTION TO CONVERT CASE TO CHAPTER 7

Upon consideration of the motion (the "Motion") of Aquila Energy Capital Corporation ("Aquila"), Concert Capital Resources, LP ("Concert"), and Network Electric Company ("NEC"), for an order converting the Case to Chapter 7; it appearing that there is good cause to grant the relief requested; and, there being no objection to the relief requested; it is therefore ORDERED as follows:

1.     The Motion is granted.

2.     The above-captioned Case will be converted to a chapter 7 proceeding.

ENTERED:

Dated: _____, 2005

Honorable Eugene R. Wedoff

SEP 2 1 2005

CHZ\1285076 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| RESOURCE TECHNOLOGY CORP. | ) | Case No. 99 B 35434 |
| Debtor. | ) | Hon. Eugene R. Wedoff |

## NOTICE OF FILING

**Please take notice** that on February 24, 2006, the undersigned caused to be filed with the Clerk of the United States Bankruptcy Court for the Northern District of Illinois, 219 S. Dearborn Street, Chicago, IL, Draft Settlement Agreement, true and correct copies of which are attached hereto and hereby served upon you.

JAY A. STEINBERG, Chapter 7 Trustee for the
Estate of Resource Technology Corporation,

By:   /s/ George P. Apostolides
One of his attorneys

Barry A. Chatz (#06196639)
George P. Apostolides (ARDC #06228768)
Arnstein & Lehr LLP
120 S. Riverside Plaza, Suite 1200
Chicago, IL  60606
(312) 876-7100
Fax: (312) 876-7100

## CERTIFICATE OF SERVICE

George P. Apostolides, an attorney, certifies that he served a copy of the foregoing Draft Settlement Agreement to all parties on the attached Service List via facsimile on February 24, 2006 before 8:00 p.m. and via the Electronic Filing system.

   /s/ George P. Apostolides
George P. Apostolides

1037226_1

**SERVICE LIST**

Kathryn Gleason, Esq.
U.S. Trustee's Office
227 West Monroe Street
Suite 3350
Chicago, IL  60606
Fax #  (312) 886-5794

Stuart M. Rozen
Craig E. Reimer
Mayer Brown & Platt
190 S. LaSalle Street
Chicago, IL  60603
Fax # :  (312) 701-7711

Gerald F. Munitz, Esq.
Kathryn A. Parnenter, Esq.
Goldberg Kahn et. al.
55 East Monroe Street
Suite 3700
Chicago, IL  60603
Fax # :  (312) 332-2196

Michael S. Baird, Esq.
Stotis & Baird, Chartered
200 West Jackson Blvd,
Suite 1050
Chicago, IL  60606
Fax #  (312) 461-1486

Richard Mason, Esq.
McGuire Woods LLP
77 W. Wacker Dr.
#4400
Chicago, IL  60601
Fax # :  (312) 849-3690

Thomas R. Osterberger
333 N. Hammes Avenue
Suite 101
Joliet, IL  60432
Fax # :  (815) 725-9059

Charles P. Schulman
Mark A. Brand
David L. Lieberman
Arlene Gelman
Sachnoff & Weaver Ltd.
30 South Wacker Drive, 29th Floor
Chicago, IL  60606
Fax # :  (312) 207-6400

Edward I. Lesniak
Burke, Warren, et al.
Attorneys for Catholic
 Bishop of Chicago
330 N. Wabash Avenue
22nd Floor
Chicago, IL  60611-3607
Fax # :  (312) 840-7900

Thomas W. Goedert
Earl L. Neal & Associates
203 N. LaSalle Street
Suite 2300
Chicago, IL 60601-1213
Fax # : (312) 641-5137

Pia N. Thompson
Sonnenschein Nath, et al.
8000 Sears Tower
233 South Wacker Drive
Chicago, IL 60606
Fax # : (312) 876-7934

Michael L. Molinaro
Neal, Gerber & Eisenberg
Two North LaSalle Street
Chicago, IL 60602
Fax # : (312) 269-1747

Kevin T. Keating
Mark F. Shure
Keating & Shure, Ltd.
150 North Wacker Drive
Suite 1550
Chicago, IL 60606
Fax # : (312) 201-9368

John Kelliher
General Counsel
Illinois Commerce Comm'n
160 North LaSalle Street
9th Floor
Chicago, IL 60601
Fax # (312) 793-1556

William J. Connelly, Esq.
Karen R. Goodman, Esq.
Hinshaw & Culbertson
222 N. LaSalle Street
Suite 330
Chicago, IL 60601
Fax # : (312) 704-3001

James Newbold
Assistant Atty General
100 West Randolph St.
Suite 13-222
Chicago, IL 60601
Fax # : (312) 814-3589

Frank W. Ierulli
William W.P. Atkins
Peoria County Ct House
324 Main Street
Peoria, IL 61602
Fax # : (309) 672-6029

James I. Manning
Heyl Royseter, et al
Bank One Building
124 South Adams Street

Suite 600
Peoria, IL 61602
Fax # : (309) 676-3374

David E. Finck
Monica Oathout
Schwartz Junell, et al.
909 Fannin, Suite 2000
Houston, TX 77010
Fax # (713) 752-0327

Gus A. Paloian
William J. Factor
Phillip I. Comella
Sara E. Lorber
Seyfarth Shaw LLP
55 E. Monroe St., #4200
Chicago, IL 60603
Fax # : (312) 269-8869

John S. Delnero
Bell, Boyd & Lloyd, LLC
70 West Madison Street
Suite 3300
Chicago, IL 60602
Fax # : (312) 372-2098

Dennis Quaid
FagelHaber LLC
55 East Monroe Street
40th Floor
Chicago, IL 60603
Fax # : (312) 782-1826

Karen V. Newbury
Jenner & Block, LLC
One IBM Plaza
Chicago, IL 60611
Fax # : (312) 527-0484

George Roe
University of Illinois
Business Administration
601 South Morgan Street
Chicago, IL 60067
Fax # : (312) 996-4520

Steven R. Jakubowski
Elizabeth F. Richert
Robert Coleman & Assoc
77 West Wacker Drive
Suite 4800
Chicago, IL 60601
Fax # : (312) 444-1028

William J. McKenna, Jr.
Foley & Lardner LLP
321 North Clark Street
Suite 2800
Chicago, IL 60610
Fax # : (312) 832-4700

Louis D. Bernstein
Mark E. Leipold
Gould & Ratner
222 North LaSalle Street
Suite 800
Chicago, IL 60601
Fax # : (312) 236-3241

Eugene J. Geekie
Jon C. Vigano
Schiff Hardin LLP
6600 Sears Tower
Chicago, IL 60606
Fax # : (312) 258-5700

John F. Higgins
Joshua W. Wolfshore
Porter & Hedges LLP
1000 Main Street
36th Floor
Houston, TX 77002
Fax # : (713) 228-1331

Gregory J. Jordan
Dykema Gossett PLLC
10 South Wacker Drive, Suite 2300
Chicago Illinois 60606-7439
Fax #: (866) 698-0830

## SETTLEMENT AGREEMENT

This Settlement Agreement is made and entered into on February 14, 2006, between the Estate of Resource Technology Corporation (the "Estate"), on the one hand, and Chiplease, Inc. ("Chiplease"), Leon Greenblatt ("Greenblatt"), Banco Panamericano ("Banco") and Scattered Corporation ("Scattered") (Chiplease, Greenblatt, Banco and Scattered collectively referred to as the "Greenblatt Entities"). The Estate and the Greenblatt Entities collectively referred to in the Settlement Agreement as the "Parties".

## RECITALS

WHEREAS, a bankruptcy case (the "Bankruptcy Case") was commenced on November 15, 1999, when an involuntary petition was filed against Resource Technology Corporation ("RTC" or "Debtor"). On February 1, 2000, a consensual Order of Relief and Order Converting the Bankruptcy Case to a case under Chapter 11 of the Bankruptcy Code became effective;

WHEREAS, on August 26, 2003, the Court appointed Gregg E. Szilagy as the Chapter 11 Trustee ("Chapter 11 Trustee");

WHEREAS, on September 21, 2005, the Bankruptcy Court entered an order converting the case to a case under Chapter 7 of the Bankruptcy Code. Thereafter, Jay A. Steinberg, not individually but as Chapter 7 Trustee (the "Chapter 7 Trustee") was appointed as the Chapter 7 trustee for the Estate;

WHEREAS, Greenblatt, Chiplease and Banco (collectively, the "Banco Secured Lenders") assert pre-petition and post-petition secured claims against the Estate based upon various pre-petition loan documents and post-petition debtor in possession loans. Based upon their loans, the Banco Secured Lenders assert a lien on certain gas rights agreements and other assets of the Estate as collateral for their loans;

WHEREAS, NEC Electric Corporation ("NEC") asserts a secured claim against the Estate in an amount in excess of $43 Million relating to a borrowing facility approved by the Bankruptcy Court on August 1, 2000. NEC asserts a first priority secured claim on certain property and assets relating to the Estate's Congress, Beecher and Pontiac landfill sites;

WHEREAS, NEC loaned the Chapter 7 Estate the sum of $250,000 to pay for the Chapter 7 administrative expenses of the Estate (the "Chapter 7 Loan"). Pursuant to an order entered in the Bankruptcy Case, the first recoveries by the Estate must be paid to NEC in repayment of the Chapter 7 Loan. The Parties do not object to the repayment of the Chapter 7 Loan;

WHEREAS, on January 17, 2006, the Banco Secured Lenders filed an adversary proceeding against NEC entitled "Objection to Claim and Request for Determination as to the Validity and Extent of Lien of NEC" as adversary number 06-00072 (the "NEC Claim Litigation"). In the NEC Claim Litigation, the Banco Secured Lenders object to the secured administrative claim filed by NEC and request that NEC's claim be disallowed in its entirety;

WHEREAS, during the course of the RTC bankruptcy case, the Chapter 11 Trustee and/or the Chapter 7 Trustee filed adversary complaints against one or more of the Greenblatt Entities and others as follows:

(i)    On October 22, 2004, the Chapter 11 Trustee filed his Verified Complaint for Turnover of Property of the Estate, for Damages including Punitive Damages for Conversion of Property of the Estate, for Imposition of a Constructive Trust, and for Injunctive and Other Relief against the Banco Secured Creditors as Adv. Pro. No. 04-03867 (the "October 2004 Complaint"). The Chapter 11 Trustee dismissed the October 2004 Complaint on February 17, 2005;

(ii)    On November 16, 2004, the Chapter 11 Trustee filed his Verified Adversary Complaint for Injunctive and Declaratory Relief against the Banco Secured Creditors, Delaware Gas and Electric Inc., Scattered Corporation and Green Gas Delaware Business Trust as Adv. Pro. No. 04-04068 (the "November 2004 Complaint");

(iii)    On January 10, 2005, the Chapter 11 Trustee filed his Complaint for Unauthorized Postpetition Transfers against Loop Properties and Loop Properties, Inc. as Adv. Pro. No. 05-00025 (the "January 2005 Complaint");

(iv)    On December 30, 2004, the Bankruptcy Court granted the Chapter 11 Trustee's Motion for Preliminary Injunctive Relief enjoining the Banco Secured Parties from taking certain actions (the "December 2004 Injunctive Relief");

(v)    On October 27, 2005, the Estate filed a Complaint for Breach of Fiduciary Duty, Equitable Subordination, Violation of RICO, Injunctive Relief, Turnover of Property and Other Relief against the Banco Secured Lenders, Scattered Corporation and Green Gas Delaware Business Trust as Adv. Pro. No. 05-02521(the "October 2005 Complaint");

(vi)    On November 2, 2005, the Bankruptcy Court entered an order consolidating the November 2004 Complaint and the October 2005 Complaint;

(vii)    On November 2, 2005, the Bankruptcy Court entered an order granting in part the Estate's Motion for Preliminary Injunction (the "November 2005 Injunctive Relief");

(viii)    On January 23, 2006, the Estate filed an Adversary Complaint for Injunctive and Declaratory Relief against the Banco Secured Parties as Adv. Pro. No. 06-00436 (the "January 2006 Complaint")

The October 2004 Complaint, the November 2004 Complaint, the January 2005 Complaint, the December 2004 Injunctive Relief, the October 2005 Complaint, November 2005 Injunctive Relief, and the January 2006 Complaint are hereinafter collectively referred to that the "Trustee's Litigation";

WHEREAS, on December 28, 2005, the Bankruptcy Court entered an Order approving the Estate's Motion to Approve Settlement of §506(c) Claim with the Banco Secured Lenders (the "§506(c) Settlement"). The Bankruptcy Court required that Arnstein & Lehr LLP, as

escrowee, hold the $1,500,000 in settlement funds (the "§506(c) Funds") in escrow, pending further order of the Bankruptcy Court;

WHEREAS, the Estate moved for an Order requiring that the escrowed funds be transferred to the Estate. The Banco Secured Lenders filed a Motion to Reconsider the Bankruptcy Court's approval of the §506(c) Settlement, and objected to the Estate's motion for distribution of funds. Both the Banco Secured Lenders' Motion to Reconsider and the Estate's Motion for Distribution of Funds remain on the Bankruptcy Court's docket and have been continued from time to time;

WHEREAS, on January 12, 2006, the Bankruptcy Court approved sale procedures relating to the Estate's sale ("Sale") of certain assets (the "Sale Assets"), which included landfill gas-fired Solar Turbine combustion generators and ancillary equipment including (1) the three Solar Taurus Model Units located at the Congress landfill; (2) the one Taurus Model Unit located at the Beecher landfill; and (3) the one Solar Titan Model Unit located at the Pontiac landfill, together with all books and records pertaining to said equipment, the maintenance and operation of said equipment, spare parts and items related to said equipment to DTE Biomass Energy, Inc. ("DTE") for $6,000,000, or such higher offer;

WHEREAS, on February 6, 2006, the Bankruptcy Court entered an Order (the "Sale Order") authorizing the Sale of the Sale Assets to DTE free and clear of all liens, claims and encumbrances, with all valid liens to attach to proceeds in the same amount, extent and priority. The Bankruptcy Court authorized the distribution of Sale proceeds to the Estate in payment of its statutory compensation. The Bankruptcy Court ordered that the remaining funds be held in escrow pending further Order of the Bankruptcy Court determining the extent and priority of liens between NEC and the Banco Secured Lenders as to the Sale Assets;

WHEREAS, the Banco Secured Lenders filed an appeal of the Sale Order to the U.S. District Court (the "Sale Appeal"). On February 14, 2006, the District Court stayed the Sale pending the appeal;

WHEREAS, the deadline of the Estate to assume or reject executory contracts and/or unexpired leases of real property (collectively, "Contracts"), if any, has been extended pursuant to order of the Bankruptcy Court from time to time through February 28, 2006;

WHEREAS, the lessors to the Contracts have retained their rights to assert that the Contracts have been previously rejected or terminated;

WHEREAS, one of the Contracts is an Amended and Restated Agreement for Construction and Operation of Gas Collection Facility and Gas-To-Electric Plant dated December 2, 1997 between Congress Development Company and RTC, and later amended by the First Amendment to Amended and Restated Agreement for Construction and Operation of Gas Collection Facility and Gas-to-Electric Plant" executed June 30, 1999 and further amended by a certain side-letter agreement dated July 1, 1999 (collectively, the "Congress Agreement");

WHEREAS, one of the Contracts is an Agreement dated December 27, 1995 between RTC and American Disposal Services, Inc. ("ADS") relating to certain gas collection facilities

and certain gas to energy facilities including the Pontiac facility ("ADS Agreement"). The ADS Agreement as it relates to Pontiac Illinois was previously assumed by the Chapter 11 Trustee.

WHEREAS, one of the Contracts is an Agreement between American Grading Company ("AGC") and Resource Technology Corporation dated December 27, 1995 (the "American Grading Agreement")

WHEREAS, the Estate is seeking to abandon its right, title and interest, if any, in permits issued to RTC as the Estate maintains that the permits have inconsequential value to the Estate and are burdensome to the Estate;

WHEREAS, Scattered purchased the note and security interest of Aquila Energy Capital Corporation in and to the assets relating to Estate's Pontiac landfill facility;

WHEREAS, the Banco Secured Creditors assert that John Connolly, as President of RTC, was authorized to and delivered a proper Notice of Extension to AGC to extend the term of the American Grading Agreement;

WHEREAS, the Estate lacks sufficient resources to assume the Contracts or to satisfy the costs of administration of the Chapter 7 Estate that are currently estimated to be approximately $250,000 to $400,000 based upon the information and analysis of the Chapter 7 Trustee and John Connolly. Further the Estate lacks sufficient resources to pursue adequately the Trustee's Litigation due to the elimination of the monthly payment, of approximately $40,000.00, from the operations of the Pontiac Facility that the Estate was receiving before Aquila sold its note and security interest.

WHEREAS, the Estate and the Greenblatt Entities have engaged in substantial good faith negotiations in an effort to resolve the many disputes between the Parties including without limitation, (i) the Trustee Litigation, (ii) the Banco Secured Lenders' Motion to Reconsider the approval of the §506(c) Settlement; (iii) the Banco Secured Lenders' objection to the distribution of the §506(c) Funds to the Estate; and (iv) the Banco Secured Lender's objection to the Estate's rejection of Contracts; and

WHEREAS, the Estate and the Greenblatt Entities wish to settle their differences under and pursuant to the terms and conditions set forth herein;

NOW THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and subject to approval of the Bankruptcy Court, the parties hereto hereby agree as set forth below.

## AGREEMENT

1.    **Recitals Incorporated Into Agreement.**  The Recitals set forth above are incorporated herein by reference.

2.    **Effective Date.**  This Settlement Agreement shall become effective upon the entry of a final nonappealable order of the Bankruptcy Court approving it in a form that in all

- 4 -

respects is mutually agreed to by the Estate and the Greenblatt Entities (the "Approval Order"), in the form attached hereto as Exhibit A.

      3.    **The Sale Appeal and NEC Claim Litigation.** The Sale and the Banco Secured Lenders' right to prosecute the Sale Appeal including the asserted right to credit bid, the Banco Secured Creditors' assertion of a secured claim, the objection to NEC's secured claim including the NEC Claim Litigation are unaffected by this Settlement Agreement. Nothing in the Settlement shall be interpreted as an impediment to the Banco Secured Lenders or a waiver of any claims or lien rights that may be necessary to prosecute or provide standing to continue the NEC Claim Litigation. Nothing in the Settlement shall be interpreted as an impediment to NEC asserting any claim or counterclaim in that litigation that NEC would have had but for the Settlement. The Estate will continue in its efforts to finalize the Sale.

      4.    **The Estate's Conveyance of Assets.** Upon the Effective Date, the Estate shall designate and/or convey the following assets listed in this Section 4:

      (i)    the Estate shall designate and/or convey to Chiplease or its designee all of the Estate's right, title and interest, if any, in the Congress Agreement and any gas rights agreement or other agreements relating to the Hillside Illinois facility or arising as a result of the Congress Agreement in accordance with the terms of this Settlement Agreement;

      (ii)    the Estate shall designate and/or convey to Chiplease or its designee all of the Estate's right, title and interest, if any, in all equipment, inventory, supplies, work in process, general intangibles and causes of action ("Equipment") related to the Congress site and/or located in Hillside Illinois, except that the Estate does not convey to Chiplease or its designee any Equipment conveyed to or which the Estate has agreed to convey to DTE;

      (iii)    the Estate shall designate and/or convey to Scattered or its designee all of the Estate's right, title and interest, if any, in the ADS Agreement and any gas rights agreement or other agreements relating to the facilities that are the subject of the ADS Agreement or arising as a result of the ADS Agreement in accordance with the terms of this Settlement Agreement;

      (iv)    the Estate shall designate and/or convey to Scattered all of the Estate's right, title and interest, if any, in all Equipment related to the ADS Agreement and/or located in or related to the facilities in Pontiac Illinois, Wyandot Ohio, Clarion Pennsylvania and Wheatland Kansas;

      (v)    the Estate shall designate and/or convey to Chiplease or its designee all of the Estate's right, title and interest, if any, in the American Grading Agreement and any gas rights agreement or other agreements relating to McCook facility or arising as a result of the American Grading Agreement in accordance with the terms of this Settlement Agreement;

      (vi)    the Estate shall designate and/or convey to Chiplease or its designee all of the Estate's right, title and interest, if any, in all Equipment related to the American Grading Agreement (including without limitation, five generators) and/or located in Lyons Illinois; and

      (vii)    the Estate shall designate and/or convey to Chiplease or its designee all of the Estate's right, title and interest, if any, in all contracts including but in no way limited to landfill agreements and gas rights agreements to which RTC is a party and conveying all of the Estate's

- 5 -

right, title and interest, if any, to all of the Estate's personal property including but not limited to furniture, fixtures and all Equipment at or related to all facilities, contracts and sites not mentioned above including but not limited to the agreements related to the facilities set forth in Schedule "A".

The Estate makes no representations or warranties with respect to extent and validity of the Estate's right, title and interest, if any, in any of the foregoing assets, or whether such assets exist.

5. **Designation Rights**. The Estate shall convey to Chiplease or its designee all of the Estate's its rights, if any, to assume, assign and/or reject all Contracts (collectively, "Designation Rights") pursuant to the terms of a Designation Agreement to be entered into between the Estate and Chiplease or its designee. The conveyance of Designation Rights shall be effective upon the Effective Date of this Settlement Agreement. Upon the Effective Date, Chiplease or its designee shall have the sole, exclusive and continuing right to designate (on one or more occasions) through the Designation Period (defined in the Designation Agreement), to the same extent and validity as the Estate had at the Effective Date, (i) which Contracts shall be assumed and assigned; and (ii) which Contracts shall be rejected. As part of the Designation, the Estate shall bear no liability for cure costs or for adequate assurance of future performance costs or obligations relating to any Contracts, or any other costs or expenses relating thereto.

6. **Extension of Time to Assume or Reject Contracts**. The Estate shall seek an extension of time to assume or reject all Contracts beyond the current February 28, 2006 deadline to the later of the date that the order approving this Motion is final and nonappealable or the date on which all Designation Rights have been properly executed and conveyed, and all orders relating to all such Designations Rights, if any, are final and nonappealable. Each party receiving designation rights must file and present their motion or motion consistent with the Designation Rights Agreement on or before April 28, 2006. The Chapter 7 Trustee makes no representations or warranties with respect to extent and validity of the Estate's right, title and interest in any of the Contracts, or whether any of the Contracts are assumable or assignable.

7. **Abandonment of Permits**. The Estate shall seek Court approval for the abandonment of all permits issued to RTC.

8. **Estate's Conveyance of Certain Causes of Action**. The Estate shall convey to Chiplease or its designee all of the Estate's right, title and interest, if any, in all of the Estate's causes of action, except that the Estate shall not convey and the Estate shall retain its rights, if any, in (i) the Estate's causes of action against NEC, if any; (ii) preference or fraudulent transfer causes of action arising pursuant to 11 U.S.C. §502(d), 544, 545, 546, 547, 548, 549, 550, 551 and 553, or arising pursuant to state law fraudulent transfers; (iii) causes of action relating to the disgorgement or recovery of any disbursements made to professionals during the Chapter 11 or Chapter 7 cases including without limitation the Chapter 7 and/or Chapter 11 Trustee's statutory compensation and the Chapter 7 and/or Chapter 11 Trustee's professional fees or other expenses paid during the pendency of the Bankruptcy Case; and (iv) any causes of action against the Chapter 11 or Chapter 7 Trustees or their professionals. The Estate retains and does not convey to Chiplease or its designee or any other party the above-referenced excluded causes of action.

- 6 -

9. **Release**. The Parties shall execute the Releases attached hereto as Exhibits B and C (the "Releases"). The terms of the Releases are specifically incorporated herein.

10. **The Trustee's Litigation and Objection to Banco Secured Lenders' Claims**. The Estate shall withdraw all objections to the claims filed by the Banco Secured Lenders or any claims purchased by any of the Banco Secured Lenders or Scattered Corporation. In addition, the Estate shall dismiss with prejudice each of the adversary proceedings defined as the "Trustee's Litigation".

11. **Banco Secured Lenders' Consideration**. The Banco Secured Lenders shall pay to the Estate the following consideration:

(i) Chiplease shall pay all unpaid Chapter 7 operating expenses above $150,000 and any expenses incurred while the Chapter 7 Trustee continues to operate the Estate's business. The Estate shall pay the first $150,000 of these expenses; Chiplease shall deliver to its counsel, Dykema Gossett PLLC adequate security to guaranty that the Chapter 7 expenses shall be paid ("Adequate Security"). Chiplease shall be granted the right to contest the Estate's obligation to pay any such Chapter 7 operating expense;

(ii) The term "Chapter 7 operating expenses" shall not include the Chapter 7 Loan or any Chapter 7 Trustee's fees or expenses or any professional fees and expenses, which the Estate shall pay from the Estate's assets including but not limited to the consideration below including the §506(c) Funds;

(iii) Chiplease waives any interest in the §506(c) Funds and consents to the payment of the §506(c) Funds by Arnstein & Lehr, as escrowee, to the Estate;

(iv) Chiplease shall pay the Estate $275,000 the day following the date on which the order approving this settlement becomes final and nonappealable. The Banco Secured Creditors waive any right to a distribution from such funds. Chiplease's counsel shall provide assurance that it holds the Adequate Security at the time Chiplease delivers the $275,000 to the Chapter 7 Trustee;

(v) The Estate shall be entitled to 20% of any recovery (net of attorney's fees and costs) on any cause of action conveyed hereunder and brought by the Banco Secured Lenders and 20% of any recovery (net of attorney's fees and costs) obtained through the prosecution of the NEC Claim Litigation. Notwithstanding this subsection (v), the Estate does not convey or assign any cause of action against NEC to the Greenblatt Entities;

(vi) The Banco Secured Lenders, as pre-petition and post-petition secured lenders, waive their right to any distribution from the Estate that may be paid from the consideration delivered pursuant to the settlement set forth herein, including any right to receive a distribution from the §506(c) Settlement. In no event shall the Banco Secured Lenders be entitled to a distribution on account of any Chapter 7 administrative claim they may hold;

(vii) The Banco Secured Lenders shall otherwise maintain any Chapter 11 claim and Chapter 7 nonadministrative claim, as the case may be. In the case of a purchased claim, the Banco Secured Lenders shall not be entitled to a distribution for any claim purchased after

February 1, 2006. For distribution purposes, any distribution on account of a purchased claim shall be limited to the amount of the purchase price including the claim purchased from Aquila Energy Capital Corporation, Concert Capital Resources, LP, Concert Capital Resources A, LP, Concert Capital Resources B, LP, Concert Capital Resources C, LP, Concert Capital Resources A/B, Inc., and AECC Pontiac LLC, which shall be limited to $7,000,000; and

(viii)    In no event do the Banco Secured Lenders otherwise waive their claims, liens or debt. However, the Banco Secured Lenders waive the right to receive any Chapter 7 distribution. The Banco Secured Lenders agree that they will not pursue any claims or remedies against the Chapter 7 Trustee or his professionals.

12.    **Governing Law.**  This Settlement Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Illinois.

13.    **Representations and Warranties.**  The parties represent and warrant that they have the proper authority to sign for and on behalf of the respective entities, and the parties are all bound by the terms of this Settlement Agreement.

14.    **Amendment of Agreement.**  This Settlement Agreement shall not be amended except by a writing signed by all of the parties hereto.

15.    **Binding Effect.**  This Settlement Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

16.    **Entire Agreement.**  This Settlement Agreement constitutes the entire agreement of the parties hereto as to the subject matter hereof.  The undersigned acknowledge that there are no communications or oral understandings contrary, different, or which in any way restrict this Settlement Agreement, and that all prior agreements or understandings within the scope of the subject matter of this Settlement Agreement are, upon the execution and delivery of this Settlement Agreement, suspended, null and void.

17.    **Execution in Counterparts.**  This Settlement Agreement may be executed in one or more counterparts, each counterpart to be considered an original portion of this Settlement Agreement.

| Chiplease, Inc. | The Chapter 7 Bankruptcy Estate of Resource Technology Corporation |
|---|---|
| By: _____<br><br>**Leon Greenblatt**<br><br><br>_____ | By: _____<br>Jay A. Steinberg, not individually, but solely as Chapter 7 Trustee for the Estate of Resource Technology Corporation. |

**Banco Panamericano**

By: _____

**Scattered Corporation**

By: _____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 Proceeding |
| | ) | |
| RESOURCE TECHNOLOGY | ) | Case No. 99 B 35434 |
| CORPORATION, | ) | |
| | ) | Hon. Eugene R. Wedoff |
| Debtor. | ) | Chief U.S. Bankruptcy Judge |

### NOTICE OF FILING

To:    See Attached Service List

        PLEASE TAKE NOTICE that the Estate filed on October 23, 2006, its **SUMMARY OF CHAPTER 7 AND 11 ADMINISTRATIVE CLAIMS PENDING AGAINST ESTATE**, a copy of which is hereby served on you.

> **The Estate of Resource Technology Corporation by and through Jay A. Steinberg, not individually but solely as the Chapter 7 Trustee for the Estate of Resource Technology Corporation**
>
> By:____/s/ Miriam R. Stein_____
>         One of Its Attorneys

Barry A. Chatz (ARDC #06196639)
Miriam R. Stein (ARDC #06238163
ARNSTEIN & LEHR LLP
120 S. Riverside Plaza, Suite 1200
Chicago, IL 60606
Phone: (312) 876-7100
Fax: (312) 876-0288

### CERTIFICATE OF SERVICE

        I, Miriam R. Stein, an attorney, certify that I caused the attached Response to be served on the individuals listed on the attached service list by electronic service through ECF.

                    _____/s/ Miriam R. Stein_____

## SERVICE LIST

Allan V. Abinoja @ aabinoja@novackandmacey.com
Mark E. Abraham @ mabraham@gouldratner.com
R Scott Alsterda @ rsalsterda@uhlaw.com & ralsterda@ecf.epiqsystems.com
Andrew J. Annes @ aannes@sabt.com
George P Apostolides @ gpapostolides@arnstein.com
Marc O. Beem @ mbeem@millershakman.com & mpadilla@millershakman.com
Joseph P. Berglund @ berglundniew@aol.com
Erich S Buck @ ebuck@sachnoff.com
Kurt M Carlson @ kcarlson@tishlerandwald.com
Nicole L. Castillo @ ncastillo@nealandleroy.com
Barry A Chatz @ bachatz@arnstein.com
Faith Dolgin @ fdolgin@revenue.state.il.us
Patricia J Fokuo @ pfokuo@schiffhardin.com & edocket@schiffhardin.com
Robert P Follmer @ ostlingassociates@insightbb.com
Eugene J Geekie @ egeekie@schiffhardin.com
Arlene N Gelman @ agelman@sachnoff.com
Michael L. Gesas @ mgesas@gpgglaw.com
Kathryn Gleason @ USTPRegion11.es.ecf@usdoj.gov & Kathryn.M.Gleason@usdoj.gov
Thomas W. Goedert @ tgoedert@nealandleroy.com
Steven R Jakubowski @ sjakubowski@colemanlawfirm.com
Gregory J Jordan @ gjordan@dykema.com
Alexander D Kerr @ akerr@tishlerandwald.com & moatsvall@tishlerandwald.com
Diane F. Klotnia @ dklotnia@millershakman.com
William Irwin Kohn @ wkohn@schiffhardin.com
Theodore F. Kommers @ tkommers@gouldratner.com
Mark E Leipold @ mleipold@gouldratner.com & stamssot@gouldratner.com & lbernstein@gouldratner.com
Joy E Levy @ jelevy@arnstein.com
Ryan Liska @ ryanliska@yahoo.com
Mitchell L. Marinello @ mmarinello@novackandmacey.com
Richard J Mason @ rmason@mcguirewoods.com & docket@mcguirewoods.com & cgunderson@mcguirewoods.com
Kelly J McClintic @ ksltd@flash.net
William J McKenna @ wmckenna@foley.com & khall@foley.com
Melissa G. Melsher @ mgmelsher@uhlaw.com
Gerald F. Munitz @ gerald.munitz@goldbergkohn.com
William T Neary @ USTPRegion11.ES.ECF@usdoj.gov
Kathryn A Pamenter @ kathryn.pamenter@goldbergkohn.com
Michael C. Partee @ mpartee@atg.state.il.us
Nancy A Peterman @ petermann@gtlaw.com &carlsonk@gtlaw.com & powelly@gtlaw.com
Alex Pirogovsky @ apirogovsky@uhlaw.com
Christopher H Purcell @ shermlaw13@aol.com
Dennis E. Quaid @ dquaid@fagelhaber.com
Craig E. Reimer @ creimer@mayerbrownrowe.com
Christopher L. Rexroat @ clrexroat@uhlaw.com
Natalia K. Rzepka @ nrzepka@tishlerandwald.com

3

Michael M Schmahl @ mschmahl@mcguirewoods.com & docket@mcguirewoods.com & cgunderson@mcguirewoods.com
Peter J Schmidt @ pschmidt@dykema.com
Charles P Schulman @ cschulman@sachnoff.com
Michael J. Small @ msmall@foley.com, khall@foley.com
Jennifer E. Smiley @ jsmiley@millershakman.com & odom@millershakman.com & mpadilla@millershakman.com
Bradley A. Smith @ bsmith@nealandleroy.com
Patricia K. Smoots @ psmoots@mcguirewoods.com
Thomas M. Staunton @ tstaunton@millershakman.com
Miriam R. Stein @ mrstein@arnstein.com
Jay A Steinberg @ jsteinberg@foley.com, jsteinberg@ecf.epiqsystems.com;sbarr@foley.com
Pia N Thompson @ pthompson@sonnenschein.com
Susan Valentine @ svalentine@robinsoncurley.com
Katherine D Vega @ kvega@ngelaw.com
Jon C Vigano @ jvigano@schiffhardin.com
edocket@schiffhardin.com & dgordon@schiffhardin.com & earundel@schiffhardin.com
Bruce L Wald @ bwald@tishlerandwald.com
Peter J Young @ pyoung@jenner.com & docketing@jenner.com

4

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

In re:

RESOURCE TECHNOLOGY
CORPORATION,

               Debtor.

Chapter 7
Case No. 99 B 35434

Hon. Eugene R. Wedoff

### Summary of Administrative Claims Pending Against Estate

Jay A. Steinberg, not individually but solely as Chapter 7 Trustee ("Chapter 7 Trustee") of the Estate of Resource Technology Corporation (the "Estate"), by and through his counsel, Arnstein & Lehr LLP, hereby files his Summary of Chapter 7 and Chapter 11 Administrative Claims Pending Against the Estate, and in support thereof, states as follows:

### BACKGROUND

1.    On November 15, 1999, certain creditors of Resource Technology Corporation ("RTC") filed an involuntary petition against RTC under chapter 7 of the Bankruptcy Code.

2.    On or about January 18, 2000, RTC consented to the entry of an order for relief and entry of an order converting the case to one under chapter 11 of the Bankruptcy Code. The Court converted the case effective as of February 1, 2000.

3.    RTC remained in possession of its assets and operated its business as a debtor-in-possession in accordance with Sections 1107 and 1108 of the Bankruptcy Code until August 26, 2003.

1

4.      On August 26, 2003, the Office of the United States Trustee appointed Gregg E. Szilagyi (the "Chapter 11 Trustee") as chapter 11 trustee for RTC. The Chapter 11 Trustee thereafter operated the Estate's business under Section 1108 of the Bankruptcy Code.

5.      On September 21, 2005, the Court converted this case to a case under chapter 7 of the Bankruptcy Code.

6.      Thereafter, the Trustee was appointed as Chapter 7 trustee for the Estate.

7.      In February 2006, the Estate entered into an agreement (the "Settlement") with Leon Greenblatt, Banco Panamericano, Chiplease, Inc. and Scattered Corporation (the "Greenblatt Entities") to settle all disputes between the Estate and the Greenblatt Entities and to convey certain assets to Chiplease and Scattered (the "Purchasers").

8.      As a part the Settlement, the parties entered into an agreement entitled Designation Rights Agreement pursuant to which the Purchasers obtained the right to designate executory contracts and unexpired leases of real property for assumption and assignment by the Estate, subject to Court approval.

9.      On March 16, 2006, the Court entered an Order approving the settlement between the Estate and the Greenblatt Entities including approving the terms of the Designation Rights Agreement (the "Settlement Order").

10.     The Settlement provides that Chiplease shall pay all unpaid Chapter 7 operating expenses above $150,000 and any expenses incurred while the Estate continues to operate the Debtor's business ("Operating Expenses"). Operating Expenses does not include the Chapter 7 Trustee's fees or expenses or any professional fees and expenses.

2

11.    The Estate ceased operating the RTC's landfill facilities as of March 28, 2006.

12.    The Court entered an Order requiring all Chapter 7 administrative claims through April 28, 2006 to be filed on or before May 15, 2006.

13.    Pursuant to the Designation Rights Agreement, the Purchasers designated certain contracts to be assumed by the Estate and concurrently assigned (pursuant to Court order) to the Purchasers or their designee. The Estate filed a motion to assume and assign those certain contracts designated by the Purchasers.

14.    On August 15, 2006, the Court entered an Order authorizing the assumption and assignment of certain executory contracts and unexpired leases to Illinois Investment Trust No. 92-7163, dated August 19, 1992 (Federal ID 36-7004654), as designee of the Purchasers (the "Assignee"). Among the executory contracts assumed and assigned to the Assignee included the employment contract of John Connelly.

## Summary of Chapter 7 Administrative Claims

15.    The Court requested that the Estate provide a summary of all pending Chapter 7 administrative claims against the Estate. Attached hereto as Exhibit A is a summary of such claims.

16.    As of October 23, 2006, the Estate is holding $608,426 in the Estate's bank account.

17.    In addition to the funds in the Estate's bank account, pursuant to the Settlement, the Estate is entitled to receive 20% of net recoveries from any monies recovered as a result of the objection of Network Electric's claims by the Greenblatt Entities. The Estate will also receive 20% of any assigned litigation prosecuted by the

3

Purchasers, or one of their designees.  At this time, the Purchasers are involved in lawsuits against Jennbacher, and are currently reviewing other litigation.

18.     The Estate estimates that the professional fees through the closing of RTC bankruptcy case will total approximately $470,000.  The Estate estimates that the Trustee's statutory fees will be approximately $130,000.  According to the Settlement, Chiplease is not required to pay these claims.

19.     The filed operating expense claims against the Estate total $1.3 Million, plus certain unknown claims.  The Estate maintains that Chiplease is required to pay all of the operating expenses listed, to the extent they are allowed, pursuant to the terms of the Settlement, including any amount owed to the State of Illinois.

20.     Chiplease disputes that it Is obligated to pay the State of Illinois Chapter 7 administrative claim.   Additionally, Chiplease maintains that the amounts owed to certain creditors may be significantly less than the claim amounts. The "Estimated Actual Amount of Claim" reflects the amount that may be owed for said claims.

21.     One of the "unknown" claims includes a potential claim for indemnification by John Connolly against the Estate for Connolly's potential liability relating to the lawsuit filed against Connolly and American Grading Company by the State of Illinois, pending before the Circuit Court of Cook County as Case No. 06 CH 17351.  The Trustee maintains that the Estate has no liability for any Connolly claim for the following reasons: (i) to the extent Connolly holds a valid indemnification claim against the Estate under his employment agreement, the agreement was assumed and assigned to the Assignee, and all cure costs owed under the employment agreement were specifically assumed by the Assignee; (ii) to the extent that Connolly asserts an indemnification

4

claim against the Estate under the By-Laws of RTC, it would be treated as a general unsecured claim. Either way, the Estate has no liability for any Connolly claim, which has yet to be filed.

22.     The Estate does not expect any further claims against the Estate in light of the fact that the Estate stopped operating the landfill facilities as of March 28, 2006, at the latest.

## Summary of Chapter 11 Administrative Claims

23.     The Court also requested a summary of pending Chapter 11 administrative claims against the Estate. Attached hereto as Exhibit B is a summary of Chapter 11 administrative claims. The chart reflects approximately $87 million in Chapter 11 administrative claims are pending against the Estate, which includes the $43 million secured administrative claim of Network Electric Corporation.


Dated: October 23, 2006                    Respectfully submitted,

                                           JAY A. STEINBERG, not individually but solely
                                           as Chapter 7 Trustee for the Estate of
                                           Resource Technology Corporation

                                           By: _____ /s/ Miriam R. Stein _____

Barry A. Chatz (ARDC #06196639)
Miriam R. Stein (ARDC #06238163)
ARNSTEIN & LEHR LLP
120 S. Riverside Plaza, Suite 1200
Chicago, IL 60606
Phone: (312) 876-7100
Fax: (312) 876-0288


5

## CHART OF POTENTIAL ESTATE LIABILITY FOR CHAPTER 7 ADMINISTRATIVE CLAIMS

**Estate Professionals** - Estimate of Future Expenses - Not Assumed by Purchaser

| | |
|---|---|
| A&L | $350,000.00 |
| Environ | $3,000.00 |
| West | $15,000.00 |
| Friedman | $60,000.00 |
| G&T | $10,000.00 |
| Shakman | $20,000.00 |
| Cost for Final Tax Return | $10,000.00 |
| Trustee's Compensation | $130,590.35 |
| Potential additional Trustee Compensation | $10,000.00 |

**Totals for Professionals & Trustee**                    **$608,590.35**

**Other/Operating Claims** — Estate asserts the following claims
are Chapter 7 operating expenses assumed by Purchaser

| Claimant | Amount | Claim # (if any) | Estimated Actual Amount of Claim |
|---|---|---|---|
| McDougal Hartman Co. | $179,354.06 | 203 | $0.00 |
| 200 West Partners | $207,028.12 | 207 | $0.00 (included in Ch 11 admin claims) |
| City and County of Peoria | $12,721.61 | 240 | $0.00 |
| American Grading | $336,386.87 | 242 | Unknown (0 to $20,000) |
| Estate of Markwell d/b/a Holiday Inn | Unknown | 243 | $0.00 (included in Ch 11 admin claims) |
| Employee Claims | $106,262.97 | 244-252, 254 | Unknown (included in Ch 11 admin claims) |
| Solar Turbines | $481,310.35 | 253 | $0.00 |
| Congress | Unknown | EOD 3291 | Unknown |
| Corpus Christi | Unknown | EOD 3148 | Unknown |
| State of Illinois - subsidy | $1,261,617.00 | 241 | Purchaser disputes State's claim as an operating expense |
| John Connelly for indemnification | Unknown | | Unknown |
| Network Electric Company | $462,000.00 | 239 | Unknown |
| IRS (estimated) | $10,000.00 | | |

**Totals for Other Ch 7 Admin Claims**         **$1,323,063.98**         **$0.00** plus unknown

# CHART OF PENDING CHAPTER 11 ADMIN CLAIMS AGAINST ESTATE

| Claimant | Amount of Claim | Claim or Docket No. |
|---|---|---|
| Carlson Environmental | $100,170.00 | EOD 1224 |
| Recco Tool & Supply | $13,081.00 | EOD 1304 |
| High Ridge Partners | $36,340.14 | EOD 3141 |
| Allied Waste | $1,470,625.00 | EOD 3144 |
| Corpus Christi | Unknown | EOD 3148 |
| Congress Development | $1,200,000.00 | EOD 3152 |
| NICOR | $191,541.00 | EOD 2498 |
| Gregg Szilagyi | $678,317.00 | EOD 3001 |
| Ungaretti & Harris | $2,168,583.00 | EOD 3002 |
| State of Illinois | $28,012,630.00 | 175 |
| Network Electric Company | $43,605,475.00 | 176 (secured admin claim) |
| Barrack Ferrazzano | $17,295.00 | 201 |
| 200 West Partners | $207,028.00 | 207 |
| Shaw Gussis Fishman et al | $344,764.00 | 212 |
| Andrew Jahelka | $60,000.00 | 214 |
| Richard Nichols | $76,000.00 | 215 |
| CRRA | Unknown | 217 |
| American Grading Company | $82,695.00 | 218 |
| Scattered Corporation | $1,292,196.00 | 220 |
| Banco Panamericano | $51,191.00 | 221 |
| Banco Secured Lenders | $6,003,349.00 | 222 |
| Solar Turbines | $558,208.00 | 223/225-230 |
| County and City of Peoria | Unknown | 224 |
| IRS | $317,827.00 | 235 |
| Estate of Markwell d/b/a Holiday Inn | Unknown | 243 |
| Employee Claims | $106,262.00 | 244-252, 254 |
| Solar Turbines | $481,310.00 | 253 |
| **Total** | **$87,074,887.14** | |

4036

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

In re:                                    )    Chapter 7
                                          )
RESOURCE TECHNOLOGY                       )    Case No. 99 B 35434
CORPORATION,                              )
                                          )    Hon. Eugene R. Wedoff
                   Debtor.                )

**REPLY IN SUPPORT OF MOTION FOR ORDER
DIRECTING DISGORGEMENT OF FEES**

The Bankruptcy Estate of Resource Technology Corporation (the "Estate"), by
and through Jay A. Steinberg, not individually but solely as Chapter 7 Trustee (the
"Chapter 7 Trustee"), by and through his counsel, Arnstein & Lehr LLP, files its Reply in
Support of the Estate's Motion for an Order Directing Disgorgement of Fees (the
"Motion") paid to Ungaretti & Harris LLP, counsel to the Chapter 11 trustee ("Ungaretti"),
as follows:[1]

On December 4, 2006, this Court issued a Memorandum Opinion and Order
("Opinion") denying a proposed settlement between the Estate and Ungaretti. On the
issue of disgorgement of Ungaretti's fees, this Court stated in the Opinion,

> The estate would very likely succeed in its claim for
> disgorgement. The payments that U&H received from the
> estate during Szilagyi's chapter 11 administration were, as
> noted above, made without court authorization. ... More
> fundamentally, even if the payments had been authorized,
> they would be subject to disgorgement in view of the present
> inability of the RTC estate to pay all of its Chapter 11
> administrative expenses.

---

[1] Capitalized terms not otherwise defined in this Reply shall have the same meaning as set forth in the
Motion.

1

*See* Opinion at pages 11 and 12.  Pursuant to 11 U.S.C. §726(b) and in furtherance of
the Opinion, the Estate filed the Motion seeking an order requiring Ungaretti to disgorge
the sum of $376,235.54 paid to it without Court authority.

In its response to the Motion, Ungaretti does not distinguish or otherwise attack
this Court's rationale in the Opinion – that Ungaretti's fees are subject to disgorgement.
Instead, Ungaretti states that disgorgement is premature due to the pending appeal of
the Opinion by Ungaretti and the alleged uncertainty as to whether the Estate is
insolvent.  Ungaretti further states that the payments it received were pursuant to the
Fee Procedures Order entered by the Court on September 18, 2003 (the "Fee
Procedures Order").

Ungaretti's arguments fail on multiple grounds.  First, the Fee Procedures Order
supports disgorgement of Ungaretti's fees.  Second, the Opinion and case law support
disgorgement of Ungaretti's fees.  Finally, disgorgement is not premature.

## A.    The Fee Procedures Order Supports Disgorgement

Ungaretti alleges that it complied with the Fee Procedures Order drafted by
Ungaretti and entered by the Court on September 18, 2003 and attached to the Motion
as Exhibit A.  Ungaretti states that it "circulated its monthly invoices for the months of
September 2003 through April 2005 to the designated creditors and parties in interest."
*Response* p.2.

The Fee Procedures Order requires more than the monthly circulation of monthly
invoices by a professional.  The Fee Procedures Order requires:

> (i)    within 20 days after the conclusion of each month, the professional
> must circulate a detailed statement of services rendered;
>
> (ii)   if no timely objection is made, the Debtor is to pay 80% of fees and
> 100% of expenses for the month;

2

(iii)    payments are subject to the court's subsequent approval as part of the normal interim fee application process approximately every 120 days;

(iv)    The failure of any party to object to an invoice does not prejudice the party's right to raise any objection to a fee application;

The Fee Procedures Order further states in Paragraph 3:

> The monthly payments made pursuant to this Order shall be provisional in nature and consequently shall be subject to further order of the court as part of the interim fee application process pursuant to 11 U.S.C. §331. All fees and expenses paid to Professionals pursuant to this Order shall be subject to disgorgement until final allowance by the Court.

Ungaretti does not state whether its monthly fee statements were circulated on or before the 20th day of each month. Ungaretti does not attach copies of its fee statements to its response. Further, Ungaretti does not state whether detailed invoices were circulated. Instead, Ungaretti alleges that monthly payments in $15,000, $30,000 and/or $25,000 increments were paid to Ungaretti by the Debtor's secured creditor. The monthly payments do not appear to relate to any invoice by Ungaretti.[2]

More importantly, Ungaretti did not file interim fee applications every 120 days as required by the Fee Procedures Order. Indeed, in its Final Application filed in January 2006, Ungaretti does not attach its invoices from September 2003 through April 2005 for the Court's review and approval. Accordingly, the payments made to Ungaretti were not authorized and not made in compliance with the Fee Procedures Order or in accordance with §331. Accordingly, the fees should be disgorged. Further, even if they

---

[2] Ungaretti filed a Final Application for Compensation and Reimbursement of Expenses on or about January 25, 2006 [EOD 3002] ("Final Application"). In its Final Application, Ungaretti does not submit copies of its monthly invoices from September 2003 through April 2005, as required in the Fee Procedures Order. The Final Application does provide a chart of its monthly fees from September 2003 through April 2005, and the 80% payments do not correspond to the actual payments allegedly paid to Ungaretti by Aquila.

3

were made pursuant to the Fee Procedures Order, by the terms of the order itself the payments were subject to disgorgement.

## B. The Opinion and Case Law Support Disgorgement

This Court recognized that due to Ungaretti's failure to comply with the terms of the Fee Procedures Order and the insolvent nature of the Estate, disgorgement by Ungaretti of its fees is appropriate. As stated above, Ungaretti does not dispute the Opinion's legal reasoning. In fact, Ungaretti cites to cases that support disgorgement of fees including *In re Kids Creek Partners L.P.*, 219 B.R. 1020 (Bankr. N.D. Ill. 1998) and *In re Anolik*, 207 B.R. 34 (Bankr. D. Mass. 1997).

In *Kids Creek*, the Bankruptcy Court held that disgorgement was necessary to effectuate the bankruptcy distribution scheme where there were insufficient assets to pay the claim of a superpriority creditor. The Court recognized that interim attorney's fees and expenses are not final and "can be revisited at any time to effectuate the priority distribution scheme provided in the Bankruptcy Code." *Id.* at 875. The Court further recognized that it is the "fundamental obligation" of a Chapter 7 trustee and the Court to "see to distribution of estate assets according to the statutory priorities." *Id.*

Similarly, in *Anolik*, the Bankruptcy Court required disgorgement of the trustee's interim compensation. The Court recognized that professionals paid during the Chapter 11 phase of a bankruptcy case, which later converts to Chapter 7, "should be required to disgorge those fees so that Chapter 7 administrative expenses could be paid pro rata." *Id.* at 38-39.

In this case, as stated above, Ungaretti's fees were not authorized by the Bankruptcy Court pursuant to the Fee Procedures Order or otherwise. When an

4

estate is insolvent and a professional receives a disproportionate share of the assets as interim compensation, disgorgement is appropriate. *Kids Creek*, at 978. As this Court stated in the Opinion:

> A Chapter 11 administrative creditor who has been paid interim compensation under §331 – the procedure that U&H was required to follow to obtain authorization in this case – is required to disgorge the payments if there are insufficient assets to pay all of the other chapter 11 administrative creditors in full.

*See* pages 11 and 12. Accordingly, Ungaretti should be required to disgorge the fees paid to it during the Chapter 11 case.

## C.    Disgorgement Is Not Premature

Ungaretti alleges that disgorgement is premature since it is uncertain whether the Estate is insolvent and since Ungaretti's appeal of the Opinion is pending. The Estate disputes both of these grounds.

While in this case administrative insolvency is not an absolute, it is certainly likely that there will only be sufficient funds to pay Chapter 7 administrative expenses at best. Further, it *is* a certainty that the pro rata distribution amongst Chapter 11 administrative expenses will be not be substantial if at all.

On the asset side, the Estate is holding approximately $328,000 in its account. The Estate is entitled to 20% of net recoveries from any monies recovered as a result of the objection of Network Electric claims by the Greenblatt Entities and 20% of any assigned litigation prosecuted by the Purchaser.   To date, the validity of Network Electric claims has not been litigated and no judgments have been entered that render cash to the Estate.

5

On the liability side, there will be approximately $130,000 in trustee statutory fees. The remaining funds will be necessary to administer the Estate which is not likely to close until at least next year in light of the fact that the current litigation schedule extends through 2008.

The filed Chapter 11 administrative claims against the Estate total more than $80 million, which includes the asserted Chapter 11 administrative claim by Ungaretti in the amount of approximately $2 million. Assuming there is even $100,000 to distribute to Chapter 11 administrative creditors the pro rata distribution would be .125%. Accordingly, while the case has not closed, the Court has sufficient data to determine that disgorgement is appropriate without further delay.

Finally, while Ungaretti has appealed the Opinion, Ungaretti has not sought a stay pending appeal. Further, the appeal relates to the Court's denial of the Estate's proposed settlement with Ungaretti. The appeal does not relate to the issue of disgorgement. Therefore, disgorgement should not be delayed because of the appeal.

## CONCLUSION

WHEREFORE, for the foregoing reasons and the reasons set forth in the Motion, the Trustee respectfully requests that this Court enter an Order requiring Ungaretti & Harris LLP to disgorge the sum of $376,235.54 to the Estate for redistribution pursuant

6

to 11 U.S.C. §726(b) and granting the Estate such other and further relief as may be appropriate under the circumstances.

Dated: July 17, 2007               JAY A. STEINBERG, not individually but solely as Chapter 7 Trustee for the Estate of Resource Technology Corporation


By:   /s/ Miriam R. Stein
        One of his Attorneys

Barry A. Chatz
Miriam R. Stein
ARNSTEIN & LEHR LLP
120 S. Riverside Plaza, Suite 1200
Chicago, IL 60606
Phone: (312) 876-7100 / Fax: (312) 876-0288

7

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Resource Technology | ) | No. 00 A 00150 |
| Management, | ) | No. 99 B 35434 |
| | ) | Chicago, Illinois |
| | ) | 10:00 a.m. |
| Debtor.) | | June 17, 2008 |

TRANSCRIPT OF PROCEEDINGS BEFORE THE
HONORABLE EUGENE R. WEDOFF

APPEARANCES:

| | |
|---|---|
| For City and County of Peoria, Illinois: | Ms. Linda M. Kujaca; |
| For The State of Illinois: | Mr. James D. Newbold; |
| For Chiplease, Scattered, Banco, Mr. Greenblatt, IIT: | Mr. Louis D. Bernstein, Ms. Colleen E. McManus; |
| For American Grading and Congress Development: | Ms. Sara E. Lorber, Mr. Philip L. Comella; |
| Chapter 7 Trustee: | Mr. Jay A. Steinberg; |
| For the Estate: | Mr. George P. Apostolides; |
| For Connecticut Resource Recovery Authority: | Mr. Michael Schmahl; |
| For 200 West Partners Limited Partnership: | Mr. John W. Campbell; |
| For Samuel J. Roti: | Mr. Geoffry S. Goodman; |
| For Solar Turbines: | Ms. Amy Z. Knapp; |
| Court Reporter: | Nicole A. Abbate U.S. Courthouse 219 South Dearborn Room 661 Chicago, IL  60604. |

2

1          THE CLERK:  Resource Technology

2   Corporation, 99 B 35434, with related adversaries.

3          MS. KUJACA:  Good morning, Your Honor.

4   Linda Kujaca on behalf of the City and County of

5   Peoria.

6          MR. NEWBOLD:  James Newbold, Illinois

7   Department of Revenue, Illinois Commerce Commission.

8          MR. BERNSTEIN:  Good morning, Your

9   Honor.  Louis Bernstein on behalf of Chiplease,

10  Banco, Scattered, Mr. Greenblatt, and IIT.

11          MS. MCMANUS:  Good morning, Your

12  Honor.  Colleen McManus representing the same

13  entities as Mr. Bernstein.

14          MS. LORBER:  Good morning, Your Honor.

15  Sara Lorber on behalf of American Grading and

16  Congress Development.

17          MR. COMELLA:  Philip Comella.  Good

18  morning.  Same parties as Ms. Lorber.

19          MR. STEINBERG:  Good morning, Your

20  Honor.  Jay Steinberg, Chapter 7 Trustee.

21          MR. APOSTOLIDES:  Good morning, Your

22  Honor.  George Apostolides on behalf of the estate

23  through the trustee.

24          MR. SCHMAHL:  Good morning, Your

25  Honor.  Michael Schmahl on behalf of Connecticut

1   Resource Recovery Authority.

2                   MR. CAMPBELL:  Good morning, Your

3   Honor.  John Campbell on behalf of 200 West Partners

4   Limited Partnership.

5                   MR. GOODMAN:  Good morning, Your

6   Honor.  Geoff Goodman on behalf of Samuel Roti,

7   assignee of the claims of Markwell Hillside, LLC.

8                   MS. AMY:  Good morning.  Amy Knapp on

9   behalf of Solar Turbines.

10                  THE COURT:  Now, I received a proposed

11  agenda for today's hearing from the trustee.  That

12  agenda calls for all but two matters to be continued.

13  And I wanted to find out, first, if everyone else has

14  received that agenda.  And, secondly, if anyone has

15  any objection to the proposed continuances that the

16  trustee has requested.

17                  MR. STEINBERG:  It was filed

18  electronically.  I think everyone should have gotten

19  it, Your Honor.

20                  (Simultaneous colloquy.)

21                  MR. BERNSTEIN:  We received it, Your

22  Honor.  We have no objection.

23                  MR. SCHMAHL:  We've received it as

24  well, Your Honor, and Connecticut Resource Recovery

25  has no objection.

4

1                    THE COURT:  Perhaps, Mr. Apostolides,
2   if you'd like -- for those of you who have not had an
3   opportunity to review your proposed agenda, if you '
4   could just outline briefly what continued dates you
5   have in mind and what the reason was behind the
6   suggestion.
7                    MR. APOSTOLIDES:  Your Honor, the
8   agenda contains approximately 20 different items and
9   categories of items.
10                   All of the claims which are Chapter 11
11  claims or claims of the estate are being continued
12  for 90 days.  The Chapter 7 claims we're proposing a
13  30-day date for those.  That essentially covers
14  everything.
15                   There is one adversary proceeding
16  against CRRA.  We've asked for a 90-day continuance
17  on that.
18                   THE COURT:  All right.
19                   So, again, if anyone has any objection
20  to those continuances, let me know, otherwise, I
21  would order the continuance as suggested in the
22  agenda.
23                   All right.  Fine.
24                   MR. NEWBOLD:  Your Honor, what's the
25  date?  Just so we know what the dates are.

5

1              MR. STEINBERG:  Want to pick some

2    dates?

3              THE COURT:  Oh, sure.  I thought you

4    already consulted with Mr. Castaneda about the dates.

5              All right.  You want a 30-day date?

6              MR. STEINBERG:  For the 7s.

7              THE COURT:  And a 30-day date would

8    bring us to -- well, either the 16th or the 23rd of

9    July, whichever you would prefer.

10             MR. STEINBERG:  Could we possibly make

11   it -- is the 21st a bad day?

12             THE COURT:  Since I'm not here, yes.

13             MR. STEINBERG:  It would be a good day

14   to have it then, Your Honor.

15             THE COURT:  16, 23, 29 or 30.

16             MR. STEINBERG:  Is the 14th a bad day,

17   too?

18             THE COURT:  It's a Monday.  I don't --

19   I don't have 7 and 11 calls on Monday.

20             MR. BERNSTEIN:  Are you always this

21   difficult, Mr. Steinberg?

22             MR. STEINBERG:  Okay.  Well, let's

23   take the 16th, 17th.  Whatever the court...

24             MS. LORBER:  16th?

25             MR. BERNSTEIN:  Whatever works for

6

1   Mr. Steinberg, Your Honor.

2                    MS. MCMANUS:  Whatever works for Your

3   Honor.

4                    THE COURT:  Well, that's what I'm

5   saying, any of the dates that aren't X'd out on

6   Tuesday and Wednesday are good dates.  So 15, 16, 23,

7   29 or 30.

8                    And if, Mr. Steinberg, you would like

9   the 16th, you have it.

10                   MR. STEINBERG:  What do I want?

11                   MS. LORBER:  I would prefer the 16th.

12   The 29th I'm out of the country.

13                   THE COURT:  July 16 will be the 30-day

14   date.

15                   Going into the next month, we have 12,

16   13, 19, or 20 of August.

17                   MR. APOSTOLIDES:  Judge, we'd ask for

18   90 days on the 11s, so that would take us to

19   September.

20                   THE COURT:  So September then,

21   September 16 or 17.

22                   MR. STEINBERG:  09-16.  Could we do it

23   possibly September 9th?

24                   THE COURT:  Yes.  That's available.

25                   MR. STEINBERG:  Okay.  Thank you.

7

1           THE COURT:  Okay.  Now, for the two

2  matters that are in dispute for today.

3           The first is the trustee's motion for

4  disgorgement of fees that were received by the firm

5  of Ungaretti & Harris during the pendency of the case

6  in Chapter 11.  That matter was fully briefed as far

7  as the underlying legal questions, and unless there's

8  something that anyone wants to add, I would be

9  inclined simply to enter an order of disgorgement for

10 the reasons that I had previously given.  And if

11 there's a need for any further elaboration on those

12 discussions in the opinion that I issued rejecting

13 the settlement, I believe the reply brief that was

14 filed by the trustee sets out the grounds for

15 disgorgement very effectively.

16           Just to briefly recapitulate those

17 grounds:  First, the fees that were received by

18 Ungaretti & Harris during the Chapter 11 term of this

19 case were not received in conformity with the order

20 that had been entered by the court allowing interim

21 payment of fees, principally because there were no

22 periodic interim fee applications under Section 331

23 of the Bankruptcy Code, but also because there

24 appears not to have been a payment of 80 percent of a

25 monthly invoice on a regular basis.  What happened

8

1   was the payments were made in round numbers that

2   apparently had no relationship to invoice amounts.

3               But wholly apart from the question of

4   non-compliance with the court order allowing payment

5   of fees during the pendency of the case in Chapter

6   11, there is a very apparent insufficiency of assets

7   to pay the administrative claims that arose during

8   the pendency of the Chapter 11 case.

9               The administrative claims, during that

10  time of the case are required by the Code to be paid

11  on a pro rata basis.  And the orders of the court

12  allowing any payment of fees on an interim basis were

13  subject to potential disgorgement with no limitation

14  on the grounds for disgorgement.  And, accordingly,

15  to maintain the Code's policy of equality of

16  distribution, disgorgement is required.

17              The reply brief and the opinion that I

18  issued rejecting the trustee's earlier settlements

19  set out the authorities that support that

20  proposition.  And on that basis, then, the trustee's

21  motion will be granted.

22              MR. STEINBERG:  We submitted an order,

23  I think.

24              THE COURT:  If you have an order, I'll

25  enter it right now.

9

1          MR. APOSTOLIDES:  It's been handed up.

2   It was the order that was attached to the original

3   motion.                                                  •

4          THE COURT:  Do we have anyone from

5   Ungaretti & Harris here?

6          MR. STEINBERG:  I don't believe so,

7   Your Honor.

8          THE COURT:  All right.  I would think

9   that 30 days would be an appropriate time for them to

10  make that payment.

11         MR. STEINBERG:  That's fine.

12         THE COURT:  And rather than put within

13  30 days of the date of this order, it's better to put

14  a calendar date.

15         MR. STEINBERG:  Yes.

16         THE COURT:  So we'll say on or before

17  July 18th.

18         The other matter that's set for

19  discussion or ruling today is the motion to require

20  security to be posted by Chiplease.  There are three

21  possible outcomes that I see for this motion.  One is

22  to order no security to be posted by Chiplease; the

23  other is to require the $5 million that's sought by

24  the motion; and the third is to require the $500,000

25  that was set out in the original settlement with the

10

1   trustee approved by the court.

2          Now of those three, it appears to me

3   that the most reasonable is the middle one in that

4   the settlement required what was referred to as

5   security for the payment by Chiplease of

6   administrative claims in the Chapter 7 phase of this

7   case.  And the order directing approval of the

8   settlement provides that these funds are to be held

9   in escrow by Chiplease's counsel for the payment of

10  all unpaid Chapter 7 operating expenses.

11          In order to be held in escrow for the

12  payment of all unpaid Chapter 7 operating expenses,

13  that sum would have to be held in escrow until all

14  applications for payment of administrative expenses

15  had been received.

16          So reading the order approving the

17  settlement together with the settlement itself, which

18  refers to this $500,000 deposit as quote, adequate

19  security, close quote, I think the intent is plain

20  that the $500,000 is supposed to be held in escrow

21  until the conclusion of the case in Chapter 7 to

22  assure that payment is actually made by Chiplease.

23          It appears that that provision of this

24  order has not been complied with.  An order and

25  compliance consistent with the terms of the order

11

1  would be appropriate.

2         On the other hand, ordering a payment

3  of $5 million would be something that goes well

4  beyond the term of the order.  And I frankly don't

5  see any basis for me to create an obligation that the

6  parties did not negotiate and consent to at the time

7  that the order was entered.

8         And then, finally, to do nothing would

9  be to countenance what would appear to be a breach of

10 the agreement and a violation of the court's order,

11 which required that the escrow be established.

12         Now, if anyone thinks that that

13 analysis is incorrect, I'll be happy to hear from

14 you.

15         MS. LORBER:  Your Honor, the reason

16 why I think just requiring Chiplease to post 500,000

17 is not adequate -- there are a couple of reasons.

18 First is the fact that they simply chose unilaterally

19 not to comply with the court order.

20         THE COURT:  That's right.  So we

21 enforce the order against them --

22         MS. LORBER:  Without any

23 consequences --

24         THE COURT:  But, I think, multiplying

25 it by 10 is somewhat difficult to understand.

12

1          MS. LORBER:  Perhaps not 10, but there

2   are no consequences here for this party that has

3   blatantly violated the court order --

4          THE COURT:  Let me interrupt you for

5   just a second.

6          What one usually does to enforce a

7   contract that's been breached is to require

8   compliance with the contract.  What you're

9   essentially doing is asking for punitive damages to

10  be assessed because simply requiring compliance with

11  the contract doesn't punish them.  Well, they don't

12  need to be punished, they need to comply with the

13  contract.

14         MS. LORBER:  Not punitive damages,

15  Your Honor.  We're seeking to enforce the terms of

16  the settlement agreement.  And the problem here is

17  that when the settlement agreement was entered into,

18  we didn't know how many administrative claims were

19  against the estate.  The bar -- the claims -- the

20  administrative claims bar date was following the

21  approval of the settlement agreement.  We now know

22  that there's over $20 million in administrative

23  claims against the estate.

24         We also found out after the settlement

25  agreement that Chiplease does not appear to have the

13

1   ability to pay those administrative claims if they're

2   allowed.  We saw in connection with the adequate

3   assurance trial that Chiplease doesn't have any        •

4   liquid assets.  It's refused to disclose what its

5   assets are.  Mr. Greenblatt says he doesn't even

6   know --

7                    THE COURT:  Okay.  Ms. Lorber, I have

8   to interrupt you.

9                    MS. LORBER:  Okay.

10                   THE COURT:  If these factors were

11  factors that should be relevant now, they should have

12  been relevant at the time that the settlement was

13  presented to me for approval.

14                   If you wanted to take discovery

15  regarding the extent of Chiplease's assets, that

16  would have been the time to do it.  And if you didn't

17  have that information and you thought that the

18  absence of that information made the deal proposed by

19  the trustee a bad deal, that would have been the time

20  to present it.

21                   Moving to where we are right now, we

22  have an agreement that was actually entered into with

23  the trustee, sent out on notice to all creditors with

24  an opportunity for anyone who didn't like the terms

25  of that agreement to object to it, and the agreement

14

1   was approved.   It's binding on all the parties.

2              You can't take an agreement that calls

3   for $500,000 of security and enforce it by requiring

4   $5 million of security or even $500,001 of security.

5   If I'm going to be able to exercise discretion to

6   change the terms, there's no basis for the exercise

7   of the discretion.   I can pull a number out of the

8   air.

9              MR. COMELLA:   Your Honor, if I could

10  just add.   I think there's only -- I think there's

11  really one reason why more than 500 would be

12  appropriate, and that is because when Chiplease had

13  the obligation to post the 500 under a settlement and

14  under a court-approved settlement, they didn't do it.

15             So if we have a claim allowed for a

16  million dollars, we know that that last half a

17  million dollars is going to be like death to recover.

18  And so the only question is, in light of the history

19  here, it's not punitive.   This is reality.   This

20  is -- this is the case history.   The only question is

21  whether in light of the -- of the practice that we've

22  seen here on the posting security, whether additional

23  security is warranted so the claimants don't incur

24  both the litigation risk and the collection risk.

25  It's the collection risk that's the problem.

15

1          THE COURT:  It would be a wonderful

2    provision to have put into the agreement, but it

3    wasn't put into the agreement.  All I can do -- the

4    only authority I have right now is to enforce the

5    terms of the agreement.  And given that we're dealing

6    with a contract, the way to enforce a contract is to

7    require compliance with its terms.

8          Now, I would suppose that I could

9    order interest on the $500,000 that would have been

10   earned from the time that it should have been

11   deposited to now.  That would be -- that would put

12   the counter-parties to Chiplease in the position they

13   would have been in had the contract been complied

14   with.  And that, I think, is within the authority of

15   the court to order what amounts to prejudgment

16   interest in enforcing the terms of the --

17          MR. STEINBERG:  Two years interest.

18          THE COURT:  But that's it.

19          MS. LORBER:  Can I ask -- raise one

20   more question?  I do believe that the settlement

21   agreement, though, is unclear as to what is going to

22   happen if Chiplease does not perform by paying the

23   allowed Chapter 7 --

24          THE COURT:  Well, very frequently

25   contracts don't provide for the remedies that will

16

1    take place in terms of the breach.  But what happens

2    then is that the common law provides the remedy for a

3    breach of contract.

4                    MS. LORBER:  But the administrative

5    claimants are not parties to this agreement in the

6    traditional sense.

7                    THE COURT:  They're third-party

8    beneficiaries.

9                    MS. LORBER:  Correct.

10                   THE COURT:  Does that give them

11   greater rights than the parties to the contract?

12                   MS. LORBER:  No.  But the deal that

13   was struck was to make this estate administratively

14   solvent.

15                   THE COURT:  No, it wasn't.

16                   MS. LORBER:  Yes, it was.

17                   THE COURT:  The deal that was struck

18   was for Chiplease to have the obligation to pay

19   administrative expenses, and for Chiplease to pay a

20   $500,000 deposit into escrow to assure that those

21   payments be made.  That's the deal.

22                   MS. LORBER:  But Chiplease is coming

23   in here and stepping into the shoes of the trustee

24   and litigating as if it's in the trustee's position,

25   and it's sort of skewing the role of the parties.  And

17

1  at the end of the day, the administrative claimants

2  are going to be left holding the bag without a

3  remedy.

4          MR. GOODMAN:  Your Honor, if I may?

5  Geoff Goodman on behalf of Sam Roti, who is perhaps

6  the largest Chapter 7 claimant.

7          I was being -- kind of going with Ms.

8  Lorber.  I would assume Your Honor -- if once these

9  claims are allowed, and I believe they will be

10  allowed well in excess of the 500,000, a million, or

11  several million, I would assume Your Honor has a

12  remedy in the event that they don't comply, could

13  preclude Chiplease from having access to the

14  bankruptcy court and essentially stepping into the

15  shoes of the trustee and using this court as they

16  would under those circumstances.

17          THE COURT:  If they don't comply with

18  a future obligation to pay the Chapter 7

19  administrative expenses, we'll deal with that at the

20  time that it occurs.

21          I'm not going to prejudge

22  hypothetically a fact situation that we're talking

23  about hypothetically.  That would be a complete

24  misuse of the judicial procedures.

25          What I can do now is deal with the

18

1   matter that's before me.  And having heard nothing

2   that dissuades me from my initial view, what I will

3   do is enter an order.

4              Now I don't know what an appropriate

5   rate of interest would be.

6              MR. STEINBERG:  We can check what

7   T-bills were.

8              THE COURT:  I think what you want to

9   do is find out what interest rate would have been

10  earned on these funds had they been deposited by the

11  Dykema firm in an escrow account as called for by the

12  court order.

13             And if you can get me a draft order by

14  Wednesday of next week calling for that amount to be

15  paid within a reasonable time by Chiplease, I'll

16  enter that order.

17             If there's some dispute as to what the

18  interest rate ought to be, I'll be happy to hear from

19  the parties Wednesday of next week.

20             MR. STEINBERG:  We can probably work

21  it out.  Just whatever the T-bill rates are, that's

22  where we'll put it.

23             MR. BERNSTEIN:  Let's just check with

24  Dykema and see how they held the money.  I don't

25  know.

19

1               THE COURT:  Okay.

2               MR. BERNSTEIN:  Thank you.

3               THE COURT:  There's also a final        •

4  application for compensation from Ungaretti & Harris

5  in the Chapter 11 case that you wanted me to rule on

6  today.  I don't see any point in dealing with that

7  Chapter 11 any more than -- any more than any of the

8  others.

9               MR. STEINBERG:  I agree.  The same

10 90-day date?

11              THE COURT:  That's right.

12              MR. STEINBERG:  Also, could we amend

13 it to have the escrow placed with Arnstein & Lehr?

14              THE COURT:  Of course.

15              MR. STEINBERG:  I trust Mr. Bernstein,

16 but we've had some --

17              MR. BERNSTEIN:  I would prefer.

18              THE COURT:  That's fine.  All right

19 then.  This is draft order to follow for June 25.

20              All other matters are continued as we

21 discussed earlier.

22              MR. STEINBERG:  Thank you, Your Honor.

23              This is the last thing I ever thought

24 would happen in this case.  I am amazed.

25              (Which were all the proceedings had in

20

1                    the above-entitled cause, June 17,

2                    2008, 10:00 a.m.)

3    I, NICOLE ABBATE, DO HEREBY CERTIFY
     THAT THE FOREGOING IS A TRUE AND ACCURATE
4    TRANSCRIPT OF PROCEEDINGS HAD IN THE ABOVE-
     ENTITLED CAUSE.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Resource Technology Corporation,)   No. 99 B 35434
                                 )   Chicago, Illinois
                                 )   9:30 a.m.
                    Debtor.       )   July 15, 2008

TRANSCRIPT OF PROCEEDINGS BEFORE THE
HONORABLE EUGENE R. WEDOFF

APPEARANCES:

For the Chapter 7 Trustee:   Ms. Miriam Stein;

For Ungaretti & Harris:      Ms. Natalia Rzepka;
                             Mr. Scott Alsterda;

Court Reporter:              Amy Doolin, CSR, RPR
                             U.S. Courthouse
                             219 South Dearborn
                             Room 661
                             Chicago, IL  60604.

2

1          THE CLERK:  Resource Technology

2    Corporation, 99 B 35434.

3          MS. RZEPKA:  Good morning, Your Honor.

4    Natalia Rzepka on behalf of Ungaretti & Harris.

5          MS. STEIN:  Good morning, Your Honor.

6    Miriam Stein on behalf of the Chapter 7 trustee.

7          MR. ALSTERDA:  Good morning, Your

8    Honor.  Scott Alsterda from Ungaretti & Harris.

9          THE COURT:  We've talked about this

10   many times, and I think I stated on the record my

11   view as to the lack of a likelihood of success.  So I

12   think this is really something you need to take to

13   the district court.

14         MS. RZEPKA:  We will do that, Your

15   Honor.

16         THE COURT:  This is denied.

17         MS. RZEPKA:  We also have a motion to

18   extend the time to file the record and --

19         THE COURT:  That's fine.  That one is

20   granted.

21              (Which were all the proceedings had in

22              the above-entitled cause, July 15,

23              2008, 9:30 a.m.)

24   I, AMY I. DOOLIN, CSR, RPR, DO HEREBY CERTIFY
     THAT THE FOREGOING IS A TRUE AND ACCURATE
25   TRANSCRIPT OF PROCEEDINGS HAD IN THE ABOVE-
     ENTITLED CAUSE.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | |
| RESOURCE TECHNOLOGY | ) | |
| CORPORATION, | ) | Case No. 99 B 35434 |
| | ) | |
| Debtor. | ) | Hon. Eugene R. Wedoff |
| | ) | U.S. Bankruptcy Judge |

## THE ESTATE'S DESIGNATION OF ITEMS FOR RECORD ON APPEAL RE: THE APPEAL FILED BY CHIPLEASE, INC. [4322]

The Estate of Resource Technology Corporation (the "Estate"), by and through

Jay A. Steinberg, not individually but solely in his capacity as Chapter 7 Trustee (the

"Trustee") of the Estate, pursuant to Federal Rule of Bankruptcy Procedure 8006,

designates the following additional items for the record on appeal with respect to the

Notice of Appeal filed by Chiplease, Inc. [4322] from the Bankruptcy Court's Order on

Chapter 7 Administrative Claimant's Motion for Entry of Order Requiring Chiplease, Inc.

to Post Security, entered on June 25, 2008 [4318].

### DESIGNATION OF ADDITIONAL ITEMS FOR THE RECORD ON APPEAL

| | | |
|---|---|---|
| 1. | Notice of Motion and Motion to Stay Pending Appeal filed by Chiplease, Inc. | 4328 |
| 2. | Objection to Motion to Stay Pending Appeal filed by Congress | 4334 |
| 3. | Response to Motion to Stay Pending Appeal filed by the Estate | 4335 |
| 4. | Order Denying for the Reasons Stated on the Record Motion to Stay Pending Appeal | 4349 |
| 5. | Transcript of July 16, 2008 Hearing before Judge Wedoff (ordered) | |

6.    Transcript of July 17, 2008 Hearing before Hon. Judge Kennelly (ordered)

7.    July 18, 2008 Order on Motion to Stay (08 C 4040)

THE CHAPTER 7 ESTATE OF RESOURCE
TECHNOLOGY CORPORATION, BY AND
THROUGH JAY A. STEINBERG, NOT
INDIVIDUALLY BUT SOLELY IN HIS
CAPACITY AS CHAPTER 7 TRUSTEE

By:_____ /s/ George P. Apostolides_____

Barry A. Chatz
George P. Apostolides
Arnstein & Lehr LLP
120 S. Riverside Plaza, Suite 1200
Chicago, IL  60606
(312) 876-7100
Fax: (312) 876-0288

James Richmond
Greenberg Traurig LLP
77 W. Wacker Drive
Suite 2500
Chicago, IL  60601
(312) 456-8400
Fax: (312) 456-8435

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | Case No. 99 B 35434 |
| RESOURCE TECHNOLOGY | ) | Honorable Eugene R. Wedoff |
| CORPORATION, | ) | |
| Debtor. | ) | |

### NOTICE OF MOTION

**TO: SEE ATTACHED SERVICE LIST**

**PLEASE TAKE NOTICE** that on **Wednesday, July 16, 2008,** at the hour of **9:30 a.m.** or as soon thereafter as counsel may be heard, I shall appear before the Honorable Eugene R. Wedoff in **Courtroom 744** of the Dirksen Federal Building, 219 South Dearborn Street, Chicago, Illinois, or before any other Judge who may be sitting in his stead and shall then and there present **Chiplease, Inc.'s Motion for Limited Stay Pending Appeal of Order on Motion to Compel Posting of Security** which is hereby served upon you, and shall move the Court for entry of an Order in accordance therewith.

**AT WHICH TIME AND PLACE YOU MAY APPEAR IF YOU SO SEE FIT.**

### CHIPLEASE, INC.

By:    /s/  Colleen E. McManus
       One of Its attorneys

Louis D. Bernstein ARDC No. 6192379
Colleen E. McManus ARDC No. 06243473
MUCH SHELIST DENENBERG AMENT & RUBENSTEIN, P.C.
191 North Wacker Drive, Suite 1800
Chicago, Illinois 60606
Telephone: 312.521.2000
Facsimile:  312.521.2100

## CERTIFICATE OF SERVICE

I, Colleen E. McManus, an attorney, certify that I caused a copy of the foregoing motion to be served via ECF electronic service as well as <u>via messenger</u> on the following attorneys on July 11, 2008:

Office of the United States Trustee
219 South Dearborn Street
Suite 873
Chicago, IL 60604

George Apostolides
Arnstein & Lehr LLP
120 S. Riverside Plaza
Suite 1200
Chicago IL 60606

Philip Comella
Sara E. Lorber
SEYFARTH SHAW LLP
131 South Dearborn Street
Suite 2400
Chicago, IL 60603

/s/ Colleen E. McManus

7

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Chapter 7 |
| | ) | Hon. Eugene R. Wedoff |
| RESOURCE TECHNOLOGY | ) | Case No. 99 B 35434 |
| CORPORATION, | ) | |
| | ) | Hearing: Wednesday, |
| Debtor. | ) | July 16, 2008 at 9:30 a.m. |

## CHIPLEASE, INC.'S MOTION FOR LIMITED STAY PENDING APPEAL OF ORDER ON MOTION TO COMPEL POSTING OF SECURITY

Chiplease, Inc. ("Chiplease"), by its undersigned attorneys, moves this Court, pursuant to Fed. R. Bankr. P. 8005, for a stay of the Court's order on the motion to compel Chiplease to post security. In support of its motion, Chiplease states:

### Factual Background

1.     On November 15, 1999, certain creditors of RTC filed an involuntary petition under Chapter 7 of the Bankruptcy Code. On or about January 18, 2000, RTC consented to entry of an order for relief converting its case to Chapter 11 of the Bankruptcy Code.

2.     RTC's case was converted to Chapter 11 as of February 1, 2000. RTC remained in possession of its assets and operated its business as a debtor-in-possession until August 26, 2003. Jay A. Steinberg serves as Chapter 7 trustee in this case (the "Trustee").

3.     On February 17, 2006, the Trustee filed a motion for authority to enter into a settlement agreement with Leon Greenblatt, Banco Panamericano, Chiplease and Scattered Corporation to compromise all disputes between the settling parties and to convey RTC estate assets, including certain executory contracts and leases, to Scattered and/or Chiplease or their designee (the "Settlement Agreement").

4.    On March 16, 2006, the Bankruptcy Court entered an order granting the Trustee's

motion and approving the Settlement Agreement.

5.    The Settlement Agreement provides, in pertinent part:

> Chiplease shall pay all unpaid Chapter 7 operating expenses above $150,000
> and any expenses incurred while the Estate continues to operate the Debtor's
> business ("Expenses").    The Estate shall pay the first $150,000 of these
> expenses.    On or before the Closing Date, Chiplease shall deliver to its
> counsel, Dykema Gossett PLLC the sum of $500,000.00 to be used to pay the
> Expenses ("Adequate Security").    After the Estate has paid a total of $150,000
> in Chapter 7 Expenses, Chiplease will be requested to pay all additional
> Chapter 7 operating expenses. The Chapter 7 Trustee shall advise Chiplease in
> writing of Chiplease's obligation to pay one or more Expenses (the "Expense
> Request").    Chiplease shall have seven (7) days from receipt of the Expense
> Request to either pay the Estate sufficient funds to fully satisfy the Expense
> Request, or to dispute the payment of the Requested Expenses in writing
> ("Expense Dispute").    If Chiplease fails to make a timely Expense Dispute, the
> Expense Request will be deemed allowed and Chiplease will be required to
> pay it.    If an Expense Dispute is timely made, the Estate shall have ten (10)
> days from the receipt of the Expense Dispute to seek to have the Expense
> Request allowed or disallowed by the Court (the "Expense Motion").    In the
> event that the Estate does not file an Expense Motion within the ten (10) day
> period, Chiplease shall be granted standing for the limited purpose of seeking
> to have the Expense Request disallowed.

*See* Settlement Agreement at § 11(i) (emphasis added).

6.    On or about April 17, 2008, American Grading Company ("AGC") and Congress

Development Company filed a motion (the "Motion") seeking to compel Chiplease to post $5

million as security for Chapter 7 operating expenses.    In the Motion, AGC alleged that Chiplease

did not comply with the Settlement Agreement by not depositing $500,000 with Dykema

Gossett.

7.    On June 3, 2008, Chiplease filed a response in opposition to the Motion.    In its

response, Chiplease stated, among other things, that (i) the Settlement Agreement did not require

a $5 million deposit and the order approving it has *res judicata* effect; and (ii) Chiplease in fact

had satisfied Chapter 7 operating expenses in excess of $500,000 by causing Dykema Gossett to

2

write checks to pay Chapter 7 operating expenses following approval of the Settlement Agreement. In fact, the response demonstrates that after the $500,000 deposited into the Dykema Gossett account had been exhausted, Chiplease deposited additional funds to pay for additional Chapter 7 operating expenses. Chiplease attached to its response numerous exhibits demonstrating the Chapter 7 operating expenses it had already paid.

8.    On June 17, 2008, this Court ruled on the Motion by directing Chiplease to pay an additional $500,000.00 into a new account at the Arnstein & Lehr law firm (the Trustee's counsel). The Court also ordered Chiplease to pay interest on the $500,000 but did not specify a rate of interest; the Court suggested that the parties determine the rate of interest that would have been earned on the funds at Dykema Gossett.

9.    On June 24, 2008, Chiplease filed the affidavit of John Connolly, which supported the statements in Chiplease's response to the Motion, explained Chiplease's payments of Chapter 7 operating expenses and attached more exhibits identifying Chapter 7 operating expenses Chiplease had paid.

10.    The parties were unable to agree on a form of order—among other reasons, because Chiplease objected to the payment of interest on the $500,000. On June 25, 2008, this Court ruled that Chiplease must pay $500,000.00 into Arnstein & Lehr, plus compound interest in the amount of $47,367.47, by July 17, 2008 (the "Order").

11.    On July 1, 2008, Chiplease filed a notice of appeal of the Order.

**Legal Argument**

12.    Fed. R. Bankr. P. 8005 provides, in pertinent part:

A motion for a stay of a judgment, order, or decree of a bankruptcy court, for approval of a supersedeas bond, or for other relief pending appeal must ordinarily be made in the first instance in the bankruptcy court. Notwithstanding Rule 7062 but subject to the power of the district court and

3

the bankruptcy appellate panel reserved hereinafter, the bankruptcy court may suspend or order the continuation of other proceedings in the case under the Code or make any other appropriate order during the pendency of an appeal on such terms as will protect the rights of all parties in interest....

13.    In considering whether to grant a stay pending appeal under Rule 8005, courts consider four factors, whether: (a) the appellant is likely to succeed on the merits of the appeal; (b) the appellant will suffer irreparable injury absent a stay; (c) a stay would substantially harm other parties in the litigation; and (d) a stay is in the public interest. *See e.g., Village of Rosemont v. Jaffe (In re Emerald Casino, Inc.)*, 334 B.R. 378, 391 (N.D. Ill. 2005).

14.    First, Chiplease need not show that it is more likely than not to succeed on appeal. Instead, the standard applied is whether the appellant has a "substantial case on the merits." This district has interpreted that factor as follows:

> The first factor, "likelihood of success," presents the most conceptual difficulty. Obviously, we think an appeal will probably fail; we have reviewed our opinion and stand by it. Had we thought an appeal would be successful, we would not have ruled as we did in the first place. But a party seeking a stay need not show that it is more than 50% likely to succeed on appeal; otherwise, no district court would ever grant a stay. It is enough that the City have a substantial case on the merits.

*Thomas v. City of Evanston*, 636 F.Supp. 587, 590 (N.D. Ill. 1986).

15.    Chiplease has a substantial case on the merits of one or more issues it has appealed, namely that: (i) Chiplease already has paid more than $500,000.00 in Chapter 7 operating expenses, which is consistent with the letter and spirit of the Settlement Agreement; (ii) the Settlement Agreement did not provide for interest--let alone compound interest--on the $500,000, nor was there any evidence that the Dykema Gossett account was interest-bearing; (iii) the Settlement Agreement did not provide for a deposit at the Arnstein & Lehr law firm; and (iv) the Bankruptcy Court ignored Chiplease's evidence and did not conduct an evidentiary hearing on issues of fact raised in Chiplease's response. Indeed, if the Trustee had insisted on including

4

in the Settlement Agreement, the requirements described in "ii" and "iii" above, Chiplease would not have entered into such a settlement with the Trustee. As Chiplease argued in its response to the Motion, it is too late for AGC or the Court to add new terms to the Settlement Agreement contrary to the agreement's plain language.

16.    In particular, argument "i" above is well-supported by the exhibits to both Chiplease's response and John Connolly's affidavit. Chiplease caused Dykema Gossett to write checks to pay Chapter 7 operating expenses following approval of the Settlement Agreement in excess of $500,000 and wrote additional checks to pay Chapter 7 operating expenses in excess of the $500,000. (*See, e.g.*, "Exhibit B" to Connolly's affidavit, which contains copies of numerous checks written on the Dykema account for, *e.g.*, RTC payroll.) The Court did not appear to consider this evidence at the hearings on the Motion and did not address issues of fact at the hearings.

17.    Moreover, in ordering $500,000 plus compound interest to be deposited at Arnstein & Lehr, the Court seems to find that the monies are now property of the estate, which finding Chiplease strongly disputes. Since the funds are not property of the estate, the Court's order requiring the funds be held in the Trustee's counsel's account, creates an inherent conflict of interest where none previously existed.

18.    Second, Chiplease will suffer irreparable injury absent a stay because Chiplease is required to put $547,367.47 into an account at Arnstein & Lehr by July 17, 2008 for payment of Chapter 7 operating expenses *even though* it already has paid more than $500,000 in Chapter 7 operating expenses. This is a significant financial burden for Chiplease and will cause it to incur debt and/or liquidate assets when it was not prepared to do so.[1]    Furthermore, Chiplease was not

---

[1]    Also because of this economic hardship, Chiplease submits that waiver of a bond, as sometimes required in connection with a stay under Rule 8005, is appropriate.

prepared to deposit compound interest over two years insofar as the Settlement Agreement as negotiated and approved did not call for that.

19.    Third, the granting of a stay would not harm other parties to this matter because (i) Chiplease already has paid a substantial amount and number of Chapter 7 operating expenses; and (ii) numerous Chapter 7 administrative claims--including AGC's--are pending <u>but have not yet been allowed</u>, and thus, are not entitled to payment.  Accordingly, these claimants are not prejudiced by a stay of the Order because they are not yet entitled to relief.

20.    Finally, a stay is in the public interest because our legal system does not favor compelling entities to take actions contrary to settlements they negotiated; that would deter people from settling out of court.  Moreover, staying the Order will not impact any public interest or public policy.

**WHEREFORE**, Chiplease, Inc. prays that this Court enter an order staying its June 25, 2008 order requiring Chiplease to place $547,367.47 into a new account with Arnstein & Lehr, and for such other relief as this Court deems just and proper.

**CHIPLEASE, INC.**

By:    /s/ Colleen E. McManus
       One of its attorneys

Louis D. Bernstein, ARDC No. 6192379
Colleen E. McManus, ARDC No. 06243473
**Much Shelist Denenberg**
    **Ament & Rubenstein, P.C.**
191 North Wacker Drive, Suite 1800
Chicago, IL  60606
Telephone:  312-521-2000

6

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Chapter 7 |
| | ) | Hon. Eugene R. Wedoff |
| RESOURCE TECHNOLOGY | ) | Case No. 99 B 35434 |
| CORPORATION, | ) | |
| | ) | Hearing:  Wednesday, |
| Debtor. | ) | July 16, 2008 at 9:30 a.m. |

## ORDER FOR LIMITED STAY PENDING APPEAL

This cause coming to be heard on Chiplease, Inc.'s motion for a limited stay pending appeal (the "Motion"); notice of the Motion having been provided; the Court having reviewed the Motion and having heard any arguments of counsel; and the Court being otherwise fully advised in the premises; IT IS HEREBY ORDERED THAT:

This Court's order of June 25, 2008 requiring Chiplease to place $547,367.47 into a new account with Arnstein & Lehr is stayed until further order of Court.

ENTERED:

_____

Honorable Eugene R. Wedoff
United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 99 B 35434 |
| | ) | Chapter 7 |
| RESOURCE TECHNOLOGY | ) | Hon. Eugene R. Wedoff |
| CORPORATION, | ) | |
| | ) | |
| Debtor. | ) | |

## OBJECTION TO CHIPLEASE, INC.'S MOTION FOR LIMITED STAY PENDING APPEAL OF ORDER ON MOTION TO COMPEL POSTING OF SECURITY

American Grading Co. and Congress Development Company (collectively, the "Administrative Claimants") hereby by object on a preliminary basis to Chiplease, Inc.'s Motion for Limited Stay Pending Appeal of Order on Motion to Compel Positing of Security (the "Stay Motion").

1.   No basis exists for staying enforcement of this Court's June 25 2008 Order requiring Chiplease to pay $547,367.47 in order to comply with its obligations under the Settlement Agreement (as defined in the Stay Motion). The Stay Motion should be denied for at least the following reasons:

2.   First, for all of the reasons set forth in the Administrative Claimants' briefing on the motion to compel Chiplease to post security, the Trustee's response thereto and the Court's oral ruling on the motion (all of which are incorporated herein by reference), Chiplease is not likely to succeed on the merits of its appeal, and its reliance on the untimely filed affidavit of John Connelly is misplaced.

3.   Second, Chiplease will not suffer irreparable harm if the Court's Order is not stayed pending appeal because it will be paid back all of its money if it wins on appeal, along with whatever interest has accrued thereon. Thus, there is no real harm.

4.      Moreover, to the extent there is any harm, it is monetary harm, and it is well-established that monetary harm is not irreparable harm warranting stay pending appeal. *See, e.g., Classic Components v. Mitsubishi Electronics Am.,* 841 F.2d 163, 164-65 (7th Cir. 1988) (citing *Sampson v. Murray,* 415 U.S. 61, 88-91(1974)) (monetary harm is generally not irreparable); *Dailey v. Home Federal Sav. and Loan,* 1996 WL 131180 *1 (N.D.Ill. 1996) (no irreparable harm where parties can be adequately compensated by money damages); *In re S.N.A. Nut Co.,* 1996 WL 31155 *3 (N.D.Ill. 1996); *Robbins v. Pepsi-Cola Metropolitan Bottling Co.* 637 F.Supp. 1014, 1020 (N.D.Ill., 1986).

5.      The exception to this general rule is where the party that has been "ordered to pay the monetary damages is insolvent or facing imminent bankruptcy, or is in a perilous financial state." *Bridgeport, Port Jefferson Steamboat Co. v. Bridgeport Port Auth.,* 2004 WL 840140 *3 (D.Conn. April 15, 2004) (internal quotation marks and citations omitted); *accord " Robbins v. Pepsi-Cola Metropolitan Bottling Co.,* 637 F. Supp. 1014, 1020 (N.D. Ill.), *aff'd,* 800 F.2d 641 (7th Cir. 1986) (irreparable harm may exist if the judgment will bankrupt the appellant or leave it on the brink of financial ruin); *Sea Carriers Corp. v. Empire Programs, Inc.,* 2006 WL 3354139 *4 (S.D.N.Y. Nov. 20, 2006) ("Monetary loss therefore will not suffice unless the movant shows damage that cannot be rectified by financial compensation .... One such exception is where the party to be enjoined is shown to be insolvent or imminently insolvent."); *Mitsubishi Power Sys., Inc. v. Shaw Group, Inc.,* 2004 WL 527047, at *2 (S.D.N.Y. March 16, 2004) ("Courts have generally applied this limited exception where insolvency is imminent.").

6.      While Chiplease asserts in a footnote that it is under "economic hardship," it offers no evidence demonstrating that it is insolvent, facing imminent bankruptcy or in a perilous financial state sufficient to make its required payment of $547,367.47 qualify as irreparable

2

harm. If the Court is inclined to grant any weight to Chiplease's unsupported assertion of financial distress, then the Court should set this matter for an evidentiary hearing and allow the Administrative Claimants to conduct discovery into Chiplease's financial condition.

7.    Third, the Administrative Claimants will be significantly prejudiced if Chiplease's performance under the Court's Order is stayed pending appeal. The payment under the Court's Order is intended to put the parties in the same position they would have been in if Chiplease had deposited the security in March 2006, when the Settlement Agreement was approved. For Chiplease to now claim that it is financially unable to pay the bargained-for consideration under the Settlement Agreement brings the validity of that settlement into question. If Chiplease cannot meet its financial obligations under the Settlement Agreement, it is not entitled to retain the benefits of that Agreement. The Administrative Claimants pursued their claims in the expectation that if allowed, they would be paid. Now it appears that Chiplease may be saying that it actually never had any intention of funding the payment of allowed claims at the same time it was litigating against them because it does not have the money to pay such claims. Certainly, if Chiplease cannot post the $547,367.47 required by the Settlement Agreement to secure its performance now, how will it possibly pay the potential $20 million in Chapter 7 administrative expense claims that are pending against the estate? If this is the situation, the Administrative Claimants must know that fact now so that they can evaluate their options.

8.    If Chiplease files for bankruptcy after it looses this appeal or after the Administrative Claimant's claims are allowed, the Administrative Claimants will be left without any effective remedy against Chiplease. The only way to avoid this situation is by requiring Chiplease to post the security required by the Settlement Agreement.

3

WHEREFORE, for the reasons stated herein, the Administrative Claimants respectfully request that the Court (i) deny the Stay Motion, and (ii) grant the Administrative Claimants such further relief as is appropriate under the circumstances.

DATED:  July 15, 2008                   Respectfully submitted,

                                        **AMERICAN GRADING CO. and CONGRESS
                                        DEVELOPMENT COMPANY**


                                        By:___/s/ Sara E. Lorber_____
                                               One of Their Attorneys



Philip L. Comella (6185243)
Sara E. Lorber (6229740)
SEYFARTH SHAW LLP
131 South Dearborn Street
Chicago, Illinois  60603
Tel. (312) 460-5000
Fax: (312) 460-7000
pcomella@seyfarth.com
slorber@seyfarth.com

CH1 11521197.1

## **CERTIFICATE OF SERVICE**

I, Sara Lorber, hereby certify that on April 17, 2008, I caused a copy of the foregoing document to be served upon the parties listed on the attached Service List via electronic filing

By:   /s/  Sara E. Lorber

CH1 11521197.1

## SERVICE LIST

Colleen E. McManus @ CMcManus@muchshelist.com
Allan V. Abinoja @ aabinoja@novackandmacey.com
Mark E. Abraham @ mabraham@gouldratner.com
R Scott Alsterda @ rsalsterda@uhlaw.com & ralsterda@ecf.epiqsystems.com
Andrew J. Annes @ aannes@sabt.com
George P Apostolides @ gpapostolides@arnstein.com
Marc O. Beem @ mbeem@millershakman.com & mpadilla@millershakman.com
Joseph P. Berglund @ berglundniew@aol.com
Erich S Buck @ ebuck@sachnoff.com
Kurt M Carlson @ kcarlson@tishlerandwald.com
Nicole L. Castillo @ ncastillo@nealandleroy.com
Barry A Chatz @ bachatz@arnstein.com
Faith Dolgin@ fdolgin@revenue.state.il.us
Patricia J Fokuo @ pfokuo@schiffhardin.com & edocket@schiffhardin.com
Robert P Follmer @ ostlingassociates@insightbb.com
Eugene J Geekie @ egeekie@schiffhardin.com
Arlene N Gelman @ agelman@sachnoff.com
Michael L. Gesas @ mgesas@gpgglaw.com
Kathryn Gleason @ USTPRegion11.es.ecf@usdoj.gov & Kathryn.M.Gleason@usdoj.gov
Thomas W. Goedert @ tgoedert@nealandleroy.com
Steven R Jakubowski @ sjakubowski@colemanlawfirm.com
Gregory J Jordan @ gjordan@dykema.com
Alexander D Kerr @ akerr@tishlerandwald.com & moatsvall@tishlerandwald.com
Diane F. Klotnia @ dklotnia@millershakman.com
William Irwin Kohn @ wkohn@schiffhardin.com
Theodore F. Kommers @ tkommers@gouldratner.com
Mark E Leipold @ mleipold@gouldratner.com & stamssot@gouldratner.com &
lbernstein@gouldratner.com
Joy E Levy @ jelevy@arnstein.com
Ryan Liska @ ryanliska@yahoo.com
Mitchell L. Marinello @ mmarinello@novackandmacey.com
Richard J Mason @ rmason@mcguirewoods.com & docket@mcguirewoods.com &
cgunderson@mcguirewoods.com
Kelly J McClintic @ ksltd@flash.net
William J McKenna @ wmckenna@foley.com & khall@foley.com
Melissa G. Melsher @ mgmelsher@uhlaw.com
Gerald F. Munitz @ gerald.munitz@goldbergkohn.com
William T Neary @ USTPRegion11.ES.ECF@usdoj.gov
Kathryn A Pamenter @ kathryn.pamenter@goldbergkohn.com
Michael C. Partee @ mpartee@atg.state.il.us
Nancy A Peterman @ petermann@gtlaw.com &carlsonk@gtlaw.com & powelly@gtlaw.com
Alex Pirogovsky @ apirogovsky@uhlaw.com
Christopher H Purcell @ shermlaw13@aol.com
Dennis E. Quaid @ dquaid@fagelhaber.com

Craig E. Reimer @ creimer@mayerbrownrowe.com
Christopher L. Rexroat @ clrexroat@uhlaw.com
Natalia K. Rzepka @ nrzepka@tishlerandwald.com
Michael M Schmahl @ mschmahl@mcguirewoods.com & docket@mcguirewoods.com &
cgunderson@mcguirewoods.com
Peter J Schmidt @ pschmidt@dykema.com
Charles P Schulman @ cschulman@sachnoff.com
Michael J. Small @ msmall@foley.com, khall@foley.com
Jennifer E. Smiley @ jsmiley@millershakman.com & odom@millershakman.com &
mpadilla@millershakman.com
Bradley A. Smith @ bsmith@nealandleroy.com
Patricia K. Smoots @ psmoots@mcguirewoods.com
Thomas M. Staunton @ tstaunton@millershakman.com
Miriam R. Stein @ mrstein@arnstein.com
Jay A Steinberg @ jsteinberg@foley.com, jsteinberg@ecf.epiqsystems.com;sbarr@foley.com
Pia N Thompson @ pthompson@sonnenschein.com
Susan Valentine @ svalentine@robinsoncurley.com
Katherine D Vega @ kvega@ngelaw.com
Jon C Vigano @ jvigano@schiffhardin.com
edocket@schiffhardin.com & dgordon@schiffhardin.com & earundel@schiffhardin.com
Bruce L Wald @ bwald@tishlerandwald.com
Peter J Young @ pyoung@jenner.com & docketing@jenner.com

CH1 11521197.1

CH1 11521197.1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | |
| RESOURCE TECHNOLOGY | ) | |
| CORPORATION, | ) | Case No. 99 B 35434 |
| | ) | |
| Debtor. | ) | Hon. Eugene R. Wedoff |
| | ) | U.S. Bankruptcy Judge |

### THE ESTATE'S RESPONSE TO CHIPLEASE INC.'S MOTION FOR LIMITED STAY PENDING APPEAL OF ORDER ON MOTION TO COMPEL POSTING OF SECURITY

The Estate of Resource Technology Corporation (the "Estate"), by and through Jay A. Steinberg, not individually but solely in his capacity as Chapter 7 Trustee (the "Trustee") of the Estate, submits this Response to Chiplease's Motion for Limited Stay Pending Appeal of Order on Motion to Compel Posting of Security (the "Motion") as follows.

It is patently clear that there is no basis whatsoever for this Court to stay its June 25, 2008 Order (the "June 25 Order") pending Chiplease's appeal. As this Court well knows, the June 25 Order directed Chiplease to pay $547,367.47 into an escrow account set up at the office of the Estate's counsel, Arnstein & Lehr LLP, on or before July 17, 2008. The Court should deny the Motion and require Chiplease to deliver the make that payment.

### BACKGROUND

In addition to the background which Chiplease has set forth in the Motion, the Court should be reminded of the procedural events which led to the June 25 Order.

On April 17, 2008, two of the Chapter 7 Administrative Expense Claimants, American Grading Co. and Congress Development Co., filed their motion for the entry

of an order requiring Chiplease to post security (the "Security Motion").  The motion argued, in short, that Chiplease's financial position compelled the posting of additional security beyond the $500,000.00 which Chiplease was required to deposit by the March, 2006 settlement agreement and Order approving the settlement involving the Estate and Chiplease.  The Security Motion sought the posting of security in the amount of $5,000,000.00.

After the Security Motion was filed, Chiplease's counsel, Gregory Jordan and Peter Schmidt of the Polsinelli firm, withdrew from their representation of Chiplease. Louis Bernstein and Colleen McManus of the Much Shelist firm appeared on Chiplease's behalf.  As a result of the change in law firms, the Trustee requested an accounting of funds received into the escrow.  The response of Chiplease counsel raised a suspicion that the $500,000.00 escrow had not been established, notwithstanding the Estate's good faith belief to the contrary.

On June 3, 2008, both the Estate and Chiplease filed their responses to the Security Motion.  The Chiplease response acknowledged that Chiplease did not deposit the $500,000.00 required by the settlement agreement and Order.  Chiplease also took the position that it should not have to establish the $500,000.00 escrow because it had already paid Chapter 7 Operating Expenses in excess of $500,000.00.

On June 17, 2008, the Court heard argument on the Motion and indicated that Chiplease had to deposit $500,000.00 in escrow at the office of the Estate's counsel, Arnstein & Lehr LLP.  The Court also indicated that interest was appropriate.  The parties were to return with a draft order.  On June 24, 2008, Chiplease filed an affidavit of John Connolly in opposition to the Security Motion, even though the Court had

2

already indicated how it would rule. The parties could not agree on the form of an order, so the parties had to appear on the draft order to follow call set for June 25, 2008. The Court entered the June 25 Order that day.

Chiplease then appealed, and in the Motion seeks a stay of enforcement of the June 25 Order. As set forth below, the Court should deny that request.

## ARGUMENT

It is patently clear that Chiplease fails the test for obtaining a stay under Seventh Circuit law. In re Forty-Eight Insulations, 115 F.3d 1294, 1300 (7th Cir. 1997) sets forth the four factors a court must consider in determining whether to grant a stay pending appeal: "(1) whether the appellant is likely to succeed on the merits of the appeal; (2) whether the appellant will suffer irreparable injury absent a stay; (3) whether a stay would substantially harm other parties in the litigation; and (4) whether a stay is in the public interest." The movant has the burden of establishing each of these elements. In re Doctors Hosp. of Hyde Park, 376 B.R. 242, 246 (Bankr. N.D. Ill. 2007). The In re Forty-Eight case controls, not the District Court's 1986 Thomas v. City of Evanston case which is cited by Chiplease in the Motion. As set forth below, the analysis of these factors does not compel the grant of a stay.

First, Chiplease has to show that it is likely to succeed on the merits of the appeal. In the context of a stay pending appeal, "where the applicant's arguments have already been evaluated on the success scale, the applicant must make a stronger threshold showing of likelihood of success to meet his burden." Id. at 1301. In the In re Forty-Eight matter, the Seventh Circuit said that the showing must be "a substantial showing of likelihood of success."

3

Chiplease cannot possibly make the required showing, for two reasons. First, it is obvious that pursuant to the settlement agreement and the settlement Order Chiplease was required to post the $500,000.00 in escrow. That money was to be held in escrow for the payment of all unpaid Chapter 7 operating expenses above $150,000.00 and any expenses incurred while the Estate continues to operate the Debtor's business. See paragraph 23 of the Settlement Order, attached as Exhibit A, pp. 13-14. Chiplease has acknowledged that it failed to deposit the money.

Second, Chiplease does not have the right to determine what constitutes allowed unpaid Chapter 7 operating expense claims. In fact, under the procedure established by the Settlement Agreement:

> The Chapter 7 Trustee shall advise Chiplease in writing of Chiplease's obligation to pay one or more Expenses (the "Expense Request"). Chiplease shall have seven (7) days from receipt of the Expense Request to either pay the Estate sufficient funds to fully satisfy the Expense Request, or to dispute the payment of the Requested Expenses in writing ("Expense Dispute"). If Chiplease fails to make a timely Expense Dispute, the Expense Request will be deemed allowed and Chiplease will be required to pay it. If an Expense Dispute is timely made, the Estate shall have ten (10) days from the receipt of the Expense Dispute to seek to have the Expense Request allowed or disallowed by the Court (the "Expense Motion"). In the even that the Estate does not file an Expense Motion within the ten (10) day period, Chiplease shall be granted standing for the limited purpose of seeking to have the Expense Request disallowed.

(Exhibit A, Settlement Agreement, at par. 11(i)). Chiplease does not have the unilateral right to decide what can be paid out of the escrow. As of the date of this response, the above mechanism has not been necessary because the Chapter 7 claims status hearing has been continued from time to time and is now scheduled for July 16, 2008. As such, there has been no determination whether any Chapter 7 claims are allowed

4

unpaid Chapter 7 operating expense claims.  Based on this, there has been no opportunity to use the procedure set forth above.

This Court should also reject Chiplease's arguments that interest is inappropriate and that the money should not be held in an account maintained by the Trustee.  The Court made clear that the escrowed amount has to have been held in an interest-bearing account, as it is for the benefit of creditors.  Further, in light of Chiplease's abject failure to deposit the money in escrow despite the settlement agreement and court order requiring it, a deposit in an account maintained by the Trustee is clearly appropriate.

Second, Chiplease cannot show that it will suffer irreparable harm without the stay.  As In re Forty-Eight points out, this factor, as all four factors, mirrors the consideration of this factor in a ruling on a preliminary injunction.  In re Forty-Eight, 115 F.3d at 1300.  Thus, Chiplease can only show irreparable harm if money damages are not an adequate remedy.  Chiplease argues only that the payment is a significant financial burden for Chiplease.  This does not meet the standard of irreparable harm set forth in any case law in this district or anywhere else.  What a party agrees to deposit a sum of money, fails to deposit that money, and then is ordered to deposit that money, by definition there cannot be irreparable harm.

Third, Chiplease cannot show that a stay will not render substantial harm to other parties in the litigation.  American Grading and Congress raised the issue of the adequacy of the security in the Security Motion.  This Court found that the deposit of the $500,000.00, as required by the settlement agreement and order, is appropriate.  In

5

light of the anticipated litigation regarding the value of administrative claims, it is proper for this Court to require the posting of the security it approved back in March, 2006.

Finally, a stay is not in the public interest. The public interest dictates that parties like Chiplease should be required to satisfy their obligations. The settlement agreement and order required the deposit of $500,000.00 almost two and a half years ago, and Chiplease failed to make that deposit or comply with the court's order. The public interest requires the enforcement of court orders and requires the denial of this request for a stay.

## CONCLUSION

For the reasons set forth above, this Court should deny the Motion and require Chiplease to deposit the amount of $547,367.47 into an account maintained by the Trustee on or before July 17, 2008.

> THE CHAPTER 7 ESTATE OF RESOURCE TECHNOLOGY CORPORATION, BY AND THROUGH JAY A. STEINBERG, NOT INDIVIDUALLY BUT SOLELY IN HIS CAPACITY AS CHAPTER 7 TRUSTEE
>
> By:____ /s/ George P. Apostolides

Barry A. Chatz
George P. Apostolides
Arnstein & Lehr LLP
120 S. Riverside Plaza, Suite 1200
Chicago, IL 60606
(312) 876-7100
Fax: (312) 876-0288

6

# EXHIBIT A

IN THE UNITED STATES BANKRUPTY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In re:

RESOURCE TECHNOLOGY
CORPORATION,

Debtor.

Chapter 7
Case No. 99 B 35434

Hon. Eugene R. Wedoff

## ORDER APPROVING SETTLEMENT BETWEEN THE ESTATE OF RESOURCE TECHNOLOGY CORPORATION AND THE GREENBLATT ENTITIES AND GRANTING FURTHER RELIEF

This matter coming before the Court on the motion filed by Jay A. Steinberg, not individually, but solely as the Chapter 7 Trustee (the "Chapter 7 Trustee") for the Chapter 7 estate of Resource Technology Corporation (the "Estate") for entry of an order to (i) approve a settlement agreement, a copy of which is attached hereto and incorporated herein as Exhibit "A", (Settlement Agreement") by and between the Estate and the Greenblatt Entities (defined below); (ii) authorize the conveyance, designation and abandonment of certain estate assets to Chiplease, Inc. or its designee ("Chiplease") and Scattered Corporation or its designee ("Scattered") (Chiplease and Scattered, as applicable, (collectively "Purchaser")) pursuant to the terms of the Agreements (defined below); (iii) approve a designation rights agreement in favor of Purchaser, a copy of which is attached as Exhibit "A" to the Settlement Agreement ("Designation Rights Agreement") (the Settlement Agreement and Designation Rights Agreement are jointly referred to as the "Agreements"); (iv) authorize the disbursement of $250,000 to NEC Electric Corporation ("NEC"); and (v) approve shortened notice of this Motion (the "Settlement Motion"); the Court having afforded the Chapter 7 Trustee and all other parties in interest an opportunity to be heard, having considered the testimony provided at the hearing on these matters, and having considered the

Settlement Motion and the entire record in this proceeding to date; the Court being otherwise fully advised in the premises, and finding notice of the Settlement Motion to be sufficient under the circumstances; the Court makes the following Findings of Facts, Conclusions of Law and other determinations:

### Findings of Fact and Other Determinations

A.    On November 15, 1999, (the "Petition Date"), an involuntary petition for relief under Chapter 7 of the Bankruptcy Code (11 U.S.C. Section 101 et.seq.) was filed against Resource Technology Corporation ("RTC" or the "Debtor"). An order for relief was entered on January 18, 2000, at which time the case was converted to one under Chapter 11. Gregg E. Szilagyi was appointed as the Chapter 11 Trustee (the "Chapter 11 Trustee").

B.    The case was converted back to a Chapter 7 proceeding on September 21, 2005. The Chapter 7 Trustee was appointed as interim trustee in September 2005 and became the permanent trustee in November 2005.

C.    The Debtor is in the business of capturing and converting methane landfill gas into electric energy, which the Debtor then sold to utilities like Commonwealth Edison. The Debtor operates its business at a number of landfill sites.

D.    Leon Greenblatt, Chiplease, Inc. and Banco Panamericano, Inc. (collectively, the "Banco Secured Lenders") assert pre-petition and post-petition secured claims against the Estate based upon various pre-petition loan documents and post-petition debtor-in-possession loans. Based upon their loans, the Banco Secured Lenders assert a lien on certain gas rights agreements and other assets of the Estate as collateral for their loans.

2

E.    Network Electric Corporation ("NEC") asserts a secured claim against the Estate in an amount in excess of $43 Million relating to a borrowing facility approved by this Court on August 1, 2000.  NEC asserts a first priority secured claim on certain property and assets relating to the Estate's Congress, Beecher and Pontiac landfill sites.

F.    NEC also loaned the Chapter 7 Estate the sum of $250,000 to pay for the Chapter 7 administration of the estate (the "Chapter 7 Loan").  The first recoveries by the Estate are to be paid to NEC in repayment of the Chapter 7 Loan.

G.    On January 17, 2006, the Banco Secured Lenders filed an adversary proceeding against NEC entitled "Objection to Claim and Request for Determination as to the Validity and Extent of Lien of NEC."  In the adversary proceeding, the Banco Secured Lenders objected to the secured administrative claim filed by NEC and request that NEC's claim be disallowed in its entirety.  The Banco Secured Lenders do not contest the payment of $250,000 to NEC as repayment of the Chapter 7 Loan.

H.    Various adversary complaints were filed by the Estate against the Banco Secured Lenders and other defendants (the "Trustee's Litigation") as follows:

        (i)    On October 22, 2004, the Chapter 11 Trustee filed his Verified Complaint for Turnover of Property of the Estate, for Damages including Punitive Damages for Conversion of Property of the Estate, for Imposition of a Constructive Trust, and for Injunctive and Other Relief against the Banco Secured Lenders, as Adv. Pro. No. 04-03867 (the "October 2004 Complaint"). The Chapter 11 Trustee dismissed the October 2004 Complaint on February 17, 2005.

        (ii)    On November 16, 2004, the Chapter 11 Trustee filed his Verified Adversary Complaint for Injunctive and Declaratory Relief against the Banco Secured Lenders, Delaware Gas and Electric Inc., Scattered Corporation and Green Gas Delaware Statutory Trust incorrectly identified as Green Gas Delaware Business Trust as Adv. Pro. No. 04-04068 (the "November 2004 Complaint").  On December 30, 2004, the Court granted the Chapter 11 Trustee's Motion for Preliminary Injunctive Relief enjoining the Banco Secured Parties from taking certain actions (the "December 2004 Injunctive Relief").

3

(iii)    On January 10, 2005, the Chapter 11 Trustee filed his Complaint for Unauthorized Postpetition Transfers against Loop Properties and Loop Properties, Inc. as Adv. Pro. No. 05-00025 (the "January 2005 Complaint").

(iv)    On October 27, 2005, the Estate filed a Complaint for Breach of Fiduciary Duty, Equitable Subordination, Violation of RICO, Injunctive Relief, Turnover of Property and Other Relief against the Banco Secured Lenders, Scattered Corporation and Green Gas Delaware Business Trust (the "October 2005 Complaint") as Adv. Pro. No. 05-02521.

(v)    On November 2, 2005, the Court entered an order consolidating the November 2004 Complaint and the October 2005 Complaint.  On November 2, 2005, the Court entered an order granting in part the Estate's Motion for Preliminary Injunction (the "November 2005 Injunctive Relief").

(vi)    On January 23, 2006, the Estate filed an Adversary Complaint for Injunctive and Declaratory Relief against the Banco Secured Parties as Adv. Pro. No. 06-00436 (the "January 2006 Complaint").

I.    On December 28, 2005, this Court entered an Order approving the Estate's Motion to Approve Settlement of 506(c) Claim with the Banco Secured Lenders pursuant to Section 363 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure (Rule 101 et.seq., the "Bankruptcy Rules").  The Court required that Arnstein & Lehr LLP, as escrowee, hold $1.5 Million in settlement funds in escrow, pending further Order of the Court (the "506(c) Funds").  The Banco Secured Lenders filed a Motion to Reconsider the Court's approval of the 506(c) settlement, and objected to the Estate's motion for distribution of the 506(c) Funds. This Motion is still pending as of the date of this Order.

J.    On January 12, 2006, this Court approved sale procedures relating to the Estate's sale of certain assets, which included landfill gas-fired Solar Turbine combustion generators and ancillary equipment including (1) the three Solar Taurus Model Units located at the Congress landfill; (2) the one Taurus Model Unit located at the Beecher landfill; and (3) the one Solar Titan Model Unit located at the Pontiac landfill, together with all books and records pertaining to said equipment, the

4

maintenance and operation of said equipment, spare parts and items related to said equipment (the "DTE Sale Assets") to DTE Biomass Energy, Inc. ("DTE") for $6,000,000, or such higher offer (the "Sale").

K.     On February 6, 2006, the Court conducted a hearing on the Sale.  The Court authorized the Sale free and clear of all liens, claims and encumbrances, with all valid liens to attach to proceeds in the same amount, extent and priority (the "Sale Order").  The Court authorized the distribution of funds to the Chapter 7 Trustee in payment of his statutory compensation.  The Court ordered that the remaining funds be held in escrow pending further Order of the Court determining the extent and priority of liens between NEC and the Banco Secured Lenders as to the DTE Sale Assets.

L.     The Banco Secured Lenders filed an appeal of the Sale Order to the United States District Court (the "Sale Appeal").  On February 17, 2006, the United States District Court stayed the Sale pending the appeal.

M.     On March 2, 2006, the United States District Court affirmed the Sale Order.  On the same date, the Estate closed on the Sale to DTE and conveyed the DTE Sale Assets to DTE free and clear of all liens, claims and encumbrances.  The Chapter 7 Trustee received the statutory compensation authorized by the Court at the closing of the Sale to DTE.

N.     The Chapter 7 Trustee, on the one hand, and the Banco Secured Lenders and Scattered Corporation (collectively, the "Greenblatt Entities"), on the other hand, have decided to resolve all issues between the Estate and the Greenblatt Entities, and toward that end seek Court approval of the Settlement Agreement, approval of the Designation Rights Agreement and approval of and authorization of the conveyance, designation and abandonment of certain Estate assets to Purchaser as set forth in the Agreements, approval and authorization of releases, attached to the Settlement

5

Agreement as Exhibits D and E (the "Releases") and the dismissal of various causes of action and the granting of other relief, pursuant to Sections 105, 363, 365 and 554 of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules.

O.    The terms of the Agreements are supported by sound business reasons and are consistent with fundamental policies of the Bankruptcy Code.  Approval of the Agreements will serve to benefit the Estate.  This Court has discretion to authorize and approve the Agreements and the other relief granted herein.

P.    The settlement as set forth in the Settlement Agreement, sale of assets as set forth in the Settlement Agreement and the transfer and conveyance of certain Designation Rights as defined in the Designation Rights Agreement ("Designation Rights") to Purchaser and the Releases are each a reasonable and valid exercise of the Estate's business judgment and is otherwise appropriate under Sections 363 and 365 of the Bankruptcy Code.

Q.    The Agreements were negotiated, proposed and entered into by the Estate and the Greenblatt Entities, respectively at arms length and in good faith and without collusion.  The Purchaser, as defined herein, is a good faith purchaser for value within the meaning of Section 363(m) of the Bankruptcy Code and entitled to all of the protections afforded by said provision

R.    The consideration provided pursuant to the Agreements is fair and reasonable.

S.    The Estate makes no representations or warranties with respect to the Designation Rights (Paragraph 14) causes of action (Paragraph 20) and equipment, inventory, supplies, work in progress and general intangibles (Paragraph 13). Specifically, the Estate makes no representations or warranties whether (i) any of the Contracts, as defined herein, which may be designated, are executory in nature; (ii) any

6

of the Contracts are unexpired or expired; (iii) whether the Contracts are assumable; (iv) whether the Estate owns or has any interest in any of the Contracts or other assets conveyed or that may be designated under the Agreements and pursuant to this Order.

T.    All objections to the Settlement Motion have been overruled or withdrawn.

U.    This Court shall retain jurisdiction to enforce this Order.

## Conclusions of Law and Other Determinations

1.    This Court has core jurisdiction to enter a final Order with respect to the Settlement Motion and all of the relief requested thereby pursuant to 28 U.S.C. §§ 157(b)(A), (M), (N) and (O).  This Court has exclusive jurisdiction over the Debtor's property and property of the Estate, wherever located, pursuant to 28 U.S.C. § 1334(d).

2.    Due and proper notice of the hearing on the Settlement Motion has been given to all parties in interest as required by Sections 105(a), 363(b), 365(a) and 554 of the Bankruptcy Code and Rules 2002(a)(2), 2002(c)(l), 2002(d), 6004, 6006 and 6007 of the Bankruptcy Rules.

3.    This Court has statutory authority to grant the relief in the Settlement Motion pursuant to Sections 105(a), 363, 365 and 554 of the Bankruptcy Code.

4.    Good business reasons justify granting the relief requested in the Settlement Motion. Therefore, Chapter 7 Trustee shall be and hereby is authorized to enter into the Agreements on behalf of the Estate and to take such actions necessary to effectuate the Agreements as being in the best interest of the Estate and its creditors.

5.    Permits issued to RTC for the operation of its business ("Permits"), which the Chapter 7 Trustee on behalf of the Estate seeks to abandon,  are burdensome to

7

the Estate, and are of inconsequential value and benefit to the Estate.  Further, the abandonment of the Permits is in the best interest of the estate.

6.     This Court will retain jurisdiction over the subject matters of this Order, the Agreements and the Settlement Motion, as well as the parties that have appeared with respect to the Settlement Motion, to enforce, interpret and enter supplemental orders with respect to the subject matter of this Order and the Settlement Motion.

## Decretal Provisions

Based on the foregoing Findings of Fact, Conclusions of Law and Other Determinations,

IT IS ORDERED, ADJUDGED AND DECREED as follows:

7.     To the extent set forth in this Order, the relief requested in the Settlement Motion is herewith granted.

8.     The terms and provisions of the Settlement Agreement are approved in their entirety.

9.     The terms and provisions of the Designation Rights Agreement are approved in their entirety.

10.    In the event of any inconsistency between the Agreements and this Order, this Order shall be controlling unless this Order specifically states that one of the Agreements is controlling.

11.    The Chapter 7 Trustee is herewith authorized to execute and deliver all documents on behalf of the Estate, as may be reasonably necessary to consummate

and effectuate the Agreements in a manner consistent with and not in violation of the terms of this Order.

12.    The Chapter 7 Trustee on behalf of the Estate and the Greenblatt Entities are herewith authorized and directed to take all actions that may reasonably be required for the purpose of consummating and implementing the Settlement.

13.    Pursuant to Section 363 of the Bankruptcy Code, the Estate is authorized to sell, transfer and convey to the Purchaser the assets (including causes of action) to be conveyed as set forth in Paragraphs 4, 5 and 8 of the Settlement Agreement. Such assets are sold, transferred and conveyed free and clear of all liens, claims and encumbrances, with the exception of Permitted Liens. Permitted Liens are all liens that are asserted by the Greenblatt Entities. Any potential Defendant that has a counterclaim, to any cause of action herein conveyed, shall maintain the right to assert that counterclaim, as a set-off up to the amount of the claim.

14.    Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Estate is authorized to transfer and convey all of its right, title and interest, if any, in all contracts, executory or otherwise, including any alleged executory contracts listed on Exhibit "C" to the Settlement Agreement, ("Contracts"), to the Purchaser consistent with the terms of the Designation Rights Agreement. The conveyance of Designation Rights shall be effective on the closing date of the Settlement Agreement (the "Effective Date"). Upon the Effective Date, Purchaser shall have the sole, exclusive and continuing right to designate (on one or more occasions), to the same extent and validity as the Estate had at the Effective Date, (i) which Contracts shall be assumed and assigned; and (ii) which Contracts shall be rejected pursuant to the terms of the Designation Rights

9

Agreement. The Purchaser shall not have the right to designate any Contract that has previously been terminated by a final non-appealable Court Order or if the Estate believes in good faith that a particular designation will result in the Estate being subject to sanctions pursuant the Fed. R. Bankr. P. 9011 or allegations of bad faith, but the Purchaser shall have the right to petition the Court to compel the Trustee to comply with the Purchaser's direction to designate. The conveyance of the Designation Rights shall be free and clear of all liens, claims and encumbrances, with the exception of Cure Costs, as such term is defined in the Designation Rights Agreement and Permitted Liens. In accordance with the Designation Rights Agreement, the Purchaser shall remain obligated to cure any defaults under any Contract affected thereunder, including without limitation, Cure Costs, and provide adequate assurance of future performance, pursuant to the terms of the Designation Rights Agreement. The Estate shall not be liable for Cure Costs or for adequate assurance of future performance costs or any obligations or damage claims under the Contracts, or for any other claims which may arise as a result of the entry into or operation of the Designation Rights Agreement. Purchaser shall pay all costs and expenses incurred in the preparation, presentation and trial, if necessary, related to all actions required of the Estate pursuant to the Designation Rights Agreement.

15.     The provisions of Paragraph S of this Order, contained in the Findings of Fact and Other Determinations, are hereby Ordered and approved.

16.     Each Purchaser is a good faith purchaser pursuant to the terms of Section 363(m) of the Bankruptcy Code. The Purchaser negotiated the terms of the sale of assets at arms length and in good faith. The Purchaser did not seek or take unfair advantage over any other prospective bidder. Further, neither the Chapter 7 Trustee,

nor his employees, attorneys, agents or representatives have colluded with either Purchaser or their respective officers, employees, attorneys, agents or representatives, or in any manner whatsoever violated the provisions of Section 363(n) of the Bankruptcy Code.

17.    The Greenblatt Entities reserve the right to assert that any extension or renewal option in a Contract which purports to be "personal" only to the Estate or to be exercisable only by the Estate is an unenforceable restriction on assignment within in the meaning of Section 365(f) and (l) of the Bankruptcy Code and, in fact, may be freely exercised by Purchaser to its full extent, without prejudice to any affected party asserting a contrary position.

18.    The Purchaser shall have no successor liability or other liability for any of the Estate's employee obligations.

19.    Pursuant to Section 554 of the Bankruptcy Code, the Chapter 7 Trustee's abandonment of the Permits is hereby approved, and the Permits are deemed abandoned as of the Effective Date.  By agreement, the Estate, the Greenblatt Entities and the People of the State of Illinois will not assert or pursue any causes of action that remain in the pending adversary proceeding known as People of the State of Illinois and Stryker International, Inc. v. Resource Technology Corporation, Adversary Proceeding No. 00 A 1143, or with relation to any matters relating to the Stryker International, Inc. bankruptcy estate   In addition, the State of Illinois will not file or assert any environmental claims against the Estate.

20.    Notwithstanding anything to the contrary in the Agreement or in this Order, the Estate and the Greenblatt Entities, including Chiplease, as the purchaser of the

11

Estate's assets located in Shelton, Connecticut, and any designee or assignee of the Greenblatt Entities, will not assert or pursue any causes of action against Connecticut Resources Recovery Authority ("CRRA") or relating to the Shelton, Connecticut landfill site, including, without limitation, any causes of action asserted in the adversary proceeding pending in this Court known as Resource Technology Corporation v. Connecticut Resources Recovery Authority, No. 00 A 0150 (the "CRRA Adversary") and any request for reconsideration, appeal or review from the judgment entered in the U.S. District Court case known as Resource Technology Corporation v. Connecticut Resources Recovery Authority, No. 05 C 4535 (the "CRRA Appeal").   In addition, no claim, cause of action or right of review or appeal against CRRA or relating to the Shelton, Connecticut landfill site and no contract with CRRA or relating to the Shelton, Connecticut landfill site will be included in any transfer or assignment authorized under this Order or in the Agreement.  Also, the Shelton, Connecticut site and all contracts with CRRA or relating to the Shelton, Connecticut site will be excluded from Schedule A and Exhibit C to the Settlement Agreement and will be excluded from the Designation Rights Agreement and will be excluded from the contracts as to which the Estate seeks an extension of time to assume or reject.  CRRA withdraws its Chapter 7 administrative claim against the Estate and will not file or assert any other Chapter 7 administrative claim against the Estate.  However, CRRA preserves its Chapter 11 administrative claim and its pre-bankruptcy claims against the Estate.  Notwithstanding the foregoing, the Greenblatt Entities do not waive any lien rights held by them or the right to enforce the same. *In addition, notwithstanding any language in this Order transferring assets free and clear of liens, claims and encumbrances, CRRA preserves its existing liens, if any.*

21.    Pursuant to Section 363 of the Bankruptcy Code, the Estate's conveyance of the Estate's right, title and interest, if any, in and to causes of action with the *only* *and interests in any of the Estate's assets located in Shelton, Connecticut, to the extent they have priority over any or all of the Greenblatt Entities' existing liens or interests.*

exception of Excluded Causes of Action, is approved. Excluded Causes of Action include, specifically, the Estate's rights, if any, in (i) the Estate's causes of action against NEC, if any; the Estate's causes of action in adversary No. 00 A 1143, as described in Paragraph 19 above, or with relation to any matters relating to the Stryker International, Inc. bankruptcy estate; and the Estate's causes of action, if any, against CRRA (as defined in paragraph 20) or relating to the Shelton, Connecticut landfill, including without limitation, any claim asserted in the CRRA Adversary or any request for reconsideration, appeal or review of the judgment entered in the CRRA Appeal; (ii) preference or fraudulent transfer causes of action arising pursuant to Sections 502(d), 544, 545, 546, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code, or arising pursuant to state law fraudulent transfers; (iii) ~~causes of action relating to the disgorgement or recovery of~~ any ~~disbursements made to professionals during the~~ Chapter 11 or Chapter 7 ~~cases~~ *disgorgement rights* ~~including without limitation the Chapter 7 and/or Chapter 11 Trustee's statutory compensation and the Chapter 7 and/or Chapter 11 Trustee's professional fees or other expenses paid during the pendency of the Bankruptcy Case~~; and (iv) any causes of action against the Chapter 11 or Chapter 7 Trustees or their professionals. The Estate retains and does not convey to Chiplease or any other party the Excluded Causes of Action.

22.     The Chapter 7 Trustee on behalf of the Estate is authorized to execute the Releases. The Releases shall be effective only upon the Closing Date, as such term is defined in Paragraph 12 of the Settlement Agreement.

23.     As more fully set forth in Paragraph 11 of the Settlement Agreement: (i) the Purchaser shall deposit the sum of $500,000.00 to be held in escrow by its counsel, Dykema Gossett PLLC, for the payment of all unpaid Chapter 7 operating expenses

13

above $150,000.00 and any expenses incurred while the Estate continues to operate the Debtor's business; (ii) Chiplease and, to the extent necessary, any of the Greenblatt Entities, waive any interest in the 506(c) Funds and, by the entry of this Order, consent to the payment of the 506(c) Funds by Arnstein & Lehr LLP as escrowee to Jay A. Steinberg, not individually but solely as Chapter 7 Trustee of the Estate of Resource Technology Corporation; (iii) Chiplease shall pay the sum of $275,000.00 to Jay A. Steinberg, not individually but solely as Chapter 7 Trustee of the Estate of Resource Technology Corporation, and the Banco Secured Lenders waive any right to a distribution from such funds; (iv) Chiplease shall pay 20% of any recovery (net of attorney's fees and costs) on any cause of action conveyed hereunder; (v) all parties receiving a release from the Estate pursuant to the Settlement Agreement shall not file a Chapter 7 claim and shall not receive a distribution on any Chapter 7 claim they may have; (vi) any party receiving a release from the Estate pursuant to the Settlement Agreement shall maintain any Chapter 11 claim that it may own, and in the case of a claim purchased from a third party, the distribution relating thereto shall be limited to the amount paid for the claim, and specifically the claim purchased from Aquila Energy Capital Corporation and other entities shall be limited to $7,000,000.00 (notwithstanding the foregoing, no claim purchased after February 1, 2006 shall be entitled to a distribution); (vii) in no event do the Banco Secured Lenders otherwise waive their claims, liens or debt, but the Banco Secured Lenders waive the right to receive any Chapter 7 distribution, and the Banco Secured Lenders agree that they will not pursue any claims or remedies against the Chapter 7 Trustee or his professionals; (viii) the Parties shall execute and exchange the releases attached as Exhibits D and E to the Settlement Agreement; and (ix) the Purchaser and the Estate shall execute the

14

documents required and perform the acts required to finalize the settlement pursuant to the terms of the Settlement Agreement and the Designation Rights Agreement.

24.    The Estate is authorized to pay the Chapter 7 Loan to NEC upon receipt of the 506(c) Funds or the $275,000 payment by Chiplease, Inc.

25.    If Purchaser determines that it will remove any property from a landfill for which the gas rights agreement has not been assigned to it, Purchaser agrees to give not less than 5 days notice in writing to the landfill owner at the last known address available to Purchaser of the intended removal and further agrees to advise the landfill owner as to the removal of such property.  If no agreement is reached, either party has the right to petition this Court for resolution of the dispute.

26.    The lien of NEC, if any, shall attach to the proceeds of the Settlement Agreement, subject to the payment of all costs of administration of the Estate.  A subsequent hearing will be held to determine the validity, priority and amount, if any, of the NEC lien.  Nothing in this order shall create for or provide to NEC lien rights other than those that previously existed.

27.    This Court retains jurisdiction over:

A.    the Agreements;

B.    the determination of any dispute or controversies arising in connection with the Agreements; and

C.    the determination of any dispute relating to the enforcement and interpretation of the terms and conditions of this Order or the Agreements.

28.    This Order is intended to be final and immediately effective when docketed by the clerk of this Court, pursuant to Fed. R. Bankr. P. 7062, made applicable by Fed. R. Bankr. P. 6004, 6006 and 9014

29.     To the extent any Finding of Fact is determined to be a Conclusion of Law, and to the extent any Conclusion of Law is determined to be a Finding of Fact, then each such Finding of Fact is incorporated into this Court's Conclusions of Law, and each such Conclusion of Law is incorporated into this Court's Findings of Fact.

Dated:  March 16, 2006


ENTERED FOR THE COURT:

United States Bankruptcy Judge


16

EXHIBIT A

# SETTLEMENT AGREEMENT

This Settlement Agreement is made and entered into on March 14, 2006, between the Estate of Resource Technology Corporation (the "Estate"), on the one hand, and Chiplease, Inc. ("Chiplease"), Leon Greenblatt ("Greenblatt"), Banco Panamericano, Inc. ("Banco") and Scattered Corporation ("Scattered") (Chiplease, Greenblatt, Banco and Scattered collectively referred to as the "Greenblatt Entities") on the other hand. The Estate and the Greenblatt Entities collectively referred to in this Settlement Agreement as the "Parties".

## RECITALS

WHEREAS, a bankruptcy case (the "Bankruptcy Case") was commenced on November 15, 1999, when an involuntary petition was filed against Resource Technology Corporation ("RTC" or "Debtor"). On February 1, 2000, a consensual Order of Relief and Order Converting the Bankruptcy Case to a case under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §101 et.seq. (the "Bankruptcy Code") became effective;

WHEREAS, on August 26, 2003, Gregg E. Szilagyi was appointed as the Chapter 11 Trustee ("Chapter 11 Trustee");

WHEREAS, on September 21, 2005, the United States Bankruptcy Court, Northern District of Illinois, Eastern Division (the "Court") entered an order converting the case to a case under Chapter 7 of the Bankruptcy Code. Thereafter, Jay A. Steinberg, not individually but as Chapter 7 Trustee (the "Chapter 7 Trustee") was appointed as the Chapter 7 trustee for the Estate;

WHEREAS, it is the intention of the Parties that any reference to an order shall mean an order entered by the Court ("Order");

WHEREAS, Greenblatt, Chiplease and Banco (collectively, the "Banco Secured Lenders") assert pre-petition and post-petition secured claims against the Estate based upon various pre-petition loan documents and post-petition debtor in possession loan documents. Based upon their loans, the Banco Secured Lenders assert a lien on certain gas rights agreements and other assets of the Estate as collateral for their loans;

WHEREAS, Network Electric Corporation ("NEC") asserts a secured claim against the Estate in an amount in excess of $43 Million relating to a borrowing facility approved by this Court on August 1, 2000. NEC asserts a first priority secured claim on certain property and assets relating to the Estate's Congress, Beecher and Pontiac landfill sites.;

WHEREAS, NEC loaned the Chapter 7 Estate the sum of $250,000 to pay for the Chapter 7 administrative expenses of the Estate (the "Chapter 7 Loan"). Pursuant to an order entered in the Bankruptcy Case, the first recoveries by the Estate must be paid to NEC in repayment of the Chapter 7 Loan;

WHEREAS, on January 17, 2006, the Banco Secured Lenders filed an adversary proceeding against NEC entitled "Objection to Claim and Request for Determination as to the Validity and Extent of Lien of NEC." In the adversary proceeding, the Banco Secured *Lenders*

- 1 -

objected to the secured administrative claim filed by NEC and request that NEC's claim be *disallowed in its entirety.* The Banco Secured Lenders do not contest the payment of $250,000 to NEC as repayment of NEC's loan to the Chapter 7 Estate;

WHEREAS, during the course of the Bankruptcy Case, the Chapter 11 Trustee and/or the Chapter 7 Trustee filed adversary complaints against one or more of the Greenblatt Entities and others as follows:

(i)     On October 22, 2004, the Chapter 11 Trustee filed his Verified Complaint for Turnover of Property of the Estate, for Damages including Punitive Damages for Conversion of Property of the Estate, for Imposition of a Constructive Trust, and for Injunctive and Other Relief against the Banco Secured Lenders as Adv. Pro. No. 04-03867 (the "October 2004 Complaint"). The Chapter 11 Trustee dismissed the October 2004 Complaint on February 17, 2005;

(ii)    On November 16, 2004, the Chapter 11 Trustee filed his Verified Adversary Complaint for Injunctive and Declaratory Relief against the Banco Secured Lenders, Delaware Gas and Electric Inc., Scattered Corporation and Green Gas Delaware Business Trust as Adv. Pro. No. 04-04068 (the "November 2004 Complaint");

(iii)   On January 10, 2005, the Chapter 11 Trustee filed his Complaint for Unauthorized Postpetition Transfers against Loop Properties and Loop Properties, Inc. as Adv. Pro. No. 05-00025 (the "January 2005 Complaint");

(iv)    On December 30, 2004, the Court granted the Chapter 11 Trustee's Motion for Preliminary Injunctive Relief enjoining the Banco Secured Parties from taking certain actions (the "December 2004 Injunctive Relief");

(v)     On October 27, 2005, the Estate filed a Complaint for Breach of Fiduciary Duty, Equitable Subordination, Violation of RICO, Injunctive Relief, Turnover of Property and Other Relief against the Banco Secured Lenders, Scattered Corporation and Green Gas Delaware Business Trust as Adv. Pro. No. 05-02521(the "October 2005 Complaint");

(vi)    On November 2, 2005, the Court entered an order consolidating the November 2004 Complaint and the October 2005 Complaint;

(vii).  On November 2, 2005, the Court entered an order granting in part the Estate's Motion for Preliminary Injunction (the "November 2005 Injunctive Relief");

(viii)  On January 23, 2006, the Estate filed an Adversary Complaint for Injunctive and Declaratory Relief against the Banco Secured Parties as Adv. Pro. No. 06-00436 (the "January 2006 Complaint")

The October 2004 Complaint, the November 2004 Complaint, the January 2005 Complaint, the December 2004 Injunctive Relief, the October 2005 Complaint, November 2005 Injunctive Relief, and the January 2006 Complaint are hereinafter collectively referred to as the "Trustee Litigation";

WHEREAS, on December 28, 2005, the Court entered an Order approving the Estate's Motion to Approve Settlement of §506(c) Claim with the Banco Secured Lenders (the "506(c) Settlement"). The Court required that Arnstein & Lehr LLP, as escrowee, hold $1.5 million in settlement funds (the "506(c) Funds") in escrow, pending further Order;

WHEREAS, the Estate moved for an Order requiring that the escrowed funds be transferred to the Estate. The Banco Secured Lenders filed a Motion to Reconsider the Court's approval of the 506(c) Settlement, and objected to the Estate's motion for distribution of funds. Both the Banco Secured Lenders' Motion to Reconsider and the Estate's Motion for Distribution of Funds remain on the Court's docket and have been continued from time to time;

WHEREAS, on January 12, 2006, the Court approved sale procedures relating to the Estate's sale ("Sale") of certain assets (the "DTE Sale Assets"), which included landfill gas-fired Solar Turbine combustion generators and ancillary equipment including (1) the three Solar Taurus Model Units located at the Congress landfill; (2) the one Taurus Model Unit located at the Beecher landfill; and (3) the one Solar Titan Model Unit located at the Pontiac landfill, together with all books and records pertaining to said equipment, the maintenance and operation of said equipment, spare parts and items related to said equipment to DTE Biomass Energy, Inc. ("DTE") for $6,000,000, or such higher offer;

WHEREAS, on February 6, 2006, the Court entered an Order (the "DTE Sale Order") authorizing the Sale of the Sale Assets to DTE free and clear of all liens, claims and encumbrances, with all valid liens to attach to proceeds in the same amount, extent and priority. The Court authorized the distribution of Sale proceeds to the Chapter 7 Trustee in payment of his statutory compensation. The Court ordered that the remaining funds be held in escrow pending further Order determining the extent and priority of liens between NEC and the Banco Secured Lenders as to the Sale Assets;

WHEREAS, the Banco Secured Lenders filed an appeal of the DTE Sale Order (the "Sale Appeal") with the United States District Court (the "District Court"). On February 14, 2006, the District Court stayed the Sale pending the appeal;

WHEREAS, on March 2, 2006, the District Court affirmed the DTE Sale Order. On the same date, the Estate closed on the Sale to DTE and conveyed the Sale Assets to DTE free and clear of all liens, claims and encumbrances. The Chapter 7 Trustee received the statutory compensation authorized by the Court at closing of the DTE Sale;

WHEREAS, the deadline for the Estate to assume or reject executory contracts and/or unexpired leases of real property (collectively, "Executory Contracts"), if any, has been extended pursuant to Orders entered from time to time through February 28, 2006;

WHEREAS, the Estate has filed a Fifth Motion Seeking to Extend the Time to Assume or Reject Contracts until April 28, 2006 for presentment on February 28, 2006. The Estate has also filed a Motion to Extend the Time to Assume or Reject Certain Contracts (namely, the Executory Contracts relating to the Estate's Congress, Corpus Christi and Columbus landfill sites) through April 28, 2006 for presentment on February 28, 2006. Those motions and all other matters

- 3 -

before the Court on February 28, 2006 were entered and have been continued for hearing on March 14, 2006;

WHEREAS, the lessors to the Executory Contracts have retained their rights to assert that the Executory Contracts have been previously rejected or terminated;

WHEREAS, one of the Executory Contracts is an Amended and Restated Agreement for Construction and Operation of Gas Collection Facility and Gas-To-Electric Plant dated December 2, 1997 between Congress Development Company and RTC, and later amended by the First Amendment to Amended and Restated Agreement for Construction and Operation of Gas Collection Facility and Gas-to-Electric Plant" executed June 30, 1999 and further amended by a certain side-letter agreement dated July 1, 1999 (collectively, the "Congress Agreement");

WHEREAS, one of the Executory Contracts is an Agreement dated December 27, 1995 between RTC and American Disposal Services, Inc. ("ADS") relating to certain gas collection facilities and certain gas to energy facilities including the Pontiac facility ("ADS Agreement"). The ADS Agreement as it relates to Pontiac Illinois was previously assumed by the Chapter 11 Trustee;

WHEREAS, one of the Executory Contracts is an Agreement between American Grading Company ("AGC") and RTC dated December 27, 1995 (the "American Grading Agreement");

WHEREAS, the Banco Secured Lenders assert that John Connolly, as President of RTC, was authorized to and delivered to AGC a proper Notice of Extension of the American Grading Agreement extending the term of the American Grading Agreement;

WHEREAS, the Estate is seeking to abandon its right, title and interest, if any, in permits issued to RTC for the operation of its business ("Permits"), as the Estate maintains that the Permits have inconsequential value to the Estate and are burdensome to the Estate;

WHEREAS, Scattered purchased the note and security interest of Aquila Energy Capital Corporation in and to the assets relating to Estate's Pontiac facility;

WHEREAS, the Estate lacks sufficient resources to assume any Executory Contracts or to satisfy the costs of administration of the Chapter 7 Estate that are currently estimated to be approximately $250,000 to $400,000 based upon the information and analysis of the Chapter 7 Trustee and John Connolly. Further the Estate lacks sufficient resources to pursue adequately the Trustee Litigation due to the elimination of the monthly payment, of approximately $40,000.00, from the operations of the Pontiac Facility that the Estate was receiving before Aquila sold its note and security interest.

WHEREAS, the Estate and the Greenblatt Entities have engaged in substantial good faith negotiations in an effort to resolve the many disputes between the Parties including without limitation, (i) the Trustee Litigation, (ii) the Banco Secured Lenders' Motion to Reconsider the approval of the 506(c) Settlement; (iii) the Banco Secured Lenders' objection to the distribution of the 506(c) Funds to the Estate; and (iv) the Banco Secured Lender's objection to the Estate's rejection of Executory Contracts;

- 4 -

WHEREAS, in conjunction with this Agreement, the Estate, on the one hand, and Chiplease, Scattered, and their respective designees, on the other hand, wish to enter into a Designation Rights Agreement, in the form attached hereto as Exhibit A (the "Designation Rights Agreement"); and

WHEREAS, the Estate and the Greenblatt Entities wish to settle their differences under and pursuant to the terms and conditions set forth herein;

NOW THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the sufficiency of which is hereby acknowledged, and subject to approval of the Court, the Parties hereby agree as follows.

## AGREEMENT

1.    **Recitals Incorporated Into Agreement.**  The Recitals set forth above are incorporated herein by reference.

2.    **Effective Date.**  This Settlement Agreement shall become effective (the "Effective Date") upon the entry of a final nonappealable Order approving this Settlement Agreement including all of its exhibits, the form of which has been mutually agreed to by the Estate and the Greenblatt Entities (the "Approval Order"). The Parties specifically agree that the form of Order attached hereto as Exhibit B has been agreed to by them. The Parties further agree that following the hearing on this Settlement Agreement, the Parties reserve the right to revise the Order attached hereto as Exhibit B to conform to the proofs.

3.    **The Sale Appeal and NEC Claim Litigation.**  The Sale and the Banco Secured Lenders' right to prosecute the Sale Appeal including the asserted right to credit bid, the Banco Secured Lenders' assertion of a secured claim, the objection to NEC's secured claim including the NEC Claim Litigation are unaffected by this Settlement Agreement. Nothing in this Settlement Agreement shall be interpreted as an impediment to the Banco Secured Lenders or a waiver of any claims or lien rights that may be necessary to prosecute or provide standing to continue the NEC Claim Litigation. Nothing in this Settlement Agreement shall be interpreted as an impediment to NEC asserting any claim or counterclaim in that litigation that NEC would have had but for this Settlement Agreement. The Estate will continue in its efforts to finalize the Sale.

4.    **The Estate's Conveyance of Assets.**  With regard to contracts including Executory Contracts and assets listed in this Section 4, on the Closing Date, as defined in paragraph 12 of this Agreement, the Estate shall either convey designation rights to Executory Contracts (if any), assign nonexecutory contracts (if any) with the assignee having the right and opportunity to cure any defaults, and provide any necessary adequate assurance of future performance, or sell, transfer and convey all other assets (if any), all in conformance with the requirement of the Bankruptcy Code:

(i)    the Estate shall sell, transfer and convey to Chiplease or its designee all of the Estate's right, title and interest, if any, in the Congress Agreement and any gas rights agreement or other agreements relating to the Hillside Illinois facility or arising as a result of the Congress Agreement in accordance with the terms of this Settlement Agreement;

(ii)   the Estate shall sell, transfer and convey to Chiplease or its designee all of the Estate's right, title and interest, if any, in all equipment, inventory, supplies, work in process, general intangibles and causes of action ("Equipment") related to the Congress site and/or located in Hillside Illinois, except that the Estate does not convey to Chiplease or its designee any Equipment conveyed to or which the Estate has agreed to convey to DTE;

(iii)   the Estate shall sell, transfer and convey to Scattered or its designee all of the Estate's right, title and interest, if any, in the ADS Agreement and any gas rights agreement or other agreements relating to the facilities that are the subject of the ADS Agreement or arising as a result of the ADS Agreement in accordance with the terms of this Settlement Agreement;

(iv)   the Estate shall sell, transfer and convey to Scattered all of the Estate's right, title and interest, if any, in all Equipment related to the ADS Agreement and/or located in or related to the facilities in Pontiac Illinois, Wyandot Ohio, Clarion Pennsylvania and Wheatland Kansas;

(v)   the Estate shall sell, transfer and convey Chiplease or its designee all of the Estate's right, title and interest, if any, in the American Grading Agreement and any gas rights agreement or other agreements relating to McCook facility or arising as a result of the American Grading Agreement in accordance with the terms of this Settlement Agreement;

(vi)   the Estate shall sell, transfer and convey to Chiplease or its designee all of the Estate's right, title and interest, if any, in all Equipment related to the American Grading Agreement (including without limitation, five generators) and/or located in Lyons Illinois; and

(vii)   the Estate shall sell, transfer and convey Chiplease or its designee all of the Estate's right, title and interest, if any, in all contracts including but in no way limited to all executory contracts, which shall include any landfill agreements and gas rights agreements to which RTC is a party, to which the Estate has sought an extension of time to assume or reject as listed on Exhibit C, pursuant to the terms of the Designation Rights Agreement. The Estate shall sell, transfer and convey all of the Estate's right, title and interest, if any, to all of the Estate's personal property including but not limited to furniture, fixtures and all Equipment at or related to all facilities, contracts and sites not mentioned above, as listed on the attached Schedule A, including but not limited to the contracts set forth in Exhibit C, but specifically excluding the Estate's interest in any contracts regarding the Beecher, Illinois and Paxton, Illinois sites.

(viii)   Nothing herein shall be construed to excuse either Chiplease or its designee or Scattered Corporation from the obligations, if any, to comply with the provisions relating to assumption and assignment provided under Section 365 of the Bankruptcy Code and any sale, transfer and conveyance of rights under an Executory Contract shall be conditioned on and subject to the terms and conditions contained in the Designation Rights Agreement.   In the event that the Chapter 11 Trustee has previously assumed an Executory Contract, prior to assignment to Chiplease or its designee or Scattered or its designee, it shall be a requirement of any assignment that the Chapter 7 Trustee, at the sole cost and liability of the designating party, cure or provide adequate assurance that any default will be promptly cured and compensate or provide adequate assurance that any nondebtor party to an Executory Contract will be promptly compensated for any actual pecuniary loss to such party resulting from any default. In all events, the designating party shall provide adequate assurance of future performance by the designating

- 6 -

party of such Executory Contract, whether or not there has been a default in such contract or lease. The Estate makes no representations or warranties with respect to extent and validity of the Estate's right, title and interest, if any, in any of the foregoing assets, or whether such assets exist.

5.    **Designation Rights.**  On the Closing Date, the Estate shall sell, transfer and convey to Chiplease, Scattered or their respective designees all of the Estate's rights, if any, to assume, assign and/or reject all Executory Contracts (collectively, "Designation Rights") pursuant to the terms of a Designation Rights Agreement to be entered into between the Estate and Chiplease, Scattered or their respective designees.  On the Closing Date, Chiplease, Scattered or their respective designees shall have the sole, exclusive and continuing right to designate (on one or more occasions) through the Designation Period (defined in the Designation Agreement), to the same extent and validity as the Estate had on the Closing Date, (i) which Executory Contracts shall be assumed and assigned; and (ii) which Executory Contracts shall be rejected. As part of the Designation Rights Agreement, the Estate shall bear no liability for Cure Costs, as that term is defined in the Designation Rights Agreement, for costs, if any, related to adequate assurance of future performance, or for any obligations or damages under any contract conveyed under this Agreement or subsequent to such conveyance. Chiplease or its designee or Scattered or its designee, as the case may be, shall pay all reasonable costs and expenses incurred in the preparation, presentation and trial, if necessary, related to all actions required of the Estate pursuant to the Designation Rights Agreement.

6.    **Extension of Time to Assume or Reject Executory Contracts.**  The Estate has sought an extension of time to assume or reject Executory Contracts beyond the current February 28, 2006. As a material term of this Agreement, the Court must enter an order extending such time to April 28, 2006. The Chapter 7 Trustee makes no representations or warranties with respect to extent and validity of the Estate's right, title and interest in any of Executory Contracts, or whether any of Executory Contracts are assumable or assignable.

7.    **Abandonment of Permits.**  The Estate shall seek Court approval for the abandonment of Permits. The Estate's abandonment of the Permits shall be deemed effective as of the Closing Date.

8.    **Estate's Conveyance of Certain Causes of Action.**  On the Closing Date, the Estate shall sell, transfer and convey to Chiplease or its designee all of the Estate's right, title and interest, if any, in all of the Estate's causes of action, except that the Estate shall not convey and the Estate shall retain its rights, if any, in (i) the Estate's causes of action against NEC, if any; (ii) the Estate's cause of action in People of the State of Illinois and Stryker International, Inc. v. RTC, Adversary Proceeding No. 00 A 1143 (iii) preference or fraudulent transfer causes of action arising pursuant to 11 U.S.C. §502(d), 544, 545, 546, 547, 548, 549, 550, 551 and 553, or arising pursuant to state law fraudulent transfers; (iv) causes of action relating to the disgorgement or recovery of any disbursements made to professionals during the Chapter 11 or Chapter 7 cases including without limitation the Chapter 7 and/or Chapter 11 Trustee's statutory compensation and the Chapter 7 and/or Chapter 11 Trustee's professional fees or other expenses paid during the pendency of the Bankruptcy Case; and (v) any causes of action against the Chapter 11 or Chapter 7 Trustees or their professionals. The Estate retains and does not convey to Chiplease or its designee or any other party the above-referenced excluded causes of action.

9.    **Release.** On the Closing Date, the Parties shall execute the Releases attached hereto as Exhibits D and E (the "Releases"). The terms of the Releases are specifically incorporated herein.

10.    **The Trustee's Litigation and Objection to Banco Secured Lenders' Claims.** The Estate shall withdraw all objections to the claims filed by the Banco Secured Lenders or any claims purchased by any of the Banco Secured Lenders or Scattered Corporation. In addition, the Estate shall seek dismissal with prejudice of each of the adversary proceedings defined as the "Trustee Litigation". In the event that the "Trustee Litigation" is not dismissed with prejudice, the Banco Secured Lenders may terminate this Agreement without liability for breach and the parties shall return to the status quo ante.

11.    **Consideration.** Chiplease for itself and on behalf of the other Banco Secured Lenders shall pay to the Estate the following consideration:

(i)    Chiplease shall pay all unpaid Chapter 7 operating expenses above $150,000 and any expenses incurred while the Estate continues to operate the Debtor's business ("Expenses"). The Estate shall pay the first $150,000 of these expenses. On or before the Closing Date, Chiplease shall deliver to its counsel, Dykema Gossett PLLC the sum of $500,000.00 to be used to pay the Expenses ("Adequate Security"). After the Estate has paid a total of $150,000 in Chapter 7 Expenses, Chiplease will be requested to pay all additional Chapter 7 operating expenses. The Chapter 7 Trustee shall advise Chiplease in writing of Chiplease's obligation to pay one or more Expenses (the "Expense Request"). Chiplease shall have seven (7) days from receipt of the Expense Request to either pay the Estate sufficient funds to fully satisfy the Expense Request, or to dispute the payment of the Requested Expenses in writing ("Expense Dispute"). If Chiplease fails to make a timely Expense Dispute, the Expense Request will be deemed allowed and Chiplease will be required to pay it. If an Expense Dispute is timely made, the Estate shall have ten (10) days from the receipt of the Expense Dispute to seek to have the Expense Request allowed or disallowed by the Court (the "Expense Motion"). In the event that the Estate does not file an Expense Motion within the ten (10) day period, Chiplease shall be granted standing for the limited purpose of seeking to have the Expense Request disallowed;

(a)    The term "Chapter 7 operating expenses" shall not include the Chapter 7 Loan or any Chapter 7 Trustee's fees or expenses or any professional fees and expenses, which the Estate shall pay from the Estate's assets including but not limited to the consideration below including the 506(c) Funds;

(ii)    Chiplease and to the extent necessary the other Banco Secured Lenders waive any interest in the 506(c) Funds and consents to the payment of the 506(c) Funds by Arnstein & Lehr, as escrowee, to the Estate;

(iii)    Chiplease shall pay $275,000 on the Closing Date to the Estate. The Banco Secured Lenders waive any right to a distribution from such funds. On the Closing Date, Chiplease's counsel shall provide assurance that it holds the Adequate Security;

(iv)    The Estate shall be entitled to 20% of any recovery (net of attorney's fees and costs) on any cause of action conveyed hereunder and brought by Chiplease or its designee and

- 8 -

20% of any recovery (net of attorney's fees and costs) obtained through the prosecution of the NEC Claim Litigation. Notwithstanding this subsection (v), the Estate does not convey or assign any cause of action against NEC to the Greenblatt Entities including Chiplease;

(v)    The Banco Secured Lenders, as pre-petition and post-petition secured lenders, waive their right to any distribution from the Estate that may be paid from the consideration delivered pursuant to the settlement set forth herein, including any right to receive a distribution from the 506(c) Settlement. In no event shall the Banco Secured Lenders be entitled to a distribution on account of any Chapter 7 administrative claim they may hold;

(vi)    The Banco Secured Lenders shall otherwise maintain any Chapter 11 claim and Chapter 7 nonadministrative claim, as the case may be. In the case of purchased claim, the Banco Secured Lenders shall not be entitled to a distribution for any claim purchased after February 1, 2006. For distribution purposes, any distribution on account of a purchased claims shall be limited to the amount of the purchase price including the claim purchased from Aquila Energy Capital Corporation, Concert Capital Resources, LP, Concert Capital Resources A, LP, Concert Capital Resources B, LP, Concert Capital Resources C, LP, Concert Capital Resources A/B, Inc., and AECC Pontiac LLC, which shall be limited to $7,000,000; and

(vii)    In no event do the Banco Secured Lenders otherwise waive their claims, liens or debt. However, the Banco Secured Lenders waive the right to receive any Chapter 7 distribution. The Banco Secured Lenders agree that they will not pursue any claims or remedies against the Chapter 7 Trustee or his professionals.

12.    **The Closing Date.** The term "Closing Date" shall mean and the closing shall occur on the next business day after the Effective Date. On the Closing Date, the Parties shall meet and exchange the following:

(i)    The Chiplease shall:

(a)    Pay the Estate the sum of $275,000;

(b)    Provide the Estate with evidence of the deposit of the Adequate Security;

(c)    Execute the Releases; and

(d)    Execute an agreed order authorizing the disbursement of the 506(c) Funds to the Estate.

(ii)    The Estate shall:

(a)    Execute the Releases;

(b)    Execute the Designation Rights Agreement designating the Estate's rights, if any, in the Designation Rights to Chiplease or its designee;

(c)    Execute a Bill of Sale; and

-9-

(d)    Execute a Stipulation seeking dismissal of the Trustee Litigation with prejudice.

Notwithstanding the foregoing, the Closing Date shall not be deemed to have occurred until the foregoing documents and payments are executed, provided and/or exchanged.

13.    **Governing Law.**  This Settlement Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Illinois.

14.    **Representations and Warranties.**  The parties represent and warrant that they have the proper authority to sign for and on behalf of the respective entities, and the parties are all bound by the terms of this Settlement Agreement.

15.    **Amendment of Agreement.**  This Settlement Agreement shall not be amended except by a writing signed by all of the parties hereto.

16.    **Binding Effect.**  This Settlement Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

17.    **Entire Agreement.**  This Settlement Agreement and all of its Exhibits constitute the entire agreement of the parties hereto as to the subject matter hereof.  The undersigned acknowledge that there are no communications or oral understandings contrary, different, or which in any way restrict this Settlement Agreement, and that all prior agreements or understandings within the scope of the subject matter of this Settlement Agreement are, upon the execution and delivery of this Settlement Agreement, suspended, null and void.

18.    **Execution in Counterparts.**  This Settlement Agreement may be executed in one or more counterparts, each counterpart to be considered an original portion of this Settlement Agreement.

| Chiplease, Inc.¶ | The Chapter 7 Bankruptcy Estate of Resource Technology Corporation |
|---|---|
| By: _____ <br>     Leon Greenblatt <br>     Its Agent and Officer <br><br> **Leon Greenblatt** <br><br> By: _____ <br>     Leon Greenblatt <br>     Individually | By: _____ <br>     Jay A. Steinberg, not individually, but <br>     solely as Chapter 7 Trustee for the <br>     Estate of Resource Technology <br>     Corporation |

Banco Panamericano

By: _____
      Leon Greenblatt
      Its Agent and Officer

Scattered Corporation

By: _____
      Leon Greenblatt
      Its Agent and Officer

**SCHEDULE A**

**LIST OF LANDFILL SITES**

## Schedule "A"

### List of Facilities

1. Bi-State Landfill, 2248 Parks Road, Belleville, Illinois 62220;

2. Bloomington Landfill, R.R. 3 Box 145, Bloomington, Illinois;

3. Chastang Landfill, 17045 Hwy 43, Mt. Vernon, AL 36562;

4. Clarion Landfill, Meadville, Pennsylvania 16335;

5. Columbus/Pine Grove Landfill, 7160 Sacerdote Lane, Columbus, Georgia 31907;

6. Congress Landfill, 4100 West Frontage Road, Hillside, Illinois 60160;

7. Elliot Landfill, 7001 Ayers, Corpus Christi, Texas 78415;

8. NC Iowa RSWA, 3319 5th Ave. South, Ft. Dodge, Iowa 50501;

9. City of Gary Landfill, 1900 Burr Street, Gary, Indiana 46403;

10. GNOL Landfill, 5700 Hwy. 90 West, Avondale, Louisiana 70002;

11. Kewanee/National Closure Corp. Landfill, Rte. 81, Kewanee, Illinois, 61443;

12. Lansing/National Closure Corp. Landfill, 2600 W. 170th St., Lansing, IL 60438;

13. Litchfield-Hillsboro Landfill, 2782 Landfill Trail, Litchfield, Illinois 62056;

14. Lyons/McCook Landfill, 5101 S. Lawndale Ave. (Private Road), McCook, IL 60525;

15. New Haven Landfill, 260 Middletown Avenue, New Haven, Connecticut 06510;

16. Ottawa Landfill, P.O. Box 520 Koenig Road, Ottawa, Illinois 61350;

17. Peoria Landfill, 11501 West Cottonwood Lane, Brimfield, Peoria County, Illinois;

18. Pontiac Landfill, RR 3 14206 East 2100 North Road, Pontiac, IL 61764

19. Rosencranse Landfill, Rosencranse Road, TR 4860, Wayne County, Berlin Township, Pennsylvania 18405;

20. Springfield Landfill, RR#9, Sand Hill Road, Springfield, Illinois 62707;

21. Taylor Ridge Landfill, 8400 77th Street West, Taylor Ridge, Illinois 61232;

22. Viola Landfill, Greene Township, Illinois;

23.   Wheatland Landfill, PT SW/4, Section 19 Township 325 Range 24 E Columbus, Kansas 66725; and

24.   Wyandot Landfill, 11164 County Road 4, Carey, Ohio 43316.

**EXHIBIT A**

**DESIGNATION RIGHTS AGREEMENT**

## DESIGNATION RIGHTS AGREEMENT

THIS DESIGNATION RIGHTS AGREEMENT, is made and entered into on March 14, 2006 between the Estate of Resource Technology Corporation (the "Estate" or "Seller"), on the one hand, and Chiplease, Inc. or its designee ("Chiplease") or Scattered Corporation or its designee ("Scattered") (Chiplease, and Scattered collectively referred to as the "Purchaser") on the other hand. The Estate and Purchaser individually be referred to in this Settlement Agreement as a "Party" and collectively referred to in this Settlement Agreement us the "Parties".

### RECITALS

WHEREAS, the bankruptcy case known as In re Resource Technology Corporation, Case No. 99 B 35434 (the "Bankruptcy Case") was commenced on November 15, 1999, when an involuntary petition was filed against Resource Technology Corporation ("RTC" or "Debtor"). On February 1, 2000, a consensual Order of Relief and Order Converting the Bankruptcy Case to a case under Chapter 11 of the Bankruptcy Code became effective;

WHEREAS, on August 26, 2003, Gregg E. Szilagyi was appointed as the Chapter 11 Trustee ("Chapter 11 Trustee");

WHEREAS, on September 21, 2005, the United States Bankruptcy Court, Northern District of Illinois, Eastern Division (the "Court") entered an order converting the case to a case under Chapter 7 of the Bankruptcy Code. Thereafter, Jay A. Steinberg, not individually but as Chapter 7 Trustee (the "Chapter 7 Trustee") was appointed as the Chapter 7 trustee for the Estate;

WHEREAS, The Seller and Purchaser contemporaneously with this Agreement entered into an Settlement Agreement of even date; and

WHEREAS, Purchaser, as a part of the settlement under the Settlement Agreement, desires to purchase and Seller desires to sell, the Designation Rights (defined below) upon the terms and subject to the conditions set forth in this Agreement.

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein, the Parties covenant and agree as follows:

### ARTICLE I

### CERTAIN DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings:

"Affected Parties" means, with respect to a Contract, (i) the lessor under such Contract, and (ii) any sublessee under any sublease relating to such Contract.

"Agreement" means this Designation Rights Agreement.

-1-

"Approval Order" means the final and nonappealable order entered by the Court approving the Settlement Agreement and this Agreement in a form of Order attached to the Settlement Agreement as Exhibit B, which the Parties specifically agree has been agreed to by them.

"Authorized Officer" of any Person means the chief executive officer, the president, any vice president or any secretary of that Person.

"Banco Secured Creditors" means collectively, Leon Greenblatt, Chiplease, Inc. and Banco Panamericano, Inc.

"Bankruptcy Case" has the meaning set forth in the recitals above.

"Bankruptcy Code" means 11 U.S.C. §101 et.seq. and applicable portions of Titles 18 and 28 of the United States Code, as amended from time to time.

"Court" has the meaning set forth in the recitals above.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended from time to time.

"Closing Date" shall have the same meaning as that term has in Paragraph 12 of the Settlement Agreement.

"Contracts" are those contracts and leases listed on Exhibit C to the Settlement Agreement and made a part hereof. The Seller makes no representations with regard to the Contracts including without limitation the Seller makes no representations whether (i) any of the Contracts are executory in nature; (ii) any of the Contracts are unexpired or expired; (iii) whether the Contracts are assumable; (iv) whether the Seller has any interest in any of the Contracts; or (v) the existence of any Contract.

"Cure Costs" means all actions and monetary payments necessary to cure any defaults (monetary or otherwise) in a Contract. In the event that the Purchaser and Affected Party disagree as to the Cure Costs of a Contract that the Purchaser seeks to assume, the Cure Costs shall be the amount determined by the Court or actions to be taken as required by the Court, after notice and hearing, as necessary to cure any defaults (monetary or otherwise) in a Contract. Under no circumstances shall the Estate have any obligations whatsoever as set forth in more detail in the Approval Order, including but not limited to Paragraph 14 of the Approval Order "Designation Motion" has the meaning set forth in Section 2.1(c) below.

"Designation Period" has the meaning set forth in Section 2.1(b) below.

"Designation Rights" has the meaning set forth in Section 2.1(b) below.

"Effective Date" has the meaning set forth in Article III below.

"Greenblatt Entities" mean collectively the Banco Secured Creditors and Scattered Corporation.

-2-

"Objection Period" has the meaning set forth in Section 2.1(d) below.

"Order" means an order entered by the Court.

"Permitted Liens" means all liens that are asserted by the Greenblatt Entities.

"Person" means any natural person, corporation, general partnership, limited partnership, limited liability partnership, limited liability company, trust union, association, court, agency, government, tribunal, instrumentality or other entity or authority.

"Purchase Price" has the meaning set forth in Section 2.3 below.

"Settlement Agreement" is that certain Settlement Agreement entered into on March 14, 2006 between the Estate, on the one hand, and the Banco Secured Creditors and Scattered Corporation, on the other hand.

"Settlement Motion" has the meaning set forth in Section 3.3 below.

## ARTICLE II

## THE TRANSACTION

2.1    Purchase and Sale of Designation Rights and Properties.

(a)    On the terms and subject to the conditions contained in this Agreement and the Approval Order, on the Closing Date, Purchaser shall purchase from Seller, and Seller shall sell, convey, assign, transfer and deliver to Purchaser, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Estate's right, title and interest, if any, in and to the Designation Rights for all of the Contracts free and clear of all liens of any kind whatsoever to the fullest extent permissible pursuant to the Bankruptcy Code, but subject to Cure Costs, Permitted Liens and the provisions of Article 2.1 ( c ) below.

(b)    During the Designation Period, and on the terms and subject to the conditions contained in this Agreement and the Approval Order, the Purchaser shall have the sole, exclusive and continuing right to select, identify and designate (on one or more occasions): (i) which Contracts shall be assumed and assigned in connection with an assumption and assignment, and to whom; and (ii) which Contracts shall be rejected (all of which rights are referred to herein as the "Designation Rights"). Subject to the terms and provisions of this Agreement, Purchaser shall have the right to designate as the designee with respect to any particular property either itself, or any other Person. Purchaser's Designation Rights shall expire with respect to each Contract on the later of (i) the date of the expiration of the applicable Sections 365(d)(1) and 365(d)(4) of the Bankruptcy Code extension period for the assumption or rejection of the applicable Contract including any further extension granted by order of the Court, (the "Extension Period"), or (ii) April 28, 2006 (the "Designation Period"). Seller agrees as a condition of this Agreement and related agreements to use reasonable efforts to seek an extension of the Extension Period to April 28, 2006 and upon receipt of written request by the Purchaser agrees to seek and prosecute, but in no way guaranty, one further extension as may be required to effectuate the matters that are the essence of this Agreement. Notwithstanding

-3-

anything contained herein, from the date hereof until the expiration of the Designation Period, Seller shall not reject any Contract unless and until Purchaser, in accordance with this Agreement, excludes such Contract from this transaction. The Designation Rights to be acquired shall include, among other things, the exclusive power to designate to a designee (and to have Seller convey and assign to such designee) all rights, title, interests, options, contract rights, if any, of the Seller in and to one (1) or more of the Contracts of the Seller. Notwithstanding any provision to the contrary, any costs, expenses or claims attributable to a time period after the entry of the Approval Order shall be deemed a Chapter 7 Operating Expense (the "Chapter 7 Operating Expenses") and shall be the sole obligation of Purchaser.

(c)    Notwithstanding subsections (a) and (b) above, in order to effectuate either an assumption and assignment or a rejection of a Contract, the Purchaser shall draft prior to the expiration of the Designation Period within sufficient time for filing and presentation to the Court prior to the expiration of the Designation Period, a motion (the "Designation Motion"), and such Designation Motion shall: (i) identify the Contract at issue; (ii) state whether the Purchaser intends to assume and assign or reject the Contract at issue; (iii) state the identity of Purchaser's designee; (iv) state the proposed use of the Contract by the Purchaser's designee, (v) provide documentation or other information from Purchaser's designee relating to "adequate assurance of future performance" by the designee as required by Section 365 of the Bankruptcy Code; (vi) set forth a list of the Contract and all of the documents amending, modifying, supplementing or restating the Contract (which list shall be consistent with the applicable list with respect to the applicable Contracts set forth on Exhibit C attached to the Settlement Agreement and made a part hereof); (vii) request Court approval of the assumption and assignment of a Contract or rejection of a Contract, at the Purchaser's election; (viii) request a hearing before the Court on the relief requested including without limitation a hearing to determine whether the Contract was previously rejected and, therefore, not assumable or assignable under Section 365 of the Bankruptcy Code, on Cure Costs, on the adequacy of the Purchaser and/or its designee's assurance of future performance under the Contract and satisfaction of Cure Costs; and (ix) include as an attachment a proposed Order. The Seller shall use reasonable efforts to file the Designation Motion within two (2) business days of receipt from the Purchaser for presentment to the Court within the Designation Period. The Seller shall serve a copy of the Designation Motion on the Affected Parties. The Seller shall not have any liability with respect to Cure Costs or other assurances of future performance with respect to any Contract that the Purchaser seeks to have assumed and assigned as set forth in more detail in the Approval Order, including but not limited to Paragraph 14 of the Approval Order.

(d)    The Affected Parties shall have, ten (10) days from their receipt of the Designation Motion from the Seller (the "Objection Period") to file with the Court an objection in writing to the proposed assignment of the Contract to the Purchaser's designee (and concurrently deliver a copy of the said objection to the Purchaser, Seller and such other parties as are specified in the notice to the Affected Parties.

(e)    Seller shall use its reasonable efforts to have any Designation Motion and notice thereof provide that if an objection to any assumption and assignment is not timely filed prior to the expiration of the applicable Objection Period, or such objection involves a "cure issue," the objection will not preclude the assumption and assignment of the Contract, the assumption and assignment shall be deemed effective and binding (without further Order) contingent upon the

- 4 -

determination of any Cure Costs by the Court and the satisfaction of such Cure Costs in accordance with an Order. Notwithstanding the foregoing, the Affected Parties shall be deemed to have consented to the assumption and assignment and to have waived all objections thereto (other than as to cure amounts), if no objection is filed within the Objection Period. The Designation Motion must clearly state that the failure to object may result in the entry of an Order allowing assumption and assignment of a Contract without any obligations on the part of the Purchaser for adequate assurance of future performance.

(f)    Any Contract not identified in any timely filed Designation Motion shall be deemed rejected as of the expiration of the Designation Period; provided, however, Seller shall be prohibited from rejecting any Contract until such time as Purchaser has designated such Contract for rejection or the period to assume and assign such Contract, as provided under sections 365(d)(1), (d)(4) has expired and has not been further extended by the Court.

(g)    Any Contract to which the Purchaser requests by Designation Motion to be rejected, shall be deemed rejected upon the filing of a Designation Motion with the Court.

(h)    Notwithstanding the above, the Seller shall use reasonable efforts to file and present the Designation Motion. However, the Seller shall have no obligation or liability whatsoever to present any evidence or argument in favor or against assumption or assignment of a Contract including without limitation, any evidence or argument relating to the assumability of a Contract, Cure Costs and/or adequate assurance of future performance by the Purchaser or its designee. The Purchaser shall not have the right to designate any Contract that has previously been terminated by a final non-appealable Court Order or if the Seller believes in good faith that a particular designation will result in the Seller being subject to allegations of bad faith, but the Purchaser shall have the right to petition the Court to compel the Seller to comply with the Purchaser's direction to designate.

(i)    The Seller shall bear no liability for Cure Costs or for adequate assurance of future performance costs or obligations relating to any Contracts, or any other costs or expenses relating thereto.

2.2    Assumption and Assignment of Contracts.    An assumption and assignment of any Contract, pursuant to Section 365 of the Bankruptcy Code, shall be effective only upon the entry of a final and nonappealable Order approving the assumption and assignment of a Contract after notice and hearing on a timely filed and served Designation Motion; provided, however, if no such objection to the assumption and assignment is timely filed prior to the expiration of the applicable Objection Period, or such objection involves a "cure issue" which, pursuant to the Designation Order, will not preclude the assumption and assignment of the Contract, however, the assumption and assignment shall be deemed effective and binding (without further Order) upon the Court's determination of the Cure Costs and the Purchaser's satisfaction of same. Notwithstanding the foregoing, the Affected Parties shall be deemed to have consented to the assumption and assignment and to have waived all objections thereto (other than as to cure amounts), if no objection is filed prior to the expiration of the Objection Period.

2.3    Purchase Price.    The purchase price for the Designation Rights (the "Purchase Price") is included in the consideration paid or to be paid by Chiplease pursuant to Section 11 of

-5-

the Settlement Agreement. Except for the Purchase Price, the Purchaser shall have no obligation to pay the Estate any other funds other than the Purchase Price in order to assume, assign or reject any Contract. Notwithstanding the foregoing, the Purchase Price shall specifically include any obligations of the Purchaser as to the Contracts, including but not limited to, Cure Costs, adequate assurance of future performance and the payment of Chapter 7 Operating Expenses.

2.4    Purchaser shall use its best efforts to identify designees to obtain assignments of the Contracts before the expiration of the applicable Extension Period; provided, however, Purchaser shall have the right to request that Seller obtain an Order extending the Designation Period for an additional period reasonably requested by Purchaser. Should Purchaser make any such request, Seller shall use its reasonable efforts to obtain promptly such an Order. If the Court denies to extend the Designation Period, the Designation Period is terminated at the later of (i) the date of docketing of the Order denying the extension of the Extension Period; or (ii) April 28, 2006.

## ARTICLE III

## CONDITIONS FOR EFFECTIVE DATE, CLOSING DATE AND APPROVAL ORDER

3.1    The Effective Date of this Agreement is the date when the Approval Order is a final and nonappealable Order.

3.2    The Approval Order must be in the form attached as Exhibit B to the Settlement Motion is entered, unless the Parties mutually agree to revise the Order.

3.3    The Closing Date of this Agreement shall be the Closing Date as defined by Paragraph 12 of the Settlement Agreement.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

4.1    Seller makes no other representations or warranties with respect to the Contracts including without limitation the Seller makes no representations whether (i) any of the Contracts are executory in nature; (ii) any of the Contracts are unexpired or expired; (iii) whether the Contracts are assumable; (iv) whether the Seller has any interest in any of the Contracts; or (v) whether any Contract exists. Seller is conveying and designating the Contracts to Purchaser in a "WHERE-IS, AS-IS" condition.

4.2    Purchaser hereby represents and warrants to Seller as follows:

(a)    Authorization.    Purchaser has the power and authority, to enter into this Agreement and to carry out its obligations hereunder. The execution, delivery and performance of this Agreement and the consummation by Purchaser of the transactions contemplated hereby have been duly authorized by all requisite (and to the extent applicable to Purchaser) corporate, partnership or limited liability corporation action.

(b)    WHERE-IS/AS-IS.  Purchaser and its designees agree to accept the applicable Contracts in a "WHERE-IS/AS-IS" condition.

## ARTICLE V

## COVENANTS

5.1    Further Transfers and Assurances.  Seller and Purchaser will execute and deliver such further instruments of conveyance and transfer and take such additional action as Purchaser may reasonably request to effect, consummate, confirm or evidence the assignment to Purchaser's designees of the Contracts.  This Section 5.1 shall survive for six (6) months following each respective Contract transferred by this Agreement.

5.2    Taxes.  All charges for or in connection with the recording of any document or instrument contemplated hereby shall be paid by Purchaser's designees.  Seller and Purchaser or Purchaser's designee, as required by local law, will file all necessary tax returns and other documentation in connection with the taxes and fees encompassed in this Section 5.2 relating to the assignment of Contracts.

5.3    Insurance.  Without the prior written consent of Purchaser, Seller will not cancel any insurance policy relating to any landfill site listed on Schedule A to the Settlement Agreement or permit any such policy to expire prior to the later of the Designation Period or the entry of a final Order either approving or denying any pending Designation Motion as of the expiration of the Designation Period  Purchaser shall waive the Seller's obligations under the prior sentence in the event that after demand the Purchaser does not timely pay any amounts due under any such insurance policy.  If Purchaser fails to pay the amounts due hereunder and the insurance policy lapses as a result, it will not be the responsibility of Seller to reinstate and it will not be a default of Seller under this Agreement.  Seller shall not, on its own, cancel any such insurance policy.

## ARTICLE VI

## MISCELLANEOUS

6.1    Termination: Other Remedies.

(a)    This Agreement may be terminated and the transactions contemplated hereby may be abandoned by the mutual consent of Purchaser and Seller.

(b)    Upon termination of this Agreement pursuant to Section 6.1(a) above, the Contracts are immediately deemed rejected without further Order.

6.2    Default and Remedies.

(a)    The Court shall retain jurisdiction over this Agreement in the event of any default by either Party.

(b)    In the event of a material breach of, or material default under, this Agreement by Purchaser prior to the Closing Date, Seller shall, provided Seller is not in material breach of or material default under, this Agreement, be entitled, as its sole and exclusive remedy, either (i) to terminate this Agreement or (ii) to seek specific performance of this Agreement. In the event of a material breach of, or material default under, this Agreement by Purchaser after the Closing Date, Seller shall, provided Seller is not in material breach of or material default under this Agreement, be entitled, as its sole and exclusive remedy, to seek specific performance of this Agreement.

6.3    Successors and Assigns. This Agreement is made solely and specifically by and for the benefit of the Parties, and their respective successors and assigns.

6.4    Notices. All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given if and when delivered personally, or sent by facsimile transmission, or mailed, by certified or registered mail, return receipt requested, first class postage prepaid, or by Federal Express or some other reputable overnight carrier, to the Parties at the following addresses and facsimile numbers:

If to Seller addressed to:

> Barry A. Chatz
> Arnstein & Lehr LLP
> 120 S. Riverside Plaza, Suite 1200
> Chicago, IL 60606
> Fax Number: (312) 876-0288

If to Purchaser addressed to:

> Gregory J. Jordan
> Dykema Gossett PLLC
> 10 S. Wacker Drive, Suite 2300
> Chicago, IL 60606
> Fax Number: (312) 876-1155

or to such other place and with such other copies as any Party may indicate by written notice to the other Party provided in the manner set forth above.

6.5    Entire Agreement. This Agreement, and the agreements referenced herein (including without limitation, the Settlement Agreement and the exhibits to the Settlement Agreement) supersede all prior discussions and agreements between the Parties with respect to the subject matter hereof. This Agreement and other documents to be delivered in connection herewith, including without limitation the Settlement Agreement, contains the sole and entire agreement between the Parties with respect to the subject matter hereof. Notwithstanding the foregoing, the Settlement Agreement shall continue to be a binding agreement between the Parties. To the extent that there are any discrepancies between the Settlement Agreement and this Agreement, the terms of the Settlement Agreement shall control.

- 8 -

6.6 Waiver. Except as otherwise specifically provided for in this Agreement, any term or condition of this Agreement may be waived at any time by the Party that is entitled to the benefit thereof. To be effective, each such waiver shall be in writing, shall specifically refer to this Agreement and the term or condition being waived, and shall be executed by an Authorized Officer of such Party. A waiver on one occasion shall not be deemed a waiver of the same or any other breach on a future occasion.

6.7 Amendment. This Agreement may be modified or amended only in a writing duly executed by or on behalf of each of the Parties.

6.8 Counterparts: Facsimile Signatures. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement may be executed and delivered by facsimile and facsimile signatures hereof shall be deemed effective and binding as original signatures.

6.9 Invalid Provisions. If any provision of this Agreement is held to be illegal, invalid, or unenforceable under any present or future law, rule, or regulation, such provision shall be fully severable and this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof. The remaining provisions of this Agreement shall remain in full force and effect, and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance herefrom. Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as a part of this Agreement a legal, valid, and enforceable provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible.

6.10 Headings, Gender, Etc. The headings used in this Agreement have been inserted for convenience, do not modify the terms of this Agreement and do not constitute matter to be construed or interpreted in connection with this Agreement. Unless the context of this Agreement otherwise requires, (a) words of any gender shall be deemed to include each other Gender, (b) words using the singular or plural number shall also include the plural or singular number, respectively, (c) references to "hereof," "herein," "hereby" and similar terms shall refer to this entire Agreement, and (d) the words "include" and "including" shall be construed as incorporating "but not limited to" or "without limitation." The language used in this Agreement shall be deemed to the language chosen by the Parties to express their mutual intent and no rule of strict construction shall be applied against any Person.

6.11 Continuing Jurisdiction. The Parties agree that the Court shall retain jurisdiction over the enforcement of this Agreement, including, but not limited to, the performance of the obligations and transactions contemplated hereunder.

6.12 Choice of Law. This Agreement shall be construed, interpreted and the rights of the Parties determined in accordance with the laws of the State of Illinois. In the event of any litigation concerning this Agreement, proper venue shall be in the Court and the Parties consent to such jurisdiction.

6.13   No Partnership or Joint Venture.  Nothing contained in this Agreement shall be deemed to create a partnership, joint venture, or any other relationship other than that of seller and purchaser between the Parties.

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed as of the date first above written.

PURCHASER:

CHIPLEASE, INC.


By:_____
     Leon Greenblatt, Secretary

SCATTERED CORPORATION


By:_____
     Leon Greenblatt, President

SELLER:

THE CHAPTER 7 BANKRUPTCY
ESTATE OF RESOURCE TECHNOLOGY
CORPORATION

By: _____
     Jay A. Steinberg, not individually but
     solely as Chapter 7 Trustee for the
     Estate of Resource Technology
     Corporation

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In re:

RESOURCE TECHNOLOGY
CORPORATION,

Debtor.

Chapter 7
Case No. 99 B 35434

Hon. Eugene R. Wedoff

### ORDER APPROVING SETTLEMENT BETWEEN THE ESTATE OF RESOURCE TECHNOLOGY CORPORATION AND THE GREENBLATT ENTITIES AND GRANTING FURTHER RELIEF

This matter coming before the Court on the motion filed by Jay A. Steinberg, not individually, but solely as the Chapter 7 Trustee (the "Chapter 7 Trustee") for the Chapter 7 estate of Resource Technology Corporation (the "Estate") for entry of an order to (i) approve a settlement agreement, a copy of which is attached hereto and incorporated herein as Exhibit "A", (Settlement Agreement") by and between the Estate and the Greenblatt Entities (defined below); (ii) authorize the conveyance, designation and abandonment of certain estate assets to Chiplease, Inc. or its designee ("Chiplease") and Scattered Corporation or its designee ("Scattered") (Chiplease and Scattered, as applicable, (collectively "Purchaser")) pursuant to the terms of the Agreements (defined below); (iii) approve a designation rights agreement in favor of Purchaser, a copy of which is attached as Exhibit "A" to the Settlement Agreement ("Designation Rights Agreement") (the Settlement Agreement and Designation Rights Agreement are jointly referred to as the "Agreements"); (iv) authorize the disbursement of $250,000 to NEC Electric Corporation ("NEC"); and (v) approve shortened notice of this Motion (the "Settlement Motion"); the Court having afforded the Chapter 7 Trustee and all other parties in interest an opportunity to be heard, having considered the testimony provided at the hearing on these matters, and having considered the

Settlement Motion and the entire record in this proceeding to date; the Court being otherwise fully advised in the premises, and finding notice of the Settlement Motion to be sufficient under the circumstances; the Court makes the following Findings of Facts, Conclusions of Law and other determinations:

## Findings of Fact and Other Determinations

A.      On November 15, 1999, (the "Petition Date"), an involuntary petition for relief under Chapter 7 of the Bankruptcy Code (11 U.S.C. Section 101 et.seq.) was filed against Resource Technology Corporation ("RTC" or the "Debtor"). An order for relief was entered on January 18, 2000, at which time the case was converted to one under Chapter 11. Gregg E. Szilagyi was appointed as the Chapter 11 Trustee (the "Chapter 11 Trustee").

B.      The case was converted back to a Chapter 7 proceeding on September 21, 2005. The Chapter 7 Trustee was appointed as interim trustee in September 2005 and became the permanent trustee in November 2005.

C.      The Debtor is in the business of capturing and converting methane landfill gas into electric energy, which the Debtor then sold to utilities like Commonwealth Edison. The Debtor operates its business at a number of landfill sites.

D.      Leon Greenblatt, Chiplease, Inc. and Banco Panamericano, Inc. (collectively, the "Banco Secured Lenders") assert pre-petition and post-petition secured claims against the Estate based upon various pre-petition loan documents and post-petition debtor-in-possession loans. Based upon their loans, the Banco Secured Lenders assert a lien on certain gas rights agreements and other assets of the Estate as collateral for their loans.

2

E.    Network Electric Corporation ("NEC") asserts a secured claim against the Estate in an amount in excess of $43 Million relating to a borrowing facility approved by this Court on August 1, 2000.  NEC asserts a first priority secured claim on certain property and assets relating to the Estate's Congress, Beecher and Pontiac landfill sites.

F.    NEC also loaned the Chapter 7 Estate the sum of $250,000 to pay for the Chapter 7 administration of the estate (the "Chapter 7 Loan").  The first recoveries by the Estate are to be paid to NEC in repayment of the Chapter 7 Loan.

G.    On January 17, 2006, the Banco Secured Lenders filed an adversary proceeding against NEC entitled "Objection to Claim and Request for Determination as to the Validity and Extent of Lien of NEC."  In the adversary proceeding, the Banco Secured Lenders objected to the secured administrative claim filed by NEC and request that NEC's claim be disallowed in its entirety.  The Banco Secured Lenders do not contest the payment of $250,000 to NEC as repayment of the Chapter 7 Loan.

H.    Various adversary complaints were filed by the Estate against the Banco Secured Lenders and other defendants (the "Trustee's Litigation") as follows:

(i)    On October 22, 2004, the Chapter 11 Trustee filed his Verified Complaint for Turnover of Property of the Estate, for Damages including Punitive Damages for Conversion of Property of the Estate, for Imposition of a Constructive Trust, and for Injunctive and Other Relief against the Banco Secured Lenders, as Adv. Pro. No. 04-03867 (the "October 2004 Complaint"). The Chapter 11 Trustee dismissed the October 2004 Complaint on February 17, 2005.

(ii)    On November 16, 2004, the Chapter 11 Trustee filed his Verified Adversary Complaint for Injunctive and Declaratory Relief against the Banco Secured Lenders, Delaware Gas and Electric Inc., Scattered Corporation and Green Gas Delaware Statutory Trust incorrectly identified as Green Gas Delaware Business Trust as Adv. Pro. No. 04-04068 (the "November 2004 Complaint"). On December 30, 2004, the Court granted the Chapter 11 Trustee's Motion for Preliminary Injunctive Relief enjoining the Banco Secured Parties from taking certain actions (the "December 2004 Injunctive Relief").

3

(iii)    On January 10, 2005, the Chapter 11 Trustee filed his Complaint for Unauthorized Postpetition Transfers against Loop Properties and Loop Properties, Inc. as Adv. Pro. No. 05-00025 (the "January 2005 Complaint").

(iv)    On October 27, 2005, the Estate filed a Complaint for Breach of Fiduciary Duty, Equitable Subordination, Violation of RICO, Injunctive Relief, Turnover of Property and Other Relief against the Banco Secured Lenders, Scattered Corporation and Green Gas Delaware Business Trust (the "October 2005 Complaint") as Adv. Pro. No. 05-02521.

(v)    On November 2, 2005, the Court entered an order consolidating the November 2004 Complaint and the October 2005 Complaint.  On November 2, 2005, the Court entered an order granting in part the Estate's Motion for Preliminary Injunction (the "November 2005 Injunctive Relief").

(vi)    On January 23, 2006, the Estate filed an Adversary Complaint for Injunctive and Declaratory Relief against the Banco Secured Parties as Adv. Pro. No. 06-00436 (the "January 2006 Complaint").

I.    On December 28, 2005, this Court entered an Order approving the Estate's Motion to Approve Settlement of 506(c) Claim with the Banco Secured Lenders pursuant to Section 363 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure (Rule 101 et.seq., the "Bankruptcy Rules").  The Court required that Arnstein & Lehr LLP, as escrowee, hold $1.5 Million in settlement funds in escrow, pending further Order of the Court (the "506(c) Funds").  The Banco Secured Lenders filed a Motion to Reconsider the Court's approval of the 506(c) settlement, and objected to the Estate's motion for distribution of the 506(c) Funds.  This Motion is still pending as of the date of this Order.

J.    On January 12, 2006, this Court approved sale procedures relating to the Estate's sale of certain assets, which included landfill gas-fired Solar Turbine combustion generators and ancillary equipment including (1) the three Solar Taurus Model Units located at the Congress landfill; (2) the one Taurus Model Unit located at the Beecher landfill; and (3) the one Solar Titan Model Unit located at the Pontiac landfill, together with all books and records pertaining to said equipment, the

4

maintenance and operation of said equipment, spare parts and items related to said equipment (the "DTE Sale Assets") to DTE Biomass Energy, Inc. ("DTE") for $6,000,000, or such higher offer (the "Sale").

K.     On February 6, 2006, the Court conducted a hearing on the Sale.  The Court authorized the Sale free and clear of all liens, claims and encumbrances, with all valid liens to attach to proceeds in the same amount, extent and priority (the "Sale Order").  The Court authorized the distribution of funds to the Chapter 7 Trustee in payment of his statutory compensation.  The Court ordered that the remaining funds be held in escrow pending further Order of the Court determining the extent and priority of liens between NEC and the Banco Secured Lenders as to the DTE Sale Assets.

L.     The Banco Secured Lenders filed an appeal of the Sale Order to the United States District Court (the "Sale Appeal").  On February 17, 2006, the United States District Court stayed the Sale pending the appeal.

M.     On March 2, 2006, the United States District Court affirmed the Sale Order.  On the same date, the Estate closed on the Sale to DTE and conveyed the DTE Sale Assets to DTE free and clear of all liens, claims and encumbrances.  The Chapter 7 Trustee received the statutory compensation authorized by the Court at the closing of the Sale to DTE.

N.     The Chapter 7 Trustee, on the one hand, and the Banco Secured Lenders and Scattered Corporation (collectively, the "Greenblatt Entities"), on the other hand, have decided to resolve all issues between the Estate and the Greenblatt Entities, and toward that end seek Court approval of the Settlement Agreement, approval of the Designation Rights Agreement and approval of and authorization of the conveyance, designation and abandonment of certain Estate assets to Purchaser as set forth in the Agreements, approval and authorization of releases, attached to the Settlement

5

Agreement as Exhibits D and E (the "Releases") and the dismissal of various causes of action and the granting of other relief, pursuant to Sections 105, 363, 365 and 554 of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules.

O.     The terms of the Agreements are supported by sound business reasons and are consistent with fundamental policies of the Bankruptcy Code.  Approval of the Agreements will serve to benefit the Estate.  This Court has discretion to authorize and approve the Agreements and the other relief granted herein.

P.     The settlement as set forth in the Settlement Agreement, sale of assets as set forth in the Settlement Agreement and the transfer and conveyance of certain Designation Rights as defined in the Designation Rights Agreement ("Designation Rights") to Purchaser and the Releases are each a reasonable and valid exercise of the Estate's business judgment and is otherwise appropriate under Sections 363 and 365 of the Bankruptcy Code.

Q.     The Agreements were negotiated, proposed and entered into by the Estate and the Greenblatt Entities, respectively at arms length and in good faith and without collusion.  The Purchaser, as defined herein, is a good faith purchaser for value within the meaning of Section 363(m) of the Bankruptcy Code and entitled to all of the protections afforded by said provision

R.     The consideration provided pursuant to the Agreements is fair and reasonable.

S.     The Estate makes no representations or warranties with respect to the Designation Rights (Paragraph 14) causes of action (Paragraph 20) and equipment, inventory, supplies, work in progress and general intangibles (Paragraph 13). Specifically, the Estate makes no representations or warranties whether (i) any of the Contracts, as defined herein, which may be designated, are executory in nature; (ii) any

6

of the Contracts are unexpired or expired; (iii) whether the Contracts are assumable; (iv) whether the Estate owns or has any interest in any of the Contracts or other assets conveyed or that may be designated under the Agreements and pursuant to this Order.

T.    All objections to the Settlement Motion have been overruled or withdrawn.

U.    This Court shall retain jurisdiction to enforce this Order.

## Conclusions of Law and Other Determinations

1.    This Court has core jurisdiction to enter a final Order with respect to the Settlement Motion and all of the relief requested thereby pursuant to 28 U.S.C. §§ 157(b)(A), (M), (N) and (O).  This Court has exclusive jurisdiction over the Debtor's property and property of the Estate, wherever located, pursuant to 28 U.S.C. § 1334(d).

2.    Due and proper notice of the hearing on the Settlement Motion has been given to all parties in interest as required by Sections 105(a), 363(b), 365(a) and 554 of the Bankruptcy Code and Rules 2002(a)(2), 2002(c)(l), 2002(d), 6004, 6006 and 6007 of the Bankruptcy Rules.

3.    This Court has statutory authority to grant the relief in the Settlement Motion pursuant to Sections 105(a), 363, 365 and 554 of the Bankruptcy Code.

4.    Good business reasons justify granting the relief requested in the Settlement Motion. Therefore, Chapter 7 Trustee shall be and hereby is authorized to enter into the Agreements on behalf of the Estate and to take such actions necessary to effectuate the Agreements as being in the best interest of the Estate and its creditors.

5.    Permits issued to RTC for the operation of its business ("Permits"), which the Chapter 7 Trustee on behalf of the Estate seeks to abandon,  are burdensome to

7

the Estate, and are of inconsequential value and benefit to the Estate. Further, the abandonment of the Permits is in the best interest of the estate.

6.      This Court will retain jurisdiction over the subject matters of this Order, the Agreements and the Settlement Motion, as well as the parties that have appeared with respect to the Settlement Motion, to enforce, interpret and enter supplemental orders with respect to the subject matter of this Order and the Settlement Motion.

### Decretal Provisions

Based on the foregoing Findings of Fact, Conclusions of Law and Other Determinations,

IT IS ORDERED, ADJUDGED AND DECREED as follows:

7.      To the extent set forth in this Order, the relief requested in the Settlement Motion is herewith granted.

8.      The terms and provisions of the Settlement Agreement are approved in their entirety.

9.      The terms and provisions of the Designation Rights Agreement are approved in their entirety.

10.      In the event of any inconsistency between the Agreements and this Order, this Order shall be controlling unless this Order specifically states that one of the Agreements is controlling.

11.      The Chapter 7 Trustee is herewith authorized to execute and deliver all documents on behalf of the Estate, as may be reasonably necessary to consummate

and effectuate the Agreements in a manner consistent with and not in violation of the terms of this Order.

12.    The Chapter 7 Trustee on behalf of the Estate and the Greenblatt Entities are herewith authorized and directed to take all actions that may reasonably be required for the purpose of consummating and implementing the Settlement.

13.    Pursuant to Section 363 of the Bankruptcy Code, the Estate is authorized to sell, transfer and convey to the Purchaser the assets (including causes of action) to be conveyed as set forth in Paragraphs 4, 5 and 8 of the Settlement Agreement. Such assets are sold, transferred and conveyed free and clear of all liens, claims and encumbrances, with the exception of Permitted Liens. Permitted Liens are all liens that are asserted by the Greenblatt Entities. Any potential Defendant that has a counterclaim, to any cause of action herein conveyed, shall maintain the right to assert that counterclaim, as a set-off up to the amount of the claim.

14.    Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Estate is authorized to transfer and convey all of its right, title and interest, if any, in all contracts, executory or otherwise, including any alleged executory contracts listed on Exhibit "C" to the Settlement Agreement, ("Contracts"), to the Purchaser consistent with the terms of the Designation Rights Agreement. The conveyance of Designation Rights shall be effective on the closing date of the Settlement Agreement (the "Effective Date"). Upon the Effective Date, Purchaser shall have the sole, exclusive and continuing right to designate (on one or more occasions), to the same extent and validity as the Estate had at the Effective Date, (i) which Contracts shall be assumed and assigned; and (ii) which Contracts shall be rejected pursuant to the terms of the Designation Rights

9

Agreement. The Purchaser shall not have the right to designate any Contract that has previously been terminated by a final non-appealable Court Order or if the Estate believes in good faith that a particular designation will result in the Estate being subject to sanctions pursuant the Fed. R. Bankr. P. 9011 or allegations of bad faith, but the Purchaser shall have the right to petition the Court to compel the Trustee to comply with the Purchaser's direction to designate. The conveyance of the Designation Rights shall be free and clear of all liens, claims and encumbrances, with the exception of Cure Costs, as such term is defined in the Designation Rights Agreement and Permitted Liens. In accordance with the Designation Rights Agreement, the Purchaser shall remain obligated to cure any defaults under any Contract affected thereunder, including without limitation, Cure Costs, and provide adequate assurance of future performance, pursuant to the terms of the Designation Rights Agreement. The Estate shall not be liable for Cure Costs or for adequate assurance of future performance costs or any obligations or damage claims under the Contracts, or for any other claims which may arise as a result of the entry into or operation of the Designation Rights Agreement. Purchaser shall pay all costs and expenses incurred in the preparation, presentation and trial, if necessary, related to all actions required of the Estate pursuant to the Designation Rights Agreement.

15.    The provisions of Paragraph S of this Order, contained in the Findings of Fact and Other Determinations, are hereby Ordered and approved.

16.    Each Purchaser is a good faith purchaser pursuant to the terms of Section 363(m) of the Bankruptcy Code. The Purchaser negotiated the terms of the sale of assets at arms length and in good faith. The Purchaser did not seek or take unfair advantage over any other prospective bidder. Further, neither the Chapter 7 Trustee,

nor his employees, attorneys, agents or representatives have colluded with either Purchaser or their respective officers, employees, attorneys, agents or representatives, or in any manner whatsoever violated the provisions of Section 363(n) of the Bankruptcy Code.

17.    The Greenblatt Entities reserve the right to assert that any extension or renewal option in a Contract which purports to be "personal" only to the Estate or to be exercisable only by the Estate is an unenforceable restriction on assignment within in the meaning of Section 365(f) and (I) of the Bankruptcy Code and, in fact, may be freely exercised by Purchaser to its full extent, without prejudice to any affected party asserting a contrary position.

18.    The Purchaser shall have no successor liability or other liability for any of the Estate's employee obligations.

19.    Pursuant to Section 554 of the Bankruptcy Code, the Chapter 7 Trustee's abandonment of the Permits is hereby approved, and the Permits are deemed abandoned as of the Effective Date.  By agreement, the Estate, the Greenblatt Entities and the People of the State of Illinois will not assert or pursue any causes of action that remain in the pending adversary proceeding known as People of the State of Illinois and Stryker International, Inc. v. Resource Technology Corporation, Adversary Proceeding No. 00 A 1143, or with relation to any matters relating to the Stryker International, Inc. bankruptcy estate   In addition, the State of Illinois will not file or assert any environmental claims against the Estate.

20.    Notwithstanding anything to the contrary in the Agreement or in this Order, the Estate and the Greenblatt Entities, including Chiplease, as the purchaser of the

11

Estate's assets located in Shelton, Connecticut, and any designee or assignee of the Greenblatt Entities, will not assert or pursue any causes of action against Connecticut Resources Recovery Authority ("CRRA") or relating to the Shelton, Connecticut landfill site, including, without limitation, any causes of action asserted in the adversary proceeding pending in this Court known as Resource Technology Corporation v. Connecticut Resources Recovery Authority, No. 00 A 0150 (the "CRRA Adversary") and any request for reconsideration, appeal or review from the judgment entered in the U.S. District Court case known as Resource Technology Corporation v. Connecticut Resources Recovery Authority, No. 05 C 4535 (the "CRRA Appeal"). In addition, no claim, cause of action or right of review or appeal against CRRA or relating to the Shelton, Connecticut landfill site and no contract with CRRA or relating to the Shelton, Connecticut landfill site will be included in any transfer or assignment authorized under this Order or in the Agreement. Also, the Shelton, Connecticut site and all contracts with CRRA or relating to the Shelton, Connecticut site will be excluded from Schedule A and Exhibit C to the Settlement Agreement and will be excluded from the Designation Rights Agreement and will be excluded from the contracts as to which the Estate seeks an extension of time to assume or reject. CRRA withdraws its Chapter 7 administrative claim against the Estate and will not file or assert any other Chapter 7 administrative claim against the Estate. However, CRRA preserves its Chapter 11 administrative claim and its pre-bankruptcy claims against the Estate. Notwithstanding the foregoing, the Greenblatt Entities do not waive any lien rights held by them or the right to enforce the same.

21.     Pursuant to Section 363 of the Bankruptcy Code, the Estate's conveyance of the Estate's right, title and interest, if any, in and to causes of action with the

12

exception of Excluded Causes of Action, is approved.  Excluded Causes of Action include, specifically, the Estate's rights, if any, in (i) the Estate's causes of action against NEC, if any; the Estate's causes of action in adversary No. 00 A 1143, as described in Paragraph 19 above, or with relation to any matters relating to the Stryker International, Inc. bankruptcy estate; and the Estate's causes of action, if any, against CRRA (as defined in paragraph 20) or relating to the Shelton, Connecticut landfill, including without limitation, any claim asserted in the CRRA Adversary or any request for reconsideration, appeal or review of the judgment entered in the CRRA Appeal; (ii) preference or fraudulent transfer causes of action arising pursuant to Sections 502(d), 544, 545, 546, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code, or arising pursuant to state law fraudulent transfers; (iii) causes of action relating to the disgorgement or recovery of any disbursements made to professionals during the Chapter 11 or Chapter 7 cases including without limitation the Chapter 7 and/or Chapter 11 Trustee's statutory compensation and the Chapter 7 and/or Chapter 11 Trustee's professional fees or other expenses paid during the pendency of the Bankruptcy Case; and (iv) any causes of action against the Chapter 11 or Chapter 7 Trustees or their professionals.  The Estate retains and does not convey to Chiplease or any other party the Excluded Causes of Action.

22.    The Chapter 7 Trustee on behalf of the Estate is authorized to execute the Releases.  The Releases shall be effective only upon the Closing Date, as such term is defined in Paragraph 12 of the Settlement Agreement.

23.    As more fully set forth in Paragraph 11 of the Settlement Agreement: (i) the Purchaser shall deposit the sum of $500,000.00 to be held in escrow by its counsel, Dykema Gossett PLLC, for the payment of all unpaid Chapter 7 operating expenses

13

above $150,000.00 and any expenses incurred while the Estate continues to operate the Debtor's business; (ii) Chiplease and, to the extent necessary, any of the Greenblatt Entities, waive any interest in the 506(c) Funds and, by the entry of this Order, consent to the payment of the 506(c) Funds by Arnstein & Lehr LLP as escrowee to Jay A. Steinberg, not individually but solely as Chapter 7 Trustee of the Estate of Resource Technology Corporation; (iii) Chiplease shall pay the sum of $275,000.00 to Jay A. Steinberg, not individually but solely as Chapter 7 Trustee of the Estate of Resource Technology Corporation, and the Banco Secured Lenders waive any right to a distribution from such funds; (iv) Chiplease shall pay 20% of any recovery (net of attorney's fees and costs) on any cause of action conveyed hereunder; (v) all parties receiving a release from the Estate pursuant to the Settlement Agreement shall not file a Chapter 7 claim and shall not receive a distribution on any Chapter 7 claim they may have; (vi) any party receiving a release from the Estate pursuant to the Settlement Agreement shall maintain any Chapter 11 claim that it may own, and in the case of a claim purchased from a third party, the distribution relating thereto shall be limited to the amount paid for the claim, and specifically the claim purchased from Aquila Energy Capital Corporation and other entities shall be limited to $7,000,000.00 (notwithstanding the foregoing, no claim purchased after February 1, 2006 shall be entitled to a distribution); (vii) in no event do the Banco Secured Lenders otherwise waive their claims, liens or debt, but the Banco Secured Lenders waive the right to receive any Chapter 7 distribution, and the Banco Secured Lenders agree that they will not pursue any claims or remedies against the Chapter 7 Trustee or his professionals; (viii) the Parties shall execute and exchange the releases attached as Exhibits D and E to the Settlement Agreement; and (ix) the Purchaser and the Estate shall execute the

14

documents required and perform the acts required to finalize the settlement pursuant to the terms of the Settlement Agreement and the Designation Rights Agreement.

24.    The Estate is authorized to pay the Chapter 7 Loan to NEC upon receipt of the 506(c) Funds or the $275,000 payment by Chiplease, Inc.

25.    If Purchaser determines that it will remove any property from a landfill for which the gas rights agreement has not been assigned to it, Purchaser agrees to give not less than 5 days notice in writing to the landfill owner at the last known address available to Purchaser of the intended removal and further agrees to advise the landfill owner as to the removal of such property. If no agreement is reached, either party has the right to petition this Court for resolution of the dispute.

26.    The lien of NEC, if any, shall attach to the proceeds of the Settlement Agreement, subject to the payment of all costs of administration of the Estate. A subsequent hearing will be held to determine the validity, priority and amount, if any, of the NEC lien. Nothing in this order shall create for or provide to NEC lien rights other than those that previously existed.

27.    This Court retains jurisdiction over:

A.    the Agreements;

B.    the determination of any dispute or controversies arising in connection with the Agreements; and

C.    the determination of any dispute relating to the enforcement and interpretation of the terms and conditions of this Order or the Agreements.

28.    This Order is intended to be final and immediately effective when docketed by the clerk of this Court, pursuant to Fed. R. Bankr. P. 7062, made applicable by Fed. R. Bankr. P. 6004, 6006 and 9014

15

29.    To the extent any Finding of Fact is determined to be a Conclusion of Law, and to the extent any Conclusion of Law is determined to be a Finding of Fact, then each such Finding of Fact is incorporated into this Court's Conclusions of Law, and each such Conclusion of Law is incorporated into this Court's Findings of Fact.

Dated:  March 16, 2006

ENTERED FOR THE COURT:

_____
United States Bankruptcy Judge

16

**EXHIBIT C**

**CONTRACT LIST**

| PARTY/SITE | TITLE OF DOCUMENT | BETWEEN | DATE OF DOCUMENT |
|---|---|---|---|
| Bi-State | Agreement | Resource Technology corporation and Noble Earth Corporation | 10/27/95 |
| Bi-State | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Bi-State | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Bloomington | Agreement | Resource Technology Corporation and John Sexton Contractors Co. | 12/29/95 |
| Bloomington | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Bloomington | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Clarion | Agreement | Resource Technology Corporation and American Disposal Services, Inc. | 12/21/95 |
| Clarion | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Clarion | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |

| PARTY/SITE | TITLE OF DOCUMENT | BETWEEN | DATE OF DOCUMENT |
|---|---|---|---|
| Columbus | Agreement | Resources Technology Corporation and City of Columbus, GA | 08/15/95 |
| Columbus | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Columbus | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Congress/Hillside | Power Purchase Agreement | Resource Technology Corporation and Commonwealth Edison | Various Dates |
| Congress/Hillside | Amended and Restated Agreement for Construction and Operation of Gas Collection Facility and Gas-To-Electric Plant | Resource Technology Corporation and Congress Development Company | 12/02/97 |
| Congress/Hillside | Agreement for Construction and Operation of Gas Collection Facility and Gas-To-Electric Plant | Resource Technology Corporation and Congress Development Company | 11/29/96 |
| Congress/Hillside | First Amendment to Amended and Restated Agreement for Construction and Operation of Gas Collection Facility and Gas-To-Electric Plant | Resource Technology Corporation and Congress Development Company | 06/30/99 |

| PARTY/SITE | TITLE OF DOCUMENT | BETWEEN | DATE OF DOCUMENT |
|---|---|---|---|
| Congress/Hillside | Second Amendment to Agreement for Construction and Operation of Gas Collection Facility and Gas-To-Electric Plant | Resource Technology Corporation and Congress Development Company | 11/29/96 |
| Congress/Hillside | Security Agreement | Resource Technology Corporation and Congress Development Company | 11/29/96 |
| Congress/Hillside | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 05/15/99 |
| Congress/Hillside | Landfill Gas Rights and Collection Facility Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Corpus Christi (Elliott) | Landfill Gas Collection and Conversion Agreement | Resources Technology Corporation and City of Corpus Christi | 11/26/96 |
| Corpus Christi | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Corpus Christi | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
|  |  |  |  |

- 3 -

| PARTY/SITE | TITLE OF DOCUMENT | BETWEEN | DATE OF DOCUMENT |
|---|---|---|---|
| Corpus Christi | Gas Sales Agreement | Resource Technology Corporation and Texas Energy Transfer | Various Dates |
| Fort Dodge | Agreement | Resource Technology Corporation and the North Central Iowa Regional Solid Waste Agency | 10/28/94 |
| Fort Dodge | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Fort Dodge | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Gary | Agreement | Resource Technology Corporation and the City of Gary, Indiana | 12/26/96 |
| Gary | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Gary | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Gary | Gas Sales Agreement | Resource Technology Corporation and Texas Energy Transfer | Various Dates |
|  |  |  |  |

- 4 -

| PARTY/SITE | TITLE OF DOCUMENT | BETWEEN | DATE OF DOCUMENT |
|---|---|---|---|
| GNOL | Gas Sales Agreement | Resource Technology Corporation and Texas Energy Transfer | Various Dates |
| GNOL | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| GNOL | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| GNOL | Agreement | Resource Technology Corporation and Southern Recovery Management Inc. | 09/18/96 |
| GNOL | Addendum to Contract Between Resource Technology Corporation and Southern Recovery Management, Inc. | Resource Technology Corporation and Southern Recovery Management Inc. | 09/18/96 |
| Kewanee | Kewanee Landfill (no Gas Contract- National Closure owns the Site<br><br>Deed In Trust | American National Bank and Trust Company of Chicago | 03/31/95 |
| Kewanee | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Kewanee | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |

- 5 -

| PARTY/SITE | TITLE OF DOCUMENT | BETWEEN | DATE OF DOCUMENT |
|---|---|---|---|
| Lansing | Agreement | Resource Technology Corporation and John Sexton Contractors Co. | 04/24/95 |
| Lansing | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Lansing | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Lansing | Power Purchase Agreement | Resource Technology Corporation and Commonwealth Edison | Various Dates |
| Litchfield | Agreement | Resource Technology Corporation and Liberty Waste of Ohio | 12/30/96 |
| Litchfield | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Litchfield | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Lyons | Power Purchase Agreement | Resource Technology Corporation and Commonwealth Edison | Various Dates |
|  |  |  |  |

- 6 -

| PARTY/SITE | TITLE OF DOCUMENT | BETWEEN | DATE OF DOCUMENT |
|---|---|---|---|
| Lyons | Lease | Resource Technology Corporation ("RTC") and American Grading Company | 12/27/95 |
| Lyons | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Lyons | Landfill Gas Rights and Collection Facility Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Lyons | O&M Agreement | Resource Technology Corporation and Run Energy | 2005 |
| Mobile | Agreement | Resource Technology Corporation and TransAmerican Waste Industries, Inc. | 12/23/96 |
| Mobile | Gas Sales Agreement | Resource Technology Corporation and Texas Energy Transfer/Mobile Gas | Various Dates |
| Mobile | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Mobile | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
|  |  |  |  |

- 7 -

| PARTY/SITE | TITLE OF DOCUMENT | BETWEEN | DATE OF DOCUMENT |
|---|---|---|---|
| New Haven | Agreement The City of New Haven and Resource Technology Corporation Pertaining to Landfill Gas-To-Energy Conversion Project | Resource Technology Corporation and The City of New Haven | 12/31/96 |
| New Haven | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| New Haven | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Ottawa | Agreement | Resource Technology Corporation and States Land Improvement Corp. | 04/15/97 |
| Ottawa | Amendment No. 1 to Agreement | Resource Technology Corporation and States Land Improvement Corp. | 06/19/97 |
| Peoria | Lease | Resource Technology Corporation and City and County of Peoria | 11/30/95 |
| Peoria | First Amendment to Lease | Resource Technology Corporation and City and County of Peoria | 06/11/96 |
| Peoria | Second Amendment to Lease | Resource Technology Corporation and City and County of Peoria | 01/30/97 |
| Peoria | Third Amendment to | Resource Technology Corporation and City | 07/01/97 |

- 8 -

| PARTY/SITE | TITLE OF DOCUMENT | BETWEEN | DATE OF DOCUMENT |
|---|---|---|---|
| | Lease | and County of Peoria | |
| Peoria | Fourth Amendment to Lease | Resource Technology Corporation and City and County of Peoria | 10/28/97 |
| Peoria | Power Purchase Agreement | Resource Technology Corporation and Cilco | Various Dates |
| Peoria | Landfill Gas Rights and Collection Facilities Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Peoria | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Pontiac | Power Purchase Agreement | Resource Technology Corporation and Commonwealth Edison | Various Dates |
| Pontiac | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Pontiac Delaware Statutory Trust (Including All Applicable Series)" | 4/10/2002 |
| Pontiac | Landfill Gas Sales Agreement | Resource Technology Corporation and Pontiac Delaware Statutory Trust (Including All Applicable Series)" | 4/10/2002 |
| Pontiac | Agreement | Resource Technology Corporation and American Disposal Service, Inc. | 12/21/95 |

| PARTY/SITE | TITLE OF DOCUMENT | BETWEEN | DATE OF DOCUMENT |
|---|---|---|---|
| Pontiac | Supplemental Fuel Standby Agreement | Resource Technology Corporation and NICOR Gas Company | 8/1/2004 |
| Pontiac | O&M | Resource Technology Corporation and Pontiac Delaware Statutory Trust (Including All Applicable Series)" | 4/10/2002 |
| Rosencranse | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Rosencranse | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Rosencranse | License Agreement | Resource Technology Corporation and Rosencranse Corporation | 12/31/96 |
| Sangamon (Springfield) | Agreement | Resource Technology Corporation and ESG Watts, Inc. | 05/26/95 |
| Sangamon (Springfield) | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Sangamon (Springfield) | Power Purchase Agreement | Resource Technology Corporation and Cilco | Various Dates |
| Sangamon (Springfield) | Landfill Gas Rights and Collection Facility Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |

| PARTY/SITE | TITLE OF DOCUMENT | BETWEEN | DATE OF DOCUMENT |
|---|---|---|---|
| Taylor Ridge | Agreement | Resource Technology Corporation and ESG Watts, Inc. | 05/26/95 |
| Taylor Ridge | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Taylor Ridge | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Viola | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Viola | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Viola | Agreement | Resource Technology Corporation and ESG Watts, Inc. | 08/01/96 |
| Wyandot | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Wyandot | Landfill Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Wyandot | Agreement | Resource Technology Corporation and American Disposal Service | 12/21/95 |

- 11 -

| PARTY/SITE | TITLE OF DOCUMENT | BETWEEN | DATE OF DOCUMENT |
|---|---|---|---|
| Wheatland | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Wheatland | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Wheatland | Agreement | Resource Technology Corporation and American Disposal Services, Inc. | 12/21/95 |
| Solar Turbines Incorporated | Services and Maintenance Agreement | Resource Technology Corporation, Network Electric Company and Solar Turbines Incorporated | 11/17/00 |
| Solar Turbines Incorporated | Services and Maintenance Agreement | Resource Technology Corporation, Network Electric Company and Solar Turbines Incorporated | 10/25/00 |
| All Sites | Gas Rights and Collection Facilities Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| All Sites | Gas Sales Agreements | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| All Sites | O&M Agreements | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 04/01/99 |
| All Sites | O&M Agreement | Resource Technology Corporation and | 07/01/99 |

- 12 -

| PARTY/SITE | TITLE OF DOCUMENT | BETWEEN | DATE OF DOCUMENT |
|---|---|---|---|
| | | Green Gas Delaware Statutory Trust | |
| Multi-Site | Multi-Site Environmental Permitting/ Monitoring | Resource Technology Corporation and Trinity Consultants | 2005-06 |
| Multi-Site | Waste Condensate Agreement | Resource Technology Corporation and RS Used Oil | 2005 |
| Multi-Site | Environmental Monitoring Software | Resource Technology Corporation and Enviance, Inc. | 2004 |
| John Connolly | Employment Contract | Resource Technology Corporation and John Connolly | 12/95 |
| Richard Walker | Employment Contract | Resource Technology Corporation and Richard Walker | 1997 |
| Multi-Site | Agreement | Resource Technology Corporation and Chicago Climate Exchange | 07/31/04 |

- 13 -

**EXHIBIT D**

**RELEASE OF TRUSTEE, DEBTOR AND ESTATE**

## RELEASE

In consideration *of the payment of the sum of Ten Dollars and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged,* provided by Jay A. Steinberg, both individually and as the Chapter 7 Trustee (the "Chapter 7 Trustee") for the estate of Resource Technology Corporation (the "Estate"), Chiplease, Inc. Elizabeth Sharp, Michael May, Rumpelstiltskin (USA) Corp., Scattered Corporation, Loop Corp., Loop Properties, Inc., Banco Panamericano, Inc., Repurchase Corp., H&M Partners, GP, EZ Links Golf, LLC, EZ Links Golf, Inc., Green Gas Delaware Statutory Trust (previously identified as Green Gas Delaware Business Trust), South Beach Securities, Inc., 200 West Properties, LP, 200 West Partners, Inc., Old Colony Partners, LP, Old Colony Properties, Inc., Telegraph Properties LP, Telegraph Properties, Inc., Randolph Properties, LP, Randolph Properties, Inc., Pontiac Statutory Trust (f/k/a Pontiac Business Trust), Voltaire Gas and Electric, Inc., Archimedes Gas and Electric, Inc., Red Gas, Limited Liability Company and Pink Gas, Limited Liability Company, Leon Greenblatt, II, Leon Greenblatt, III, Richard Nichols, James Nichols, Andrew Jahelka, Robert Jahelka, David Neuhauser and Leslie Jabine, and their respective officers, shareholders, directors, affiliates, trustees, employees, attorneys, assigns, successors, heirs and agents (collectively and individually the "Releasing Parties") hereby release and forever discharge the Chapter 7 Trustee, individually and in his capacity as Chapter 7 Trustee, and the Estate and their respective employees, attorneys, advisors, successors, assigns and agents from any and all responsibilities, disputes and causes of action of every nature whatsoever, liquidated or unliquidated, known or unknown, matured or unmatured, fixed or contingent, which the Releasing Parties now own or hold or have at any time heretofore owned or held, or owned or held in the future against the Chapter 7 Trustee, individually and in his capacity as Chapter 7 Trustee, or the Estate (collectively or individually), related in any way to (1) Resource Technology Corporation, (2) Resource Technology Corporation's assets and liabilities, (3) related to any actions taken or not taken by the Chapter 7 Trustee concerning or relating to Resource Technology Corporation's bankruptcy case, Case No. 99-35434, currently pending in the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Case"), any adversary proceeding on behalf of or against the Estate arising from or related to the Bankruptcy Case or any appeal of a ruling in favor of the Estate and against any of the Releasing Parties arising from the Bankruptcy Case or any adversary proceeding, including any past, present or future claims against the Chapter 7 Trustee or the Estate, which the Releasing Parties may have or had at any time. Notwithstanding anything set forth herein to the contrary, the Releasing Parties do not release and/or discharge the Estate from claims, rights, demands, liabilities, responsibilities, disputes, causes of action and obligations arising out of any proof of claim that any of the Releasing Parties have or may file against the Estate, and security interest that any of the Releasing Parties may hold to secure the repayment of an obligation owing by Resource Technology Corporation or the Estate, any of the Releasing Parties rights to prosecute any appeal currently pending or to file a notice of appeal including a writ of certiorari and the right to seek further appeal, or any claims, rights, demands, liabilities, responsibilities, disputes, causes of action and obligations arising out of or set forth in the Motion of Chapter 7 Trustee for an Order Pursuant to 11 U.S.C. §363 and F.R.B.P. 9019 to (i) Approve Settlement, (ii) Authorize the Conveyance

and Abandonment of Certain Estate Assets, (iii) Approve a Designation Rights Agreement, (iv) Authorize The Disbursement Of $250,000 To NEC Electric Corporation and (v) Approve Shortened Notice Filed by the Chapter 7 Trustee on Behalf of the Estate in the Bankruptcy Case.

Notwithstanding the terms of this Release, nothing shall terminate any rights, responsibilities and obligations under any pre-petition loan documents and post-petition debtor in possession loan documents granted by Resource Technology Corporation or the Estate.

IN WITNESS WHEREOF, the undersigned has caused this Release to be executed as of March ____ 2006.

**RELEASING PARTIES:**

**CHIPLEASE, INC.**

By: _____
　　Its Agent and Officer

**MICHAEL MAY**

By: _____
　　Michael May, Individually

**SCATTERED CORPORATION**

By: _____
Its Agent and Officer

**LOOP PROPERTIES, INC.**

By: _____
Its Agent and Officer

**REPURCHASE CORP.**

By: _____
Its Agent and Officer

**ELIZABETH SHARP**

By: _____
　　Elizabeth Sharp, Individually

**RUMPELSTILTSKIN (USA) CORP.**

By: _____
Its Agent and Officer

**LOOP CORP.**

By: _____
Its Agent and Officer

**BANCO PANAMERICANO, INC.**

By: _____
Its Agent and Officer

**H&M PARTNERS, GP**

By: _____
Its Agent and General Partner

**EZ LINKS GOLF, LLC**

By: _____
Its Agent and Officer

**GREEN GAS DELAWARE STATUTORY TRUST**

By: _____
Its Agent and Trustee

**200 WEST PROPERTIES, LP**

By: _____
Its Agent and General Partner

**OLD COLONY PARTNERS, LP**

By: _____
Its Agent and General Partner

**TELEGRAPH PROPERTIES LP**

By: _____
Its Agent and General Partner

**RANDOLPH PROPERTIES, LP**

By: _____
Its Agent and General Partner

**PONTIAC STATUTORY TRUST**

By: _____
Michael Horrell
Its Agent and Trustee

**EZ LINKS GOLF, INC.**

By: _____
Its Agent and Officer

**SOUTH BEACH SECURITIES, INC.**

By: _____
Its Agent and Officer

**200 WEST PARTNERS, INC.**

By: _____
Its Agent and Officer

**OLD COLONY PROPERTIES, INC.**

By: _____
Its Agent and Officer

**TELEGRAPH PROPERTIES, INC.**

By: _____
Its Agent and Officer

**RANDOLPH PROPERTIES, INC.**

By: _____
Its Agent and Officer

**VOLTAIRE GAS AND ELECTRIC, INC.**

By: _____
Its Agent and Officer

**EXHIBIT E**

**RELEASE OF BANCO SECURED LENDERS AND OTHER PERSONS**

**EZ LINKS GOLF, LLC**

By: _____
Its Agent and Officer

**GREEN GAS DELAWARE STATUTORY TRUST**

By: _____
Its Agent and Trustee

**200 WEST PROPERTIES, LP**

By: _____
Its Agent and General Partner

**OLD COLONY PARTNERS, LP**

By: _____
Its Agent and General Partner

**TELEGRAPH PROPERTIES LP**

By: _____
Its Agent and General Partner

**RANDOLPH PROPERTIES, LP**

By: _____
Its Agent and General Partner

**PONTIAC STATUTORY TRUST**

By: _____
Michael Horrell
Its Agent and Trustee

**EZ LINKS GOLF, INC.**

By: _____
Its Agent and Officer

**SOUTH BEACH SECURITIES, INC.**

By: _____
Its Agent and Officer

**200 WEST PARTNERS, INC.**

By: _____
Its Agent and Officer

**OLD COLONY PROPERTIES, INC.**

By: _____
Its Agent and Officer

**TELEGRAPH PROPERTIES, INC.**

By: _____
Its Agent and Officer

**RANDOLPH PROPERTIES, INC.**

By: _____
Its Agent and Officer

**VOLTAIRE GAS AND ELECTRIC, INC.**

By: _____
Its Agent and Officer

**ARCHIMEDES GAS AND ELECTRIC, INC.**

**RED GAS, LIMITED LIABILITY COMPANY**

By: _____
Its Agent and Officer

By: _____
Its Agent And Officer


**PINK GAS, LIMITED LIABILITY COMPANY**

**LEON GREENBLATT, II**

By: _____
Its Agent and Officer

By: _____
Leon Greenblatt, II, Individually


**LEON GREENBLATT, III**

**RICHARD NICHOLS**

By: _____
Leon Greenblatt, III, Individually

By: _____
Richard Nichols, Individually


**JAMES NICHOLS**

**ANDREW JAHELKA**

By: _____
James Nichols, Individually

By: _____
Andrew Jahelka, Individually


**ROBERT JAHELKA**

**DAVID NEUHAUSER**

By: _____
Robert Jahelka, Individually

By: _____
David Neuhauser, Individually


**LESLIE JABINE**

By: _____
Leslie Jabine, Individually

## RELEASE

In consideration of the payment of Ten Dollars and other good and valuable consideration by Chiplease, Inc. for and on behalf of its itself, Elizabeth Sharp, Michael May, Rumpelstiltskin (USA) Corp., Scattered Corporation, Loop Corp., Loop Properties, Inc., Banco Panamericano, Inc., Repurchase Corp., H&M Partners, GP, EZ Links Golf, LLC, EZ Links Golf, Inc., Delaware Statutory Trust (previously identified as Green Gas Delaware Business Trust), South Beach Securities, Inc., 200 West Properties, LP, 200 West Partners, Inc., Old Colony Partners, LP, Old Colony Properties, Inc., Telegraph Properties LP, Telegraph Properties, Inc., Randolph Properties, LP, Randolph Properties, Inc., Pontiac Statutory Trust (f/k/a Pontiac Business Trust), Voltaire Gas and Electric, Inc., Archimedes Gas and Electric, Inc., Red Gas, Limited Liability Company and Pink Gas, Limited Liability Company, Leon Greenblatt, II, Leon Greenblatt, III, Richard Nichols, James Nichols, Andrew Jahelka, Robert Jahelka, David Neuhauser and Leslie Jabine (collectively and individually the "Released Parties") to Jay A. Steinberg, not individually but solely as the Chapter 7 Trustee (the "Chapter 7 Trustee") for the Estate of Resource Technology Corporation, (hereinafter the "Estate"), and to Jay A. Steinberg, individually in the limited capacity as a releasing party (the "Releasing Parties"), and their respective officers, shareholders, directors, affiliates, trustees, advisors, employees, attorneys, assigns, successors, heirs and agents hereby release and forever discharge the Released Parties and their respective officers, shareholders, affiliates, directors, trustees, employees, attorneys, successors, assigns and agents from any and all claims, rights, demands, liabilities, responsibilities, disputes, causes of action and obligations of every nature whatsoever, liquidated or unliquidated, known or unknown, matured or unmatured, fixed or contingent, which the Chapter 7 Trustee, individually and in his capacity as Chapter 7 Trustee, or the Estate now owns or holds or has at any time heretofore owned or held or owned or held in the future against the Released parties (collectively or individually), related in any way to RTC, RTC's bankruptcy case, Case No. 99-35434, currently pending in the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Case"), any adversary proceeding arising from or related to the Bankruptcy Case or any appeal arising from the Bankruptcy Case or any adversary proceeding, and any past, present or future claims against the Released parties, individually or collectively, and each of them, which the Chapter 7 Trustee, individually and in his capacity as Chapter 7 Trustee, the Estate or Resource Technology Corporation may have or had at any time. Notwithstanding anything set forth herein to the contrary, the Chapter 7 Trustee and the Estate do not release and/or discharge the Released Parties from claims, rights, demands, liabilities, responsibilities, disputes, causes of action and obligations arising out of or set forth in the Motion of Chapter 7 Trustee for an Order Pursuant to 11 U.S.C. §363 and F.R.B.P. 9019 to (i) Approve Settlement, (ii) Authorize the Conveyance and Abandonment of Certain Estate Assets, (iii) Approve a Designation Rights Agreement, (iv) Authorize The Disbursement Of $250,000 To NEC Electric Corporation and (v) Approve Shortened Notice Filed by the Chapter 7 Trustee on Behalf of the Estate in the Bankruptcy Case.

IN WITNESS WHEREOF, the undersigned has caused this Release to be executed as of March _____ 2006.

The   Estate   of   Resource   Technology
Corporation:

By: _____
Jay A. Steinberg. not individually but
Soley as Chapter 7 Trustee

_____
Jay A. Steinberg, individually in the limited
capacity as a Releasing Party

DsclDue, PlnDue, SealDoc, APPEAL

# U.S. Bankruptcy Court
## Northern District of Illinois (Chicago)
## Bankruptcy Petition #: 99-35434

*Assigned to:* Hon. Eugene R. Wedoff
Chapter 7
Previous chapter 11
Voluntary
Asset

*Date Filed:* 11/15/1999
*Date Converted:* 09/21/2005

*Debtor*
**Resource Technology Corporation**
330 S Wells
Chicago, IL 60606
Tax id: 00-0000000

represented by **Alex Pirogovsky**
Ungaretti & Harris LLP
3500 Three First National Plaza
Chicago, IL 60602
312 977-4400
Fax : 312 977-4405
Email: apirogovsky@uhlaw.com

**Arlene N Gelman**
Vedder Price P.C.
222 North LaSalle Street
26th Floor
Chicago, IL 60601
(312) 609-7500
Fax : (312) 609-5005
Email: agelman@vedderprice.com

**Brian M Graham**
Shaw Gussis Fishman Glantz
Wolfson et al
1144 West Fulton Street Ste 200
Chicago, IL 60607
(312) 541-0151

**Brian L Shaw**
Shaw Gusis Domanskis Et Al
1144 W Fulton Ste 200
Chicago, IL 60607
312-541-0151

**David E lieberman**

**Louis D Bernstein**
Much Shelist
191 N Wacker Dr
Suite 1800
Chicago, IL 60606

312-521-2000
Fax : 312-521-2100
Email:
lbernstein@muchshelist.com

**Mitchell L. Marinello**
Novack and Macey LLP
100 North Riverside Plaza
Chicago, IL 60606
312 419-6900
Fax : 312 419-6928
Email:
mmarinello@novackandmacey.com

**Patrick A Clisham**
Shaw Gussis Fishman Glantz
Wolfson
321 North Clark Street
Suite 800
Chicago, IL 60610
312 980-3836
Fax : 312 275-0584
Email: pclisham@shawgussis.com
*TERMINATED: 11/01/2005*

**Robert M Fishman**
1144 West Fulton St #200
Chicago, IL 60607
312-541-0151

**Susan Valentine**
Robinson, Curley & Clayton
300 S. Wacker Drive
Suite 1700
Chicago, IL 60606
312 663-3100 Ext. 206
Fax : 312 663-0303
Email:
svalentine@robinsoncurley.com

**Trustee**
**Gregg Szilagyi**
Tailwind Services LLC
One South Wacker Drive
Suite 800
Chicago, IL 60606
312-634-4748
*TERMINATED: 09/21/2005*

represented by **Alex Pirogovsky**
(See above for address)

**Christopher L. Rexroat**
Ungaretti & Harris
3500 Three First National Plaza
Chicago, IL 60602
312 977-4885
Email: clrexroat@uhlaw.com

**David E Lierberman**

Kathleen Holper Champagne

**Melissa G. Melsher**
Ungaretti & Harris LLP
3500 Three First National Plaza
Chicago, IL 60602
312 977-4363

**Steven A Miller**

**Susan G Feibus**

**Theodore E Harman**
Ungaretti & Harris
3500 Three First National Plaza
Chicago, IL 60602
312-977-60602

*Trustee*
**Jay A Steinberg, ESQ**
35 E. Wacker Drive, Suite 1550
Chicago, IL 60601
312 505-2688

represented by **Barry A Chatz**
Arnstein & Lehr LLP
120 South Riverside Plaza Ste 1200

Chicago, IL 60606
312 876-7100
Email: bachatz@arnstein.com

**Collin B Williams**
Greenberg Traurig LLP
77 West Wacker Drive
Suite 2500
Chicago, IL 60601
312 456-8400
Fax : 312 456-8435
Email: williamsco@gtlaw.com

**George P Apostolides**
Arnstein & Lehr LLP
120 S Riverside Plaza
Suite 1200
Chicago, IL 60606
312 876-7102
Fax : 312 876-0288
Email:
gpapostolides@arnstein.com

**Jennifer E. Smiley**
Miller, Shakman & Hamilton
180 N. LaSalle Street
Suite 3600
Chicago, IL 60601

312 263-3700
Fax : 312 263-3270
Email:
jsmiley@millershakman.com

**Joy E Levy**
Arnstein & Lehr LLP
120 S Riverside Plaza
Suite 1200
Chicago, IL 60606
312 876-7880
Fax : 312 876-0288
Email: jelevy@arnstein.com

**Marc O. Beem**
Miller, Shakman & Hamilton
180 N. LaSalle Street
Suite 3600
Chicago, IL 60601
312 263-3700 Ext. 203
Fax : 312 263-3270
Email:
mbeem@millershakman.com

**Miriam R. Stein**
Arnstein & Lehr LLP
120 South Riverside Plaza
Suite 1200
Chicago, IL 60606
312 876-7119
Fax : 312 876-0288
Email: mrstein@arnstein.com

*U.S. Trustee*
**William T Neary**
Office of the U.S. Trustee, Region 11
219 S Dearborn St
Room 873
Chicago, IL 60604
312-886-5785

represented by **Kathryn Gleason**
Office of the U. S. Trustee, Region
11
219 S Dearborn Room 873
Chicago, IL 60604
312 886-3327
Email:
USTPRegion11.es.ecf@usdoj.gov

*Interim Trustee*
**Jay A Steinberg**

represented by **Diane F. Klotnia**
Miller Shakman & Hamilton
180 N. LaSalle Street
Suite 3600
Chicago, IL 60601
312 759-7223
Fax : 312 263-3270
Email:

dklotnia@millershakman.com

**Frederick E Vars**
Miller Sharkman & Hamilton
180 N LaSalle St, Ste 3600
Chicago, IL 60601

**Jennifer E. Smiley**
(See above for address)

**Marc O. Beem**
(See above for address)

**Micheal L Shakman**
Miller Shakman & Hamilton
180 N Lasalle St
Suite 3600
Chicago, IL 60601
312-263-3700

*Creditor Committee*
**The Official Committee of Unsecured
Creditors**

| Filing Date | # | Docket Text |
|---|---|---|
| 07/16/2008 | 4349 | (E)Order Denying for the Reasons Stated on the Record Motion To Stay Pending Appeal. (Related Doc # 4328) . Signed on 7/16/2008. (Pruitt, Debra) (Entered: 07/17/2008) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/13/2008 14:54:23 | | |
| **PACER Login:** al0025 | **Client Code:** | 26157-0014 |
| **Description:** Docket Report | **Search Criteria:** | 99-35434 Fil or Ent: filed From: 1/1/2008 To: 8/13/2008 Doc From: 4349 Doc To: 4349 Term: included Format: HTML |
| **Billable Pages:** 3 | **Cost:** | 0.24 |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


Resource Technology Corporation,)   No. 99 B 35434
                                 )   Chicago, Illinois
                                 )   10:00 a.m.
                       Debtor.   )   July 16, 2008


TRANSCRIPT OF PROCEEDINGS BEFORE THE
HONORABLE EUGENE R. WEDOFF


APPEARANCES:

For the Trustee:              Mr. George Apostolides;

For Chiplease, Inc.:          Ms. Colleen McManus;

For the City and County
of Peoria:                    Ms. Linda Kujaca;

For American Grading
Company and Congress
Development Company:          Ms. Sara Lorber;


Court Reporter:               Amy Doolin, CSR, RPR
                              U.S. Courthouse
                              219 South Dearborn
                              Room 661
                              Chicago, IL  60604.

2

1          THE CLERK:  Resource Technology

2  Corporation, 99 B 35434.

3          MS. LORBER:  Good morning, Your Honor.

4  Sara Lorber on behalf of American Grading Company and

5  Congress Development Company.

6          MS. KUJACA:  Good morning, Your Honor.

7  Linda Kujaca on behalf of the City and County of

8  Peoria.

9          MR. APOSTOLIDES:  Good morning, Your

10 Honor.  George Apostolides on behalf of Jay

11 Steinberg, not individually, but solely as Trustee.

12         MS. McMANUS:  Good morning, Your

13 Honor.  Colleen McManus for Chiplease, Incorporated.

14         MR. CAMPBELL:  Good morning, Your

15 Honor.  John Campbell on behalf of 200 West Partners

16 Limited Partnership.

17         THE COURT:  Okay.  I see that you have

18 given me an agenda that lists what you want to do,

19 but why don't you tell me before we get into that

20 what's going on here.

21         MR. APOSTOLIDES:  What's going on is

22 back in -- earlier in this year, Chiplease made a

23 request that the trustee make a demand under debtor's

24 insurance to cover at least some of the Chapter 7

25 claims.

3

1          We made that demand on the insurance

2   company, Chubb, back in April.  We have received

3   confirmation from Chubb that they have received the

4   claim and they are looking at it.  We haven't heard

5   from them yet whether or not they are going to be

6   covering or not.

7          We have advised them -- we advised

8   them of the June date at the time that the initial

9   demand was made.  After the July date, today's date

10  was set last month, we advised them of this date.  We

11  haven't heard anything.  We haven't gotten a

12  follow-up.  We have tried to find out where they are

13  in the process, and the answer is, you know, it is

14  coming.  So...

15          THE COURT:  Do they have any

16  obligation under their policy to respond in a given

17  time to any demand made under the policy?

18          MR. APOSTOLIDES:  I'm not aware of

19  that.

20          THE COURT:  Well, that's kind of a

21  bizarre situation where an insurance company could be

22  liable on a claim and they can just wait indefinitely

23  before responding to the claim.

24          MR. APOSTOLIDES:  I don't know if they

25  -- I don't know the policy law.

4

1    THE COURT:  Well, I suppose that would

2 be something to look into.  Even if there is not

3 something in the policy, there might very well be

4 something from case law that would require them to

5 respond promptly, so you could look into that.

6                THE COURT:  What else is going on in

7 the case that's affecting the administration?

8                MR. APOSTOLIDES:  That's affecting --

9                THE COURT:  Because we've got a

10

11 number, as you've indicated in this agenda, a number

12 of Chapter 7 administrative claims that you are

13 asking to be continued.  At some point this case has

14 got to be wrapped up, and I'm just wondering what

15 your plans are for having that done.

16                MR. APOSTOLIDES:  Well, Your Honor,

17 there was some discovery that occurred on at least

18 some of these claims involving Chiplease and the

19 claimants.

20                THE COURT:  Okay.

21                MR. APOSTOLIDES:  Given Chiplease's

22 responsibilities under the settlement agreement.

23                THE COURT:  Yes.  Yes.  Chiplease is

24 the real party in interest.

25                MR. APOSTOLIDES:  Right.

4

1                THE COURT:  Well, I suppose that would

2 be something to look into.  Even if there is not

3 something in the policy, there might very well be

4 something from case law that would require them to

5 respond promptly, so you could look into that.

6                MR. APOSTOLIDES:  I will do so.

7                THE COURT:  What else is going on in

8 the case that's affecting the administration?

9                MR. APOSTOLIDES:  That's affecting --

10                THE COURT:  Because we've got a

11 number, as you've indicated in this agenda, a number

12 of Chapter 7 administrative claims that you are

13 asking to be continued.  At some point this case has

14 got to be wrapped up, and I'm just wondering what

15 your plans are for having that done.

16                MR. APOSTOLIDES:  Well, Your Honor,

17 there was some discovery that occurred on at least

18 some of these claims involving Chiplease and the

19 claimants.

20                THE COURT:  Okay.

21                MR. APOSTOLIDES:  Given Chiplease's

22 responsibilities under the settlement agreement.

23                THE COURT:  Yes.  Yes.  Chiplease is

24 the real party in interest.

25                MR. APOSTOLIDES:  Right.

5

1          THE COURT:  Rather than the estate.

2          MR. APOSTOLIDES:  So maybe Ms. McManus

3    would be in a better position to tell you exactly

4    what the status is on discovery of each of the

5    claims.

6          THE COURT:  Okay.  Well, I think all I

7    need to know from you is what you just told me, that

8    all -- if it's true that these matters are in the

9    process of either discovery or negotiated settlement,

10   but we ought -- to the extent that the claimants want

11   a prompt resolution, we ought to be working toward

12   either a trial or some deadline for the conclusion of

13   settlement discussions.

14         MR. APOSTOLIDES:  Maybe what we ought

15   to do, Judge, is set those today or we can come back

16   in 30 days with, hopefully, knowledge.  And then the

17   insurance issue, we can set all those dates at that

18   time.

19         THE COURT:  I would be happy to do

20   that if that is the pleasure of the claimants.  I

21   think they are entitled to be heard on this matter.

22         Okay.  So let's do that then.  With

23   that understanding of what's going on, first of all,

24   to the extent that we've got any Chapter 11 claims on

25   the call today --

6

1        MR. APOSTOLIDES:  None of them are up

2   today.

3        THE COURT:  Okay.  They're not up,

4   today.  All that's up today are Chapter 7

5   administrative claims.

6        MR. APOSTOLIDES:  Yes.

7        THE COURT:  Okay.  Congress

8   Development is first on the list.

9        MS. LORBER:  Yes, Your Honor.  We want

10  to move forward.  We will agree to this 30-day

11  extension.  We came in this morning, we received the

12  agenda just like the court.  We'll agree to this

13  extension, but we want dates set at the next hearing.

14        This is being carried along from time

15  to time.  We have no idea what's going on.

16        THE COURT:  Okay.  Well, you and I

17  have the same viewpoint.

18        MS. LORBER:  Right.

19        THE COURT:  That's what will be done.

20  And I think that's what should be done with all of

21  these claims.  To the extent that they have been

22  resolved in the next 30 days, terrific.  Give me an

23  agreed order.  To the extent they haven't been

24  resolved, we'll issue trial orders on all of them.

25  Okay?

7

1    Now, is there any of the claimants
2    here that wants to say anything more about their
3    request for payment of administrative expense?
4    (No response.)
5    THE COURT:  Okay.  Fine.  Then we'll
6    just see you in the 30-day date.  Now 30 days from
7    today, we're in the middle of July.  The middle of
8    August is available.  So we could give you the 13th
9    or the 19th, whichever you prefer.
10    MR. APOSTOLIDES:  The 19th would be
11    preferable, Your Honor.
12    THE COURT:  Okay.  Let's go to the
13    19th then.  It's as close to the middle as I can get
14    it.
15    MR. APOSTOLIDES:  At 10:00 o'clock?
16    THE COURT:  Yes, 10:00 o'clock.  And
17    that would be on all of these claim objections.
18    Now, the two items on the agenda --
19    MS. LORBER:  Can I add one more thing?
20    Can we also set that for a report on the insurance?
21    I know that's the intent, but I just want to make
22    sure that we'll get a report on --
23    MR. APOSTOLIDES:  Absolutely.
24    MS. LORBER:  -- the status of
25    insurance by that time.

8

1          THE COURT:  Okay.  The application for

2   compensation by trustee's counsel, okay, the only

3   reduction here is going to be $205 for excessive time

4   in preparing the fee application.  Apart from that,

5   the fees will be allowed as requested without

6   objection.

7          MR. APOSTOLIDES:  Thank you, Your

8   Honor.

9          THE COURT:  And we have findings that

10  reflect that, if you can give me an order consistent

11  with the findings.

12         MR. APOSTOLIDES:  Sure.

13         THE COURT:  Okay.  Then the remaining

14  item is Chiplease's motion for stay pending appeal.

15         Ms. McManus, I really think that the

16  critical question here is likelihood of success on

17  the merits.  And the motion for the stay misconstrues

18  the basis for the ruling that I gave last time.

19         My ruling was not based on the notion

20  that Chiplease had not paid at least $500,000 in

21  administrative expenses.  It was premised on the

22  notion that the $500,000 was intended by the

23  agreement in the settlement, as incorporated into the

24  court's order, that the $500,000 be security for

25  payment by Chiplease; that the $500,000 was to be

9

1   held in what amounted to an escrow account throughout

2   the pendency of the case to assure that as

3   administrative expenses were incurred they would be

4   paid by Chiplease.

5          So it was in the nature of a piece of

6   collateral assuring Chiplease's performance of its

7   obligation.  The $500,000 deposit was required to be

8   maintained, not expended.  The $500,000 was not,

9   under the agreement that was entered into between

10  Chiplease and the trustee, a down payment on

11  administrative expenses.  It was a security account.

12         Because it was a security account, it

13  should have been paid at the outset and maintained in

14  the control of the law firm who was designated from

15  the beginning of the time that the settlement was

16  entered into through today.  And because that was not

17  done, to comply with the court order and to enforce

18  the court order according to its terms, would put the

19  account in the position it would have been had

20  compliance with the order been performed.

21         That performance would have allowed

22  the holder of the account to obtain interest.  And as

23  I said earlier, there would have been a fiduciary

24  duty to obtain interest on that sum.  And, therefore,

25  it is appropriate both that the payment be made by

10

1  Chiplease and that it be made with the interest that

2  would have been accrued had Chiplease complied with

3  the order in the first place.

4             Now, you can disagree about my

5  interpretation of the order and take whatever remedy

6  you have by way of an appeal from the orders that

7  I've entered, but that's the issue.  I believe that

8  the interpretation I gave to the settlement with the

9  trustee and to the court order implementing that

10 settlement is pretty clearly correct.

11            And, therefore, I think there is very

12 little likelihood that Chiplease will succeed in its

13 appeal.  But if you disagree, obviously, go to the

14 district court and ask the district court for a stay.

15            MS. McMANUS:  We do disagree, Your

16 Honor.

17            THE COURT:  Okay.

18            MS. McMANUS:  I'll just make a couple

19 of points, if I may?

20            THE COURT:  Well, why don't you make

21 them to the district court, because I don't think

22 you're going to persuade me.  And you don't really

23 need to make an argument now to make the argument to

24 the district court.

25            MS. McMANUS:  That's fine, Your Honor.

11

1   Thank you.

2                        THE COURT:  Okay.  Thank you.

3                        MS. McMANUS:  Thank you.

4                        MR. APOSTOLIDES:  Thank you, Your

5   Honor.

6                        THE COURT:  And that's all for today.

7                        (Which were all the proceedings had in

8                        the above-entitled cause, July 16,

9                        2008, 10:00 a.m.)

10  I, AMY B. DOOLIN, CSR, RPR, DO HEREBY CERTIFY
    THAT THE FOREGOING IS A TRUE AND ACCURATE
11  TRANSCRIPT OF PROCEEDINGS HAD IN THE ABOVE-
    ENTITLED CAUSE.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        IN THE UNITED STATES DISTRICT COURT
2           NORTHERN DISTRICT OF ILLINOIS
                  EASTERN DIVISION

3

4    IN RE:  RESOURCE TECHNOLOGY CORPORATION

5    CHIPLEASE, INC.,                    )
6                    Movant,             )    Docket No. 08 C 4040
                                         )
7            vs.                         )
                                         )    Chicago, Illinois
8    JAY STEINBERG,                      )    July 17, 2008
                                         )    10:10 a.m.
9                    Trustee.            )

10                  TRANSCRIPT OF PROCEEDINGS
11       BEFORE THE HONORABLE MATTHEW F. KENNELLY

12   APPEARANCES:

13

14   For the Plaintiff:      MUCH, SHELIST, DENENBERG, AMENT &
                             RUBENSTEIN, P.C.
15                           BY:  MS. COLLEEN E. MC MANUS
                             191 North Wacker Drive, Suite 1800
16                           Chicago, Illinois  60606

17
     For the Defendant:      ARNSTEIN & LEHR, LLP
18                           BY:  MR. GEORGE P. APOSTOLIDES
                             120 South Riverside Plaza
19                           Suite 1200
                             Chicago, Illinois  60606

20                           SEYFARTH, SHAW, LLP
                             BY:  MS. SARA E. LORBER
21                           131 South Dearborn Street
                             Suite 2400
22                           Chicago, Illinois   60603

23
            LAURA M. BRENNAN - Official Court Reporter
24            219 South Dearborn Street - Room 2102
                   Chicago, Illinois  60604
25                     (312) 427-4393

1    above the $500,000.  They asked for the security to be

2    increased to $5 million, and I don't want to speak for her,

3    but the reason for that was essentially because in the

4    intervening two years, there has been some sense of what 'the

5    value of those claims is.

6            THE COURT:  The numbers were looking way higher.

7            MR. APOSTOLIDES:  The numbers were looking higher,

8    and there was also some testimony on the stand regarding the

9    financial viability of Chiplease.

10           So as a result of that concern, Ms. Lorber filed a

11    motion to increase the amount of security from 500,000 to 5

12    million.

13           After her motion was filed but before it was

14    initially presented to Judge Wedoff, there was a motion for

15    withdrawal filed by Mr. Jordan, who was now at the Polsinelli

16    firm.  He had changed firms, and a motion for substitution was

17    filed by the Much Shelist attorneys, one of whom was Ms.

18    McManus.

19           We asked Mr. Jordan for an accounting with regard to

20    the $500,000, where it was.  The responses that we received

21    were vague.  We talked to Mr. Bernstein, Ms. McManus' partner.

22    He said, talk to Mr. Jordan.

23           The long and short was the $500,000 we thought -- was

24    never deposited.  We thought that it should have been.  We

25    filed our response to Ms. Lorber's motion.

1    The parties couldn't agree on an interest number.
2    Chiplease took the position that interest was not appropriate.
3    We went back to Judge Wedoff eight days later on June 25th, at
4    which time he ordered that interest in the amount of 47 '
5    thousand, I think, 362 dollars or so should be deposited at an
6    account with the trustee or with the estate as well as the
7    $500,000 for the reasons that I have already said effectively.
8    If the estate had been depositing it, it would have
9    had to have put it in an interest-bearing account, and the
10   interest rate that was selected was one that -- one of the
11   federal rates.
12   THE COURT:  Okay.
13   MR. APOSTOLIDES:  Ms. McManus' client then filed a
14   notice of appeal of that, and that is the appeal.
15   THE COURT:  That is this appeal.
16   MR. APOSTOLIDES:  Right, this appeal.
17   They then filed a motion for stay in the bankruptcy
18   court to stay the enforcement of the order requiring the
19   deposit of the $547,000 and change pending the resolution of
20   the appeal.  We opposed that.  Ms. Lorber opposed that.  Those
21   are the papers that you have in front of you.
22   THE COURT:  Right.
23   MR. APOSTOLIDES:  That was heard by Judge Wedoff
24   yesterday, and he denied their motion for effectively the
25   reasons that I have said already.

1    And, in short, the reasons that we have given in our
2    response -- I know you have had a very short period of time to
3    read it -- are the $500,000 was required by the settlement
4    agreement and by the order of the bankruptcy court.  That
5    money was never deposited even though everybody, including the
6    estate, was under the impression that it should have been
7    deposited.
8    Under the settlement agreement, there is a res --
9    there is a mechanism for resolving the Chapter 7 operating
10   expense claims.  The way it works is that effectively the
11   trustee is supposed to make a demand on Chiplease.
12   THE COURT:  That is what I was going to ask.
13   Let's say that somebody had deposited -- let's say
14   that Chiplease had written a check to the Dykema firm or
15   however you do it for 500,000.  That was supposed to sit in an
16   account somewhere, and you say it should have been in an
17   interest-bearing account.  How would that money have gotten
18   disbursed to pay already allowed administrative expenses?
19   MR. APOSTOLIDES:  The first part of that answer is
20   there have to be already allowed administrative expenses.
21   THE COURT:  Right.
22   MR. APOSTOLIDES:  All the Chapter 7 administrative
23   expenses have been continued generally.  There has not been
24   any finding that any Chapter 7 allowed operating expenses --
25   THE COURT:  There have been none allowed.

1    MR. APOSTOLIDES:  -- have been allowed, right.

2    THE COURT:  Do you have an understanding as to -- and

3    I'm obviously going to ask Ms. McManus this, but do you have

4    an understanding as to what it was that was paid with the

5    $500,000 that Chiplease says it paid via Dykema Gossett?

6    MR. APOSTOLIDES:  From my understanding, and there

7    was an affidavit filed after Judge Wedoff had already made his

8    oral ruling on this, Chiplease paid some of its consultants.

9    I think it paid some of its employees maybe.

10    THE COURT:  Are those --

11    The things that it paid, are they all items of

12    expense as to which there is some sort of a pending claim for

13    allowance of an administrative expense?

14    MR. APOSTOLIDES:  No, and not only that.

15    THE COURT:  Would those be administrative expenses?

16    MR. APOSTOLIDES:  I think --

17    THE COURT:  Some might.

18    MR. APOSTOLIDES:  -- some of the -- the employees

19    have already filed an administrative expense claim; so that

20    would be.

21    But consultants -- a lot of the consultants' bills

22    are from after the time that the trustee stopped operating.

23    See, there is a distinction here which I want to

24    raise to your Honor.  What Chiplease is responsible for is

25    Chapter 7 administrative operating expenses.  Operating

1  expenses are, as I understand it --

2  THE COURT:  Operating expenses.

3  MR. APOSTOLIDES:  Yes, expenses while the trustee was

4  still operating the company which he ceased doing in October

5  of 2006.

6  THE COURT:  So what you are saying is that at

7  least --

8  MR. APOSTOLIDES:  -- March of 2006.

9  THE COURT:  -- at least some of the consultant

10  expenses that you think they paid would not have fallen within

11  that category because they postdate the period of time after

12  which the company stopped operating.

13  MR. APOSTOLIDES:  That's right.

14  THE COURT:  Okay.

15  MR. APOSTOLIDES:  So that's the first part of the

16  answer to your question.

17  The second part is once a Chapter 7 operating expense

18  is allowed, the trustee is supposed to make a demand on

19  Chiplease to pay it.  If Chiplease has a dispute with that,

20  they are supposed to -- I think it's file some type of paper

21  indicating that it's disputed.  It goes before the Court, and

22  then there is supposed to be --

23  THE COURT:  It's actually in the paragraph that Ms.

24  McManus quoted in her motion.  That is the procedure.

25  MR. APOSTOLIDES:  And there is a litigation

1  mechanism, yes, by which the amount of the claim is to be

2  fixed.

3          THE COURT:  But you are saying basically, not even

4  there yet, and that is why you are arguing that the $500,000

5  and whatever it was that Chiplease says it paid really is a

6  nonissue here, it's a nonfactor, because that's a different

7  $500,000 than what the settlement agreement was talking about.

8          MR. APOSTOLIDES:  That's exactly right, and under no

9  circumstances would the estate have allowed Chiplease to say,

10  well, this is an expense and this is an expense and draw out

11  of that money.

12          THE COURT:  Because that is up to Judge Wedoff in the

13  first instance.

14          MR. APOSTOLIDES:  Exactly.

15          THE COURT:  Do you want to say anything to supplement

16  what he said?

17          MS. LORBER:  Yes.  I just wanted to add also that

18  Judge Wedoff made it clear also that the $500,000 was intended

19  as security to secure the performance of the obligation to pay

20  the expenses.

21          THE COURT:  That's what I would have assumed.

22          MS. LORBER:  Right.  So it wasn't as if it got -- you

23  know, it would be used up for the first 500 and then there was

24  no -- you know, anyone who had an operating expense above that

25  amount had no security.

1    I believe at the first hearing he indicated that

2  after all allowed -- after all of the Chapter 7 administrative

3  expense claims were adjudicated, then that money would be

4  distributed.

5    THE COURT:  Well, I don't know about that.

6    MS. LORBER:  That might not be.

7    THE COURT:  The paragraph of the settlement agreement

8  that Ms. McManus quotes is silent on that as to whether that

9  500 is -- whether it's first in, first out; first in, last

10  out, or whatever.

11    Okay, let me hear from Ms. McManus.

12    MS. MC MANUS:  Well, your Honor, I will say that the

13  gist of our argument is that we believe the parties and the

14  bankruptcy court are now trying to alter the terms of the

15  settlement agreement.

16    THE COURT:  And you said that in your papers, and I'm

17  trying to get a handle on exactly what it is that you think is

18  being altered.

19    MS. MC MANUS:  I will take your Honor through that in

20  no particular order.

21    Number one, the settlement agreement, in particular

22  this paragraph, does not require interest.

23    THE COURT:  Okay, pause there.

24    What Mr. Apostolides said is that the settlement,

25  number one -- I will sort of reconstruct the reasoning.

1         Number one, the settlement agreement said put

2    $500,000 with Dykema Gossett.

3         Number two, he says, if that had happened, it would

4    have had to go in an interest-bearing account.

5         Number three, it, therefore, would have earned

6    interest.

7         Number four, since number one never happened, it

8    really isn't a new obligation.  It's basically putting people

9    back in the position they would have been if the money had

10   been deposited in the first place.

11        What is wrong with that argument?

12        MS. MC MANUS:  Number two of your Honor's list, which

13   is that --

14        THE COURT:  It would have had to have been --

15        MS. MC MANUS:  -- it would have earned interest.

16        Not only is that not in the settlement agreement, but

17   when I talked to Greg Jordan and Pete Schmidt, who were the

18   Chiplease attorneys prior to us, they said that the type of

19   account at Dykema that this money would have been put into

20   would not necessarily have been an interest-bearing account.

21        THE COURT:  Do you know why?

22        MS. MC MANUS:  So I don't agree with the presumption.

23        THE COURT:  Do you know why?

24        MS. MC MANUS:  I don't know why.

25        THE COURT:  I mean, in the old days -- in the old

1    days, and I have been practicing -- or I have been a judge for

2    nine years, so everything is getting to be the old days for

3    me.   In the old days even before that, in the ancient days, we

4    will say, maybe 20 years ago, client trust accounts didn't

5    earn interest.   Then that law changed and you were allowed to

6    put them in interest bearing accounts.

7           Then the Illinois -- I don't know if it was the

8    Supreme Court or whoever it was that regulates those things --

9    came up with this mechanism by which the interest was going to

10   get taken off and put into a fund for, like, pro bono

11   activities and things like that.

12          Actually, why don't you pause there because I want

13   Mr. Apostolides or Ms. Lorber to explain to me what makes you

14   think it would have gone into an interest-bearing account.

15          MR. APOSTOLIDES:   What makes us think that it should

16   have gone into an interest-bearing account --

17          THE COURT:   Should have, yes.

18          MR. APOSTOLIDES:   -- and, again, the trustee had the

19   impression it was going into an interest-bearing account, is

20   that this money is for creditors.   This is not a client funds

21   account.   It's a little bit different.

22          This money is being set aside to pay claims, and so

23   there is no interest -- there's no issue really of why there

24   would -- why it would or would not be in an interest-bearing

25   account.   There's no reason not to put in an interest-bearing

1  account.

2         What Judge Wedoff said from the bench and,

3  unfortunately, I don't have the transcript, is that it would

4  be a breach of a duty, of a fiduciary duty, not to put it in

5  an interest-bearing account because funds that are being

6  reserved for creditors in effect have to be.

7         THE COURT:  I have got a 10-page, single-spaced

8  settlement agreement that presumably doesn't say anything

9  about interest one way or another.

10         MS. LORBER:  That's right.

11         THE COURT:  So I don't know whether I agree with

12  that.

13         Let's just say for purposes of discussion that you've

14  got a decent point.  Okay, that means it's 500, not 547.  So

15  talk to me about the 500.

16         MS. MC MANUS:  The problem with the 500, and I think

17  Mr. Apostolides sort of touched on this, and not inaccurately,

18  is that Chiplease has paid Chapter 7 operating expenses.  Now,

19  I'm not going to tell the Court that every single one of the

20  expenses it paid came before the cessation of the operations.

21  I know because I looked at the documents that some of them did

22  come after operations ceased, so I'm not going to hide the

23  ball on that.  But many of them came before operations ceased,

24  and they were things like insurance payments, utility bills,

25  employee payroll, consultants who went out to these different

1   sites and landfills and performed services.

2           So while they were not allowed claims per se in terms

3   of having an allowed order -- order allowing that claim before

4   the bankruptcy court, they were Chapter 7 operating expenses.

5           And to some extent -- and I'm not going to say all --

6   the Chapter 7 trustee did know that we were paying those.

7           THE COURT:  But this agreement, or at least the

8   paragraph of it you quote here, it contemplates that the money

9   is going -- that the 500 grand is going to be delivered to

10  Dykema Gossett, the law firm, and it really doesn't say

11  whether that is going to be used, as I said before, to pay the

12  first 500 or the last 500 or the middle 500 or whatever.

13          But what it doesn't say is that Chiplease gets to

14  decide to get rid of -- you know, to spend out the 500 on its

15  own motion, as we might say in a court.  It basically says,

16  okay, you know, Chiplease is going to be requested to pay

17  additional operating expenses, and that's going to happen by

18  way of a written notification by the trustee, and it's only

19  after that happens; so why should I even care, frankly, that

20  Chiplease paid money in some other way.

21          And then my next question is going to be:  Where did

22  that money come from?  I mean, in other words, you said in

23  your motion that they caused Dykema Gossett to disburse the

24  money.  From where?  Where did it come from?

25          MS. MC MANUS:  I can answer that first, your Honor.

1  Chiplease paid some of these expenses that we are talking

2  about itself --

3          THE COURT:  Directly.

4          MS. MC MANUS:  -- on its own account, not related to

5  Dykema or not at Dykema.

6          It also had money, and, again, it didn't deposit at

7  closing the 500,000, but it did deposit money into a Dykema

8  account.

9          THE COURT:  For what purpose?

10          MS. MC MANUS:  To pay expenses.

11          THE COURT:  Okay.

12          MS. MC MANUS:  Then Dykema checks -- and I have some

13  exhibits that were attached to the John Connolly affidavit.

14  Some Dykema checks caused by Chiplease or John Connolly

15  working for the estate and with Chiplease, Dykema then wrote

16  checks for those operating expenses.  So there was Chiplease

17  money at Dykema that was written on Dykema checks to pay

18  expenses --

19          THE COURT:  Okay.

20          MS. MC MANUS:  -- if that makes sense.

21          Again, I'm not saying that it's the same as the

22  $500,000 deposit.

23          THE COURT:  Was that money --

24          Well, I guess maybe I need to ask a more precise

25  question because presumably Dykema Gossett isn't -- you know,

1   hasn't become an eleemosynary institution where they are just
2   paying out money on their own.  They are not going to pay out
3   money that a client hasn't given, okay.
4           MS. MC MANUS:  Right.
5           THE COURT:  So was that money given or deposited at
6   Dykema Gossett at some date at or around the time or after the
7   time that the settlement agreement was finalized?
8           MS. MC MANUS:  I can't tell your Honor the dates.  I
9   have not seen account statements.
10          THE COURT:  Because I'm trying to get a handle on why
11  that money was put at Dykema Gossett in the first place.  I
12  mean, every now and then clients pay law firms money as sort
13  of an advance on fees which would have been money deposited
14  for a completely different purpose, and I suppose it's
15  possible that they could have said to Dykema Gossett, hey, you
16  know, you're probably not going to use that whole 500,000, I
17  want you to take 150,000 of it and pay so and so, which would
18  have been something to put there for a completely different
19  purpose.
20          MS. MC MANUS:  Well, and, your Honor, I guess that
21  goes to another point I was going to make, and Judge Wedoff
22  went through this yesterday and we disagreed, and I know the
23  settlement agreement, this paragraph we are talking about,
24  paragraph 11, calls the $500,000 adequate security, and so I
25  understand that is where everyone is coming up with this

1    argument that it had to be sort of set aside and left aside,

2    but it does say $500,000 to be used to pay the expenses.

3    So my argument would be, well, that's what Chiplease

4    did.  They used it to pay the expenses.

5    THE COURT:  You know, honestly, I tend to agree with

6    you that the agreement is silent on that, and, I mean, I

7    suppose somebody could provide me with some sort of evidence

8    that you could consider that would permit an interpretation of

9    the contract that says that that is all to be held there until

10   kind of the end of the day.  But, really, I don't think that

11   is the issue.

12   The issue is whether it's appropriate to give

13   Chiplease credit for expenses that it paid basically on its

14   own without dealing in any way with the procedure that is

15   contemplated in the very paragraph of the settlement agreement

16   that says put the $500,000 in here.  In other words, as I said

17   a minute ago, that paragraph of the settlement agreement says

18   give Dykema Gossett a half a million dollars; the estate is

19   going to pay $150,000; and after that, Chiplease is going to

20   be requested to pay any additional operating expenses.

21   And what is going to happen is that the trustee will

22   say in writing, pay this, and Chiplease has a period of time

23   to dispute it, and if they don't dispute it, they pay it; if

24   they do dispute it, it gets resolved, and then they have to

25   pay whatever they are told to pay.

1        That is not what happened here.  I mean, it seems to

2   me that it's hard to come up with a logical interpretation of

3   this agreement that says that, okay, the $500,000 go there and

4   you can get credit for payments that you have made even if

5   this procedure wasn't even followed, and particularly in a

6   situation where nobody is really allowed an administrative

7   expense.  I mean, it's entirely possible that some of the

8   stuff you're talking about could be subject to objections, and

9   it might not ever get paid, and we have no clue --

10        MS. MC MANUS:  I suppose that's possible.

11        THE COURT:  We have no clue at this point.  At least

12   I have no clue.

13        MS. MC MANUS:  My response to part of that, but,

14   again, I can't say it for certain with all of the expenses, is

15   that for at least some of those expenses that were being paid,

16   the trustee knew about them, and that is found in the John

17   Connolly affidavit where he was literally communicating with

18   the trustee and the trustee's account himself in saying --

19   again, on some occasions; I'm not going to say all -- that he

20   was paying X and he was paying Y.

21        THE COURT:  Let me jump ahead to another issue, and

22   it's this issue of, you know, hardship or whatever you want to

23   call it.  I want to preface this by saying, and I'm not sure

24   which way that cuts.  I mean, the argument that, hey, we

25   really can't afford to put another $500,000 in there might be

1  an argument that, well, that's why we really need to find out
2  whether you can put that $500,000 in there because whatever it
3  is, it's at least described as "adequate security."
4        But talk to me about that. I mean, that is mentioned
5  in a -- I don't remember if it was a later paragraph or a
6  footnote or something in the motion.
7        MS. MC MANUS: It's paragraph 19, your Honor. It's
8  the irreparable harm.
9        Our position is basically what I just stated, which
10 is we have already gone to the expense of paying all these
11 operating expenses. We have expended almost a million and
12 maybe a little bit more when you total them up, your Honor.
13 It's not as though it's 500 on the nose.
14        It's almost a million dollars of expenses, and now we
15 are being asked to put in what we see as another 500,000 plus
16 compound interest, which we disagree with, and that will cause
17 us to have to suddenly, because the order is effective today,
18 go and liquidate other assets when we were not anticipating
19 doing that. We were anticipating that we were paying
20 operating expenses as they went, and we will have to go and
21 liquidate other assets to make this money available in a
22 trustee account when really -- and this takes me to another
23 point which we can address now or later -- this is going into
24 now the trustee account when it should have been in my
25 client's attorney's account.

1    So the hardship is that we have to go and liquidate

2  assets when we have already expended moneys, basically twice

3  as much as the $500,000, to pay expenses, and no one said

4  anything, and we have been doing this procedure for two years,

5  and now today we have to go and --

6         THE COURT:  When you say no one said anything --

7         MS. MC MANUS:  -- liquidate.

8         THE COURT:  When you say no one said anything, you

9  alluded to this earlier --

10        Actually I think that may apply to us.

11   (Brief interruption.)

12        THE COURT:  We can go back to what we were doing

13 before.

14        Let me just supplement one thing.  I guess my

15 courtroom deputy was able to find out in the meantime.  I

16 don't know if you -- did you file a civil cover sheet when you

17 filed the notice of appeal?

18        MS. MC MANUS:  My secretary, your Honor, told me via

19 e-mail at the end of the day yesterday that she didn't

20 initially, but then she was either called or e-mailed and

21 required to do so, and then she did.

22        THE COURT:  Okay.  Well, the case actually has been

23 assigned, but, interestingly enough -- and it hasn't been

24 assigned to me, but it would come to me anyway -- it's been

25 assigned to Judge Pallmeyer.  Now, here is why I would be

24

1   doing it anyway.  Judge Pallmeyer is out of town, and I am --
2   and this is actually a quasi-official term around here -- I'm
3   Judge Pallmeyer's buddy judge, and I'm hearing her motions in
4   her absence.  So I would be hearing this anyway, so as luck
5   would have it.  But, you know, in terms of where it eventually
6   gets assigned or whether it gets reassigned, you will have to
7   deal with that at some point.
8           Okay, go ahead and finish what you were saying.
9           MS. MC MANUS:  Your Honor, I was just repeating
10  myself, I think, on the irreparable harm, and; that is, number
11  one, that we have already paid probably about a million
12  dollars in operating expenses.  So that money has gone out the
13  door, and we were not prepared to pay what we see as another
14  $500,000 plus compound interest on such a short basis.
15          I will say that Chiplease doesn't have a bunch of
16  checking accounts with a bunch of liquid cash in them.  We
17  would have to go and liquidate assets such as real estate that
18  are not terribly liquid, and that is nothing new to the
19  parties here because Chiplease has been under deposition and
20  trial testimony, and there have been questions about its
21  liquidity, frankly.
22          THE COURT:  And Judge Wedoff's order, did it give a
23  time frame?
24          MS. MC MANUS:  Today is the day.
25          THE COURT:  All right.

1    MR. APOSTOLIDES:  Keep in mind, that is the order
2 that was entered on June 25th.
3    THE COURT:  No, I understand.  The $500,000 was to be
4 deposited today.
5    Okay, I just want to hypothesize for a second.  Let's
6 say that this appeal had never happened and Judge Wedoff's
7 order is there.  It says deposit the money by today, and Ms.
8 McManus picks up the phone today and calls and says, hey, we
9 don't have the money right now because we're trying to sell
10 real estate and it's going to take us a month.
11    What would have been your step at that point?  Do you
12 go and ask to have him held in contempt or what?
13    MR. APOSTOLIDES:  We would have filed a motion for
14 rule to show cause as to why they should not be held in
15 contempt.
16    THE COURT:  Okay.
17    MS. LORBER:  May I add something on that point?
18    THE COURT:  One thing and then I'm ready to rule.
19    MS. LORBER:  And that is that the administrative
20 claimant, including my claimant's mother, we have been
21 defending our administrative claims against Chiplease
22 litigating with them.  And we are going down this road.  We
23 filed those claims, and we are defending them with the
24 expectation that they are going to get paid, and now we are
25 hearing that they can't post the $500,000.  What was --

1    There's 20, about 20 --

2    THE COURT:  20 million.

3    MS. LORBER:  -- over $20 million in administrative

4    claims against this entity that it's supposed to pay under the

5    settlement agreement.

6    If this settlement -- you know, if there is no money,

7    if they can't pay this $500,000, we need to know now before we

8    spend more money.  We have been in this case for years and we

9    have been litigating these administrative claims --

10    THE COURT:  Well, it's a '99 case, right?

11    MS. LORBER:  Yes, and we have been administrating --

12    and we have been defending these administrative claims for

13    almost two years.

14    THE COURT:  Well, all I'm going to say is that the

15    proposition that --

16    Basically what happened here, if I'm recalling

17    correctly, is that Chiplease kind of took over the operation

18    of what was left of Resource Technology.  No, not really?

19    MS. LORBER:  Not really.

20    THE COURT:  Well, what was it, I mean, in a nutshell?

21    MS. LORBER:  Through the settlement, they obtained

22    the right to try to obtain assignment of many of the debtor's

23    executory contracts.

24    THE COURT:  The contracts with all the landfills.

25    MS. LORBER:  With all the landfills, right.

1    THE COURT:  And it didn't work out.

2    MS. LORBER:  Well, these are in various levels of

3    litigation and appeal and, you know.

4    THE COURT:  Well, most of the ones that I have seen

5    on appeal, the deal hasn't --

6    MS. LORBER:  It's not worked out, that's correct.

7    MR. APOSTOLIDES:  Some of them, it has, though,

8    Judge, and I just want to raise --

9    THE COURT:  I don't want anybody to raise anything

10   else.

11   MS. MC MANUS:  Your Honor, can I --

12   THE COURT:  All I was going to say is that the

13   proposition -- I have to believe that the proposition that

14   Chiplease is not going to be able to pony up $20 million

15   cannot possibly come as a tremendous shock to anybody, at

16   least not on an immediate basis.  I mean, seriously, but that

17   really doesn't have anything to do with this as far as I'm

18   concerned, and so I'm now going to rule on this.

19   MS. MC MANUS:  Your Honor, may I make one more point

20   before you rule?  And it's a point that I didn't get to.  I

21   initially said that the gist of our problem was that everyone

22   is trying to change the terms of the settlement.  I didn't get

23   to one of those points that I'd like to make briefly, if I

24   may, and; that is, that the money is supposed to be deposited

25   into Arnstein & Lehr, which is Mr. Apostolides' firm, so the

1  trustee's counsel's firm.

2          Number one, that wasn't what the settlement provided

3  for.  It provided for Dykema, and it provided for Chiplease's

4  counsel for a reason because these funds are not the property

5  of the estate yet.  These funds still belong to Chiplease

6  until such time as there is an order allowing the claim and we

7  go through the payment procedure.

8          THE COURT:  Okay.

9          MS. MC MANUS:  So that is another problem we have

10  with how things --

11          THE COURT:  Well, I could change that.  Why shouldn't

12  I just make it Dykema?

13          MS. LORBER:  Dykema Gossett.

14          THE COURT:  One person gets to answer.

15          MR. APOSTOLIDES:  I think I'm the person who should

16  answer.

17          THE COURT:  All right.

18          MR. APOSTOLIDES:  First of all, Dykema is long gone.

19          THE COURT:  Okay.  So why shouldn't I make it Much

20  Shelist because they stand in the shoes of?

21          MR. APOSTOLIDES:  Because of the issue that arose

22  with regard to the original deposit, it should have been

23  deposited.  It wasn't deposited.  The trustee was led to

24  believe it was deposited.

25          THE COURT:  Well, honestly, with all due respect to

1   everybody involved, including you, you and Judge Wedoff,

2   somebody was asleep at the switch on that one. I mean, it's

3   easy. You tell somebody, you report back to the Court by such

4   and such a date whether you deposited the money. That is,

5   like, a no-brainer. I'm not even a bankruptcy lawyer and I

6   thought of that one.

7        And that's what I would do. That's what I would do.

8   I would say, okay -- if I order money to be deposited or if I

9   decline to stay in whole or in part, I'm going to say, you

10  know, it's to be deposited by such and such a date and

11  something is to be filed with the court confirming that it

12  was. That should have happened in the first instance, okay.

13       The standards for a stay pending appeal are

14  accurately set forth in the motion: Appellant is likely to

15  succeed on the merits, appellant will suffer irreparable

16  injury if there is no stay. A stay would, I think you want to

17  say, would not substantially harm other parties in the

18  litigation and it's in the public interest.

19       It's essentially the equivalent of the standards for

20  a preliminary injunction, and in that regard the -- in my view

21  at least, the sort of sliding scale test that the Seventh

22  Circuit came up with in the case of Roland v. Dresser, which

23  was decided probably about 23 years ago at this point, 24,

24  applies. And here is my view of this.

25       First of all, I don't think that at least on the

1   $500,000 aspect of it that Chiplease has a particularly strong
2   likelihood of succeeding on appeal.  I think the agreement
3   with regard to the deposit of the $500,000 is reasonably clear
4   and probably more than reasonably clear, and it didn't
5   contemplate that that $500,000 was going to be used by
6   Chiplease basically making decisions on its own about what
7   unallowed administrative expenses are likely to be allowed and
8   are likely to be paid and then go ahead and pay them.
9          On the other hand, I think Chiplease has a decent
10  likelihood of success on the question of interest because I
11  don't see anything in the agreement or the order by Judge
12  Wedoff that required placement of this in an interest-bearing
13  account.  The agreement is silent on that, and like I say, I
14  would certainly be willing to entertain whatever parol
15  evidence or whatever you want to call it that people want to
16  offer, but I'm not persuaded as I sit here today that -- and
17  this is going to sound like a double negative because it is --
18  I'm not persuaded that Chiplease has little or no likelihood
19  of success on that.  It seems to me that unless there is
20  something in the contract or some other rule that lawyers
21  would operate under that would have required this to go in an
22  interest-bearing account that that probably would not have
23  been required.  So that's the likelihood of success issue.
24          Irreparable injury is kind of iffy, but, honestly, if
25  somebody is going to have to liquidate nonliquid assets, that

1   appeal that interest wasn't required, then Chiplease will get

2   that money back and they won't be out significantly because

3   they are not going to have to liquidate assets.  In other

4   words, it's going to be interest that is earned on the money

5   that they're putting in there right now, and so that is what I

6   have in mind in that regard.

7          And the reason that I think that it's appropriate to

8   deposit it at the law firm that represents Chiplease is that

9   that's what the agreement originally contemplated.  And I'm

10  going to require that there be a report filed by the Court by

11  Chiplease in some form that is under oath by somebody that

12  says that, you know -- let's say that report is to be filed by

13  the 25th of July, describing whether the order has been

14  complied with, and then I will set the case for a status

15  shortly after that and we'll see where we are.

16         MS. MC MANUS:  Your Honor, pardon me.  What time was

17  it on July 24th?  Was it 4:30?

18         THE COURT:  I said 4:30.

19         MS. MC MANUS:  Thank you.

20         THE COURT:  I'm going to set this over to the 29th of

21  July at -- yes, the 29th at July at 9:30 in the morning.

22         Now, what you are going to need to sort out in the

23  meantime is whose case this is.  I mean, the intention of

24  the -- when we modified the related case rules having to do

25  with bankruptcy cases, and this happened three or four years

1   ago after all the United cases came down and so on, the
2   intention of it was that appeals were going to go back to the
3   same judge.  And that has been -- I mean, that has been a
4   subject of discussion in judges' meetings and things like
5   that, none of which you have notice of, but that's the
6   intention.
7           So it seems to me that what ought to happen here --
8   and I think this happened in one or two of the other appeals,
9   and so there is a little bit of a track record.  Somebody made
10  a motion before me saying, this ought to really be your case,
11  Kennelly, and I ended up taking it, and I probably wrote a
12  minute order or at least made an oral ruling.  So my
13  suggestion would be that whoever's job it would be to do that
14  should make that motion, and, you know, maybe you can notice
15  it up for that same date --
16          MR. APOSTOLIDES:  Judge --
17          THE COURT:  -- if not sooner.
18          MR. APOSTOLIDES:  -- I would make the oral motion
19  now.
20          THE COURT:  Well, but I would rather you put it in
21  writing so that people have an opportunity to look at it and
22  object if they want to.
23          MR. APOSTOLIDES:  We will do it.
24          THE COURT:  Because that may have happened before Ms.
25  McManus' time actually.

1    MS. MC MANUS:  Perhaps.

2    MR. APOSTOLIDES:  I think that's right.

3    MS. MC MANUS:  Your Honor, I guess the only other

4    thing will be that on August 11th, the record is due to be

5    transmitted --

6    THE COURT:  Yes, I know.

7    MS. MC MANUS:  -- from bankruptcy to district court.

8    So I don't know if that gives us another case number or we

9    consolidate those.

10    THE COURT:  No, I think this -- no, it will be under

11    --

12    If you have got that case number of 08 C 4040, which

13    my courtroom deputy seems to have confirmed, everything will

14    go up under that same case number.

15    MR. APOSTOLIDES:  All right.

16    MS. MC MANUS:  Okay.

17    THE COURT:  So now I'm going to need somebody to

18    prepare a draft order that embodies what I just said.  Show it

19    to everybody else and get it over to chambers some time this

20    afternoon.

21    MR. APOSTOLIDES:  I have one more question for you,

22    your Honor.

23    Would your Honor be willing to put in the order that

24    the $500,000 is to remain in this escrow account; it's not to

25    be drawn upon by Chiplease outside of the procedures?

1    THE COURT:  What I intended when I said this before

2  was to say it's to be deposited there and isn't to be

3  disbursed until further order of Court, and I'm going to leave

4  Court blank.  I mean, it could be me, it could be Judge

5  Wedoff, it could be somebody.  But the idea is that the money

6  doesn't go until the Court says otherwise.

7    MR. APOSTOLIDES:  I will put that in the order.

8    THE COURT:  All right.

9    MR. APOSTOLIDES:  Thank you, your Honor.

10    THE COURT:  All right, thanks.

11    MS. LORBER:  Thank you, your Honor.

12    MS. MC MANUS:  Thank you, your Honor.

13  (Which were all the proceedings had in the above-entitled

14  cause on the day and date aforesaid.)

15                C E R T I F I C A T E

16

17    I hereby certify that the foregoing is a true and

18  correct transcript of the above-entitled matter.

19

20  _____              _____

21  Laura M. Brennan
    Official Court Reporter                    Date
22  Northern District of Illinois

23

24

25

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| RESOURCE TECHNOLOGY | ) | |
| CORPORATION, | ) | Case No. 08 C 4040 |
| | ) | |
| Debtor. | ) | |

## ORDER

This matter coming to be heard on Chiplease, Inc.'s Emergency Motion for Limited Stay Pending Appeal of Bankruptcy Court Order (the "Motion"), due notice having been given the parties, responses having been served on the Court by the Estate of Resource Technology Corporation, by its counsel, and American Grading Co. and Congress Development Co., by their counsel, and the Court having heard argument from the parties, IT IS HEREBY ORDERED THAT:

1.      The Motion is granted in part for the reasons stated on the record;

2.      Chiplease, Inc. is ordered to deposit the sum of $500,000.00 in an interest-bearing account (the "Deposit") at the law firm of Much Shelist Denenberg Ament & Rubenstein, P.C. on or before July 24, 2008 at 4:30 p.m.;

3.      Chiplease, Inc. is to file a report under oath with both the Clerk of the United States Bankruptcy Court for the Northern District of Illinois and the Clerk of the United States District Court for the Northern District of Illinois on or before July 25, 2008 confirming that it has made the Deposit described in Paragraph 2;

4.      The Deposit is not to be disbursed without further order of either the United States Bankruptcy Court for the Northern District of Illinois or the United States District Court for the Northern District of Illinois;

5.      This matter is set for status on July 29, 2008 at 9:30 a.m. before Hon. Matthew F. Kennelly in Courtroom 2106, without further notice.


HON. MATTHEW F. KENNELLY

Date:  July 18, 2008